**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

MIKE MARICONDA, Individually and on behalf of all others similarly situated,

     Plaintiff,

 v.

FARMLAND PARTNERS INC.,
PAUL A. PITTMAN, and
LUCA FABBRI,

     Defendants.

_____

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND
_____

Plaintiff Mike Mariconda ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Farmland Partners Inc. ("Farmland" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased or otherwise acquired the publicly traded securities of Farmland between March 16, 2016 and July 10, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

4.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as Farmland is headquartered within this District and Defendants maintain offices in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased Farmland securities during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Farmland is an internally managed real estate company that owns and seeks to acquire high-quality North American farmland and makes loans to farmers secured by farm real estate. The Company is incorporated in Maryland and its principal executive offices are located at 4600 South Syracuse Street, Suite 1450, Denver, Colorado. Farmland's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FPI."

8.      Defendant Paul A. Pittman ("Pittman") has served as Executive Chairman and Chief Executive Officer of Farmland since its formation in 2014 and it's President since May 31, 2018.

9.      Defendant Luca Fabbri ("Fabbri") has served as Chief Financial Officer and Treasurer since the founding of Farmland.

10.     Defendants Pittman and Fabbri are sometimes referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

3

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12. The Company and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

13. Section 229.404 (Item 404) of Title 17 of the Code of Federal Regulations requires a registrant of securities with the SEC to disclose transactions with "related parties," which are defined by applicable accounting standards.

### Materially False and Misleading Statements and/or Omissions

14. On March 15, 2016, during aftermarket hours, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2015. The 2015 10-K was signed by Defendants Pittman and Fabbri, with Defendant Pittman signing on behalf of Farmland. The 2015 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

15. The 2015 10-K stated that only "7.8% of the total acres in [Farmland's] portfolio (representing approximately 12.75% of our total 2016 contractual rent) are leased to either

Astoria Farms or Hough Farms, our former related tenants" and that since these leases "were negotiated between related parties[,] their terms, including rent payable to [Farmland] may have been different if they were negotiated with unaffiliated third parties," stating in pertinent part:

> *The leases with our former related tenants were not negotiated on an arm's-length basis and we may not be able to renew those leases on similar terms or at all now that those tenants are with unaffiliated third parties.*
>
> As of the date of this Annual Report, 7.8% of the total acres in our portfolio (representing approximately 12.75% of our total 2016 contractual rent) are leased to either Astoria Farms or Hough Farms, our former related tenants. At the time the leases with our related tenants were negotiated Mr. Pittman had a 28.3% indirect partnership interest in, and controlled, Astoria Farms, and had an 18.75% indirect partnership interest in Hough Farms. Mr. Hough had a 4.3% indirect partnership interest in Astoria Farms and a 28.3% indirect partnership interest in Hough Farms. Mr. Hough manages the farming operations of both of our former related tenants. As such, the leases between us and our former related tenants, which have terms that range from one to three years, were negotiated between related parties and their terms, including rent payable to us may have been different if they were negotiated with unaffiliated third parties.

16.     On May 10, 2016, Farmland held a conference call with analysts and investors to discuss Farmland's first quarter of 2016 financial results. During the call, Defendant Pittman stated the following:

> So given that ***everything we have has been -- there's been an arm's length market transaction of some sort in the last two years***, we think acquisition cost is probably the safest judgment of value. If we get out another two or three years and a major portion of this portfolio has been held for five years or more, doing some third-party appraisals, for example, would make sense. But this idea that you hold something for a year and it's up 20%, that frankly I believe is hogwash. The market is more efficient than that.
>
> [Emphasis added].

17.     On May 10, 2017, the Company filed a Form 10-Q for the quarter ended March 31, 2017 (the "1Q 2017 10-Q") with the SEC, which provided the Company's first quarter 2017 financial results and position. The 1Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2017, and that "[t]here were no changes in the

Company's internal control over financial reporting during the quarter ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." The 1Q 2017 10-Q was signed by Defendants Pittman and Fabbri. The 1Q 2017 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

18.     The 1Q 2017 10-Q merely disclosed the following concerning Farmland's related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. During the three months ended March 31, 2017 and 2016, the Company incurred costs of $83,791 and $47,053, respectively, from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

19.     On July 21, 2017, the Company filed a Form 10-Q for the quarter ended June 30, 2017 (the "2Q 2017 10-Q") with the SEC, which provided the Company's second quarter 2017 financial results and position. The 2Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of June 30, 2017, and that "[t]were no changes in the Company's internal control over financial reporting during the quarter ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." The 2Q 2017 10-Q was signed by Defendants Pittman and

Fabbri. The 2Q 2017 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.     The 2Q 2017 10-Q merely disclosed the following concerning Farmland's related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. The Company incurred costs of $135,478 and $96,469, respectively, during the six months ended June 30, 2017 and 2016 and $51,687 and $49,416, respectively, during the three months ended June 30, 2017 and 2016 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

21.     On November 9, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which provided the Company's third quarter 2017 financial results and position. The 3Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of September 30, 2017, and that "[t]were no changes in the Company's internal control over financial reporting during the quarter ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." The 3Q 2017 10-Q was signed by Defendants Pittman and Fabbri. The 3Q 2017 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of

any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

22.     The 3Q 2017 10-Q merely disclosed the following concerning Farmland's related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. The Company incurred costs of $0.16 million and $0.14 million, respectively, during the nine months ended September 30, 2017 and 2016 and $0.02 million and $0.05 million, respectively, during the three months ended September 30, 2017 and 2016 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

23.     On March 5, 2018, during aftermarket hours, the Company filed a Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2017. The 2017 10-K was signed by Defendants Pittman and Fabbri, with Defendant Pittman signing on behalf of Farmland. The 2017 10-K also contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

8

24. The 2017 10-K merely disclosed the following concerning Farmland's related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman, the Company's CEO. During the years ended December 31, 2017, 2016 and 2015, the Company incurred costs of $0.2 million, $0.2 million and $0.1 million, respectively, from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's Consolidated Statements of Operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's Consolidated Statements of Operations. As of December 31, 2017 and 2016 the Company had outstanding payables to American Agriculture Aviation LLC of $0.01 million and $0.01 million, respectively.

Effective as of December 31, 2015, Mr. Pittman neither owns any direct or indirect interest in, nor has control of, Astoria Farms and Hough Farms. As of December 31, 2017 and 2016, 4% and 6%, respectively, of the acres in the Company's farm portfolio were rented to and operated by Astoria Farms or Hough Farms, both of which were related parties until December 31, 2015. Astoria Farms is a partnership in which Pittman Hough Farms LLC ("Pittman Hough Farms"), which was previously 75% owned by Mr. Pittman, had a 33.34% interest. The balance of Astoria Farms was held by limited partnerships in which Mr. Pittman was previously the general partner. Hough Farms is a partnership in which Pittman Hough Farms previously had a 25% interest. The aggregate rent recognized by the Company for these entities for the years ended December 31, 2017, 2016 and 2015 was $2.0 million, $2.5 million and $2.7 million, respectively. As of December 31, 2016 and 2015, the Company did not have any accounts receivable from these entities.

For the years ended December 31, 2017, 2016 and 2015, Pittman Hough Farms incurred $0, $0 and $0, respectively, in professional fees on behalf of the Company. These fees were reimbursed by the Company.

Effective as of December 31, 2015, Mr. Pittman does not own any interest in American Agriculture Corporation ("American Agriculture"). American Agriculture is a Colorado corporation that was 75% owned by Mr. Pittman and

25% owned by Jesse J. Hough, who provides consulting services to the Company. The Company reimbursed American Agriculture $0, $0 and $21,259, respectively, for general and administrative expenses during the year ended December 31, 2017, 2016 and 2015, which are included in general and administrative expenses in the consolidated statements of operations.

25.     The statements referenced in ¶¶14-24 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that Farmland artificially increased revenues by making loans to related-party tenants who round-tripped the cash back to Farmland as rent; (2) that as a result, Farmland's earnings during fiscal year 2017 were materially overstated; (3) the true extent and effect of Farmland's non-arm's length transactions; and (4) as a result, Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked reasonable bases at all relevant times.

## THE TRUTH EMERGES

26.     On July 11, 2018, before market hours, *Rota Fortunae* published a report stating, among other things, that "FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up." The report further stated that "FPI has neglected to disclose that the majority of its loans have been made to two members of the management team, including Jesse Hough, CEO Paul Pittman's long-time business partner," and "[w]e found evidence that strongly supports FPI has significantly overpaid for properties," stating in pertinent part:

**Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible**

Jul. 11, 2018 8:30 AM ET
by: Rota Fortunae

10

**Summary**

- We believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up.

- FPI has neglected to disclose that the majority of its loans have been made to two members of the management team, including Jesse Hough, CEO Paul Pittman's long-time business partner.

- A UCC shows "Pittman Hough" pledged shares of FPI for a loan then FPI's stock fell 30%, and two weeks after reaching an all-time low, FPI began lending to Hough.

- Four board members and FPI's president have resigned since FPI began lending to Hough, and in March, FPI dismissed its auditor.

- We found evidence that strongly supports FPI has significantly overpaid for properties; under normal circumstances, we estimate FPI is worth $4.85/share, but we think the shares are uninvestible.

*　　*　　*

When we started looking into FPI, we found it was playing classic accounting games like capitalizing part of the expense to lease CEO Paul Pittman's personal jet and excluding farms from its same-property rent number. But it was not until we reviewed hundreds of deed records in dozens of counties across the country that we came to believe that FPI faces a significant risk of insolvency.

**Our research leads us to believe that FPI is using its mortgage-lending program to artificially increase revenues by making loans to related-party tenants who roundtrip the cash back to FPI as rent and interest revenue. We believe these loans lack economic substance because, whenever they come due, FPI happens to acquire the property collateralizing the loan, like a bank buying a house at full price when the mortgage matures.**

**And the transactions follow a pattern, whereby FPI makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/new tenant. In total, we believe up to 6% of 2017 revenues and 310% of 2017 net income could be the result of transactions that are just moving money from one side of the desk to the other.**

While FPI discloses its loans, it has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now-bankrupt tenant (not disclosed), who after defaulting on an FPI loan (not disclosed) was bailed out when FPI acquired his properties, falsely reported the purchase as a loan and then lent him an additional $61,800 the day after he signed a lease with FPI for $61,750. Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant. In July 2017, FPI made a loan secured by one of Hough's properties, which FPI then acquired two weeks before the loan matured and leased back to him just days before FPI lent him another $5.25 Million, this time as the president of an inactive entity that corporate records show he has no affiliation with, and that is secured by land that deed records show he does not own.

Our opinion that FPI appears to be playing accounting games is further bolstered by a Colorado UCC filing that shows "Pittman Hough" pledged shares of FPI for a bank loan just days before FPI signed an agreement that Pittman later stated he thought would drive the stock price higher. He was wrong. Instead the stock tanked, and two weeks after hitting an all-time low, FPI made its first loan to Jesse Hough.

**While shareholders have expressed concern about FPI's ability to maintain its dividend, we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of dilutive debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency.**

And it appears that we are not the only concerned party. Since making its first loan to Jesse Hough in July 2017, four board members and FPI's president have resigned. And in March, FPI dismissed PWC for EKS&H (auditor for MusclePharm and Heska).

But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares carry significant downside. We found evidence that suggests FPI has significantly overpaid for properties. We estimate that under normal circumstances FPI would be worth $4.85 per share (45% below the current stock price). But there is never just one cockroach, and we have no confidence in FPI's financials. Accordingly, we think FPI is uninvestible.

\*       \*       \*

And we think shareholders should be concerned with Pittman's preferred method of property valuation. From the 1Q2016 conference call:

> *I don't put a lot of stock in annual appraisals... not because appraisers are bad, but you have to understand, they are forced to perform a certain process and their charge is to do a process based on that set of rules and regulations. It is not really answering the question what farms are worth, it's actually answering a question of what farms are worth under this very mechanical valuation approach, which has a whole set of errors embedded in it.*

He then states:

> *Given that everything we [acquired] has been an arm's length market transaction of some sort in the last two years, we think acquisition cost is probably the safest judgement of value."*

**We think these comments are absurd. First, we have many reasons to question the claim that all acquisitions were arm's length. Second, Pittman apparently thinks the appraisal process is a poor judgement of value, despite its widely accepted use across the real estate industry and its use by a direct competitor. Third, he thinks what he pays, even if he overpays, is the safest judgement of value.**

This is akin to saying that if someone paid $1 Million for a house in a neighborhood filled with $500,000 houses, that all of the properties would see a commensurate $500,000 increase in value just because one person was willing to overpay. And in fact, we have evidence that suggests FPI has overpaid for properties.

27.   On this news, Farmland's stock fell $3.37 per share, or over 38%, from its previous closing price to close at $5.28 per share on July 11, 2018, damaging investors.

28.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**CLASS ACTION ALLEGATIONS**

29.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Farmland during the Class Period and who were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether Defendants' acts as alleged herein violated the federal securities laws;

b.  whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.  whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.  whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e.  whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.  whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.  Defendants' made public misrepresentations or failed to disclose material facts during the Class Period;

b.  the omissions and misrepresentations were material;

c.  the Company's securities are traded in efficient markets;

d.  the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e.  the Company traded on NYSE, and was covered by multiple analysts;

f.  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

g.  Plaintiff and members of the Class purchased the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

h.  unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

36.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

38.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39.     This Count is asserted against the Company and the Individual Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

40.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

42.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Company and the Individual Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their

associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

43. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

44. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated, as a result of the Company's and the Individual Defendants' false and misleading statements.

45. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

46. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

47.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act

### Against The Individual Defendants

48.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

50.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which were materially false or misleading.

51.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the

meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

52.     The Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

53.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and postjudgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 17, 2018                    Respectfully Submitted,


*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
BERENS LAW LLC
2373 Central Park Boulevard, Suite 100
Denver, Colorado 80238
Telephone: (303) 861-1764
Facsimile: (303) 395-0393
Email: jeff@jberenslaw.com

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Laurence J. Hasson
Daniel Sadeh
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email:  bernstein@bernlieb.com
        lhasson@bernlieb.com
        dsadeh@bernlieb.com

*Counsel for Plaintiff*

# Certification and Authorization of Plaintiff Pursuant to Federal Securities Laws

The individual or entity listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by Bernstein Liebhard LLP, retains Bernstein Liebhard LLP to file an action under the federal securities laws to recover damages and to seek other relief against Farmland Partners Inc. Bernstein Liebhard LLP will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Farmland Partners Inc. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by Bernstein Liebhard LLP.

| | |
|---|---|
| **First Name:** | mike |
| **Middle Name:** | |
| **Last Name:** | mariconda |
| **If Representing Corporation, Trust, Partnership or other entity, Name of Entity:** | |
| **If Representing an Entity, Position at Entity:** | |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Phone:** | |
| **Email:** | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing and/or the filing of a Lead Plaintiff motion on Plaintiff's behalf.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. The following sets forth all of the transactions of the Plaintiff in the securities that are the subject of the complaint during the class period specified in the complaint:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 2017-03-21 | 600 | 10.84 |

| Common Stock | 2017-05-10 | 100 | 10.50 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
| --- | --- | --- | --- |
| Common Stock | 2018-07-11 | 600 | 5.6516 |
| Common Stock | 2018-07-11 | 100 | 5.65 |

7. Plaintiff has not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below.

| | |
| --- | --- |
| I declare under penalty of perjury, under the laws of the United States of America, that the information entered is accurate: | **YES** |
| By clicking on the "submit" button below, I agree to execute this agreement and retain Bernstein Liebhard LLP to proceed on Plaintiff's behalf on a contingent fee basis consistent with the retainer agreement. | **YES** |

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States of America.

Date of signing: August 17th, 2018

