**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-02104-DME-NYW

THE TURNER INSURANCE AGENCY, INC.,
CECILIA TURNER, and
OBELISK CAPITAL MANAGEMENT, Individually
and on behalf of all others similarly situated,

     Plaintiffs,

 v.

FARMLAND PARTNERS INC.,
PAUL A. PITTMAN, and
LUCA FABBRI,

     Defendants.

---

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

Lead Plaintiffs The Turner Insurance Agency, Inc. and Cecilia Turner ("Plaintiffs"),

individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned

attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following

based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and

belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

Plaintiffs' attorneys, which included, among other things, review and analysis of conference

calls, Securities and Exchange Commission ("SEC") filings, wire and press releases, analyst

reports and advisories about the Company made by Farmland Partners, Inc. ("FPI" or the

"Company"), real estate and public filings, and information readily obtainable on the Internet.

Plaintiffs also consulted with investigators and real estate and accounting consultants.  Plaintiffs believe that additional substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class (defined below) consisting of all persons and entities other than Defendants, who purchased or otherwise acquired the publicly traded securities of FPI between November 12, 2015 and July 10, 2018, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     This case concerns Defendants' knowing failure to disclose to FPI investors that the Company was loaning money to related parties in violation of Generally Accepted Accounting Principles (GAAP) and Financial Accounting Standards Board (FASB) Accounting Standards.  Specifically, through a new loan program started by FPI on August 20, 2015 (the "Loan Program"), which Defendants touted as being synergistic to the Company's core business of renting farmland, FPI repeatedly loaned money to, among potentially other related parties, Jesse Hough and Ryan Niebur.  Hough was, among other things, FPI's co-founder, a key FPI consultant, a long-time business associate of FPI's Chief Executive Officer Defendant Paul Pittman, and a co-worker of Defendant Pittman and FPI's Chief Financial Officer Defendant Luca Fabbri.  Niebur, in turn, was an FPI manager and long-time co-worker of Defendants Pittman and Fabbri.

3.      Defendants purposefully did not disclose the identity of the borrowers in the Loan Program to FPI investors; nor did they disclose that Hough and Niebur were, in fact, the recipients of the majority of the loans and accounted for 70% of all of the monies loaned in the Loan Program.  Instead, Defendants misrepresented to investors that FPI conducted the same meaningful due diligence for the purported "third-party" borrowers in the Loan Program as it did for the Company's farm acquisition business.  In light of the foregoing, FPI investors were kept in the dark about the true nature and risk of the Loan Program.

4.      As is the danger with related party loans, which are often not negotiated at arms-length and not subject to the same level of scrutiny as traditional loans, the loans made to Hough and Niebur were inherently more risky and, as set forth *infra*, certain of them ran into problems. The foregoing, which was revealed in a detailed investigative report by an investment analyst, called into question the Company's internal and disclosure controls, its reputation, and raised concerns over FPI's revenues.  When the market learned the truth about FPI's undisclosed related party dealings, which subjected FPI to unaccounted for risk, FPI suffered reputational harm that bore on the Company's core business and FPI's stock fell almost 40%.

5.      Defendant Pittman and Jesse Hough are long-time business associates who have conducted extensive business together – both in FPI and outside of it – since at least 2011.  Since 2013, Defendant Pittman and Hough have almost continuously been directors and officers of Pine Ridge Holdings.  They have also worked together in American Agriculture Corporation, along with Defendant Fabbri, who served as that company's Senior Vice President.  Further, in January 2012, Defendant Pittman and Hough formed Pittman-Hough Farms, LLC ("Pittman Hough") as a merger of their personal farmland holdings.  Defendant Pittman and Hough (as

well as certain members of Hough's family) owned 100% of Pittman Hough.  In 2014, Defendant Pittman and Hough spun off the majority of their Pittman Hough land holdings and co-founded FPI.

6.     FPI, which had its initial public offering ("IPO") on April 11, 2014, is a Real Estate Investment Trust (REIT).  REITs like FPI are companies that own or finance income-producing real estate in different property sectors.  FPI describes itself as the largest public farmland REIT in the nation.  FPI's principal source of revenue is the collection of rents from tenants that conduct farming operations on the Company's farmland.

7.     At the time of FPI's IPO, all but two of the Company's farms were rented to and operated by either Astoria Farms or Hough Farms, both of which FPI characterized as related parties in SEC filings.  Astoria Farms was a partnership in which Pittman Hough had a 33% interest.  Hough also had a 4.3% indirect partnership interest in Astoria Farms.  The balance of Astoria Farms was held by limited partnerships in which Defendant Pittman was the general partner.  As to Hough Farms, Defendant Pittman had an 18.75% indirect partnership interest and Hough had a 28.3% indirect partnership interest.

8.     On August 20, 2015, FPI started the Loan Program, through which Defendants expanded the Company's business into loaning money to (and not just collecting rents from) farmers.  Importantly, Defendants represented to FPI investors that the Loan Program would help the Company's main business of renting land to farmers because, *inter alia*, the two were "synergistic".  Defendants further represented to FPI investors that through the Loan Program the Company would loan money to "third-party farmers" secured by real estate to provide partial financing for working capital requirements and operational farming activities.

9.     Unbeknownst to FPI investors, however, FPI used the Loan Program to repeatedly loan money to at least two related parties with formal and intimate ties to Defendants: Hough and Niebur.  Indeed, loans to Hough and Niebur comprised about 70% of the monies in the Loan Program.  In addition, as set forth herein, several of these loans were either renegotiated, defaulted, wrapped into new loans, or the borrower (Niebur) went bankrupt.  In some cases, FPI acquired the property when a loan defaulted and then entered into a lease with the same related party who had defaulted on the loan.  None of this, however, was disclosed to FPI investors.  Accordingly, FPI investors were left unaware of the true nature and risks of the Loan Program and the full extent of FPI's related party dealings.

10.    GAAP, and specifically FASB Accounting Standards Codification 850-10-20 ("ASC 850"), defines a related party, *inter alia*, as someone who "can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests."  ASC 850 requires that financial statements include disclosures of related party transactions including, first and foremost, **the nature of the relationship involved**.  ASC 850 also requires that a company disclose a description of the related party transaction.

11.    Hough is a related party as defined under ASC 850.  In addition to Hough's extensive and ongoing business ties to Defendants Pittman and Fabbri, FPI represented in public filings that Hough was also a key consultant to the Company and invaluable to FPI.  In that regard, FPI stated in its April 2014 IPO prospectus (the "IPO Prospectus") that as a consultant Hough would advise FPI on "business strategies and related matters, including asset underwriting, asset acquisitions and accounting matters" – all of which go to the heart of FPI's

business.  Moreover, FPI stated that "the loss of Jesse J. Hough, our consultant, could have a material adverse effect on our ability to implement our business strategy and to achieve our investment objectives."  Indeed, FPI flatly stated in its filings that the Company was "dependent" on Hough.  FPI further represented that "the success of the farm operator that will rent substantially all of our properties upon completion of this offering depends to a significant extent on the continued service of Jesse J. Hough."  Accordingly, Hough was clearly able to influence FPI's management or operating policies, rendering him a related party under ASC 850.

12.     Niebur likewise is a related party as defined under ASC 850.  Niebur is a close associate of Defendants Pittman and Fabbri and a former manager of FPI.  As detailed herein, a 2015 FPI presentation listed Niebur as part of FPI management.  FPI also listed Niebur as the Company's "Director of Acquisitions & Management – High Plains" in December 2016. Moreover, FPI counted Niebur as part of the Company's "leadership" in a January 23, 2017 presentation.  Niebur's LinkedIn profile further states that he worked for FPI as "Director of Acquisitions, Farm Manager, and Realtor" until January 2018.  In light of his managerial roles at FPI, and the small and intimate size of the Company (FPI has under twenty employees), Niebur (like Hough) could influence FPI's operating policies, rendering him, like Hough, a related party and warranting the disclosure of FPI's dealings with him under ASC 850.

13.     In light of the related party status of Hough and Niebur, Defendants' statements about the Loan Program throughout the Class Period were materially false and misleading when made.  Defendants repeatedly claimed that FPI was loaning money through the Loan Program to "third party farmers" – when in reality it was largely loaning money to Hough and Niebur. Defendants' statements were likewise materially false and misleading because loans made to

related parties invariably have more lenient underwriting and due diligence than loans to "third parties" and thus carry more risk – a fact investors should have known.

14.     Defendants were well aware of their duties to disclose related party transactions because FPI included other related party disclosures in its public filings.  Upon information and belief, Defendants may not have disclosed these related party transactions to conceal that the Loan Program was designed, at least in part, to benefit related parties.

15.     Between August 2017 and April 2018, around the same time that FPI made a $5.25 million loan to Hough, which more than doubled the monies loaned in the Loan Program from $4 million to $9.25 million, four of FPI's directors and its President resigned.  In March 2018, FPI also inexplicably switched auditors.  This spate of resignations and change in auditors – beginning so close to FPI's January 2018 $5.25 million loan to Hough – suggests that FPI directors and its auditor were uncomfortable with FPI's undisclosed related party dealings.

16.     On July 11, 2018, the truth about FPI's related party dealings was finally revealed when investment analyst Rota Fortunae published a detailed report on investing website *Seeking Alpha* (the "Seeking Alpha Report").  The Seeking Alpha Report, which is replete with documentary evidence, revealed to investors for the first time that the majority of the loans in the Loan Program were, in fact, made to related parties Hough and Niebur:

**Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible**

FPI…has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now-bankrupt tenant (not disclosed),…Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant.

17. The Seeking Alpha Report also revealed to investors that numerous loans in the Loan Program had defaulted, been renegotiated, were wrapped into new loans, or were threatened by bankruptcy (in the case of Niebur) – further demonstrating that there were serious problems in FPI's screening process for loans in the Loan Program despite the Company's public representations concerning its rigorous due diligence. The Seeking Alpha Report also stated that, in light of the foregoing, "[w]e believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up."

18. In the Seeking Alpha Report, Rota Fortunae further stated that "we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency." One month later, on August 8, 2018, FPI did, in fact, cut its quarterly dividend – by more than half – to 5 cents a share compared with its most recent dividend of 12.75 cents.

19. After the Seeking Alpha Report was published on July 11, 2018, FPI common stock plummeted almost 40%, from a July 10, 2018 closing price of $8.49 to close at only $5.18 on July 11, 2018. FPI's preferred stock also fell from a July 10, 2018 closing price of $23.73 to close at only $17.53 on July 11, 2018.

20. Plaintiffs and the proposed class lost tens of millions of dollars when the artificial inflation was removed from the stock.

21. In an effort to stave the bleeding, on July 17, 2018, FPI issued a purported partial "rebuttal" of the Seeking Alpha Report. Among other shortcomings, the rebuttal mis-framed the question of whether Hough and Niebur were indeed related parties and in conclusory fashion simply stated that they are not. In pertinent part, the Seeking Alpha Report stated as follows:

…Hough was not a "related party" under…SEC and FASB rules at the time [of the] loans…. Hough is a tenant and a borrower of [FPI]. From April 16, 2014 through April 16, 2018, Mr. Hough was a consultant of the Company. He was a business partner of…CEO, Paul Pittman, prior to [IPO] and during the first couple of years subsequent to the [IPO]…. *Hough never had decision-making authority over any matters or transactions involving the Company.*

But FASB (ASC 850) states that a related party is someone "who can significantly influence the management or operating policies" – not someone with "decision-making authority".

22. In addition to filing its purported rebuttal, FPI also sued Rota Fortunae for, *inter alia*, defamation in connection with the Seeking Alpha Report. That action (*Farmland Partners, Inc. v. Rota Fortunae*, No. 1:18-cv-02351-KLM (D. Col.)), is currently pending. FPI's purported rebuttal and its lawsuit against Rota Fortunae did not, however, achieve the intended result of discrediting the Seeking Alpha Report and causing a rebound of FPI's stock price.

23. FPI's common stock currently trades at approximately $5.35 per share – essentially the same price it fell to after the Seeking Alpha Report was published. FPI's trading price shows that the Company has not regained its reputation and the market has not regained its confidence in FPI.

## JURISDICTION AND VENUE

24. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as FPI is headquartered within this District and Defendants maintain offices in this District.

27.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

28.     Plaintiffs The Turner Insurance Agency, Inc. and Cecilia Turner, as set forth in certifications attached hereto, purchased FPI securities during the Class Period and were damaged upon the revelation of the alleged corrective disclosure.  The Turner Insurance Agency is an insurance company managed by Kurt Turner.  Kurt Turner is married to Cecilia Turner.

29.     As set forth in its attached certification, additional named plaintiff Obelisk Capital Management purchased FPI preferred stock during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

30.     Defendant FPI is an internally managed REIT that owns and rents land to farmers and makes loans to farmers secured by farm real estate.  FPI is a relatively small company with only 16 employees.  The Company is incorporated in Maryland and its principal executive offices are located at 4600 South Syracuse Street, Suite 1450, Denver, Colorado. FPI's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FPI."  FPI's preferred stock trades on the NYSE under the ticker symbol "FPI-PB".

31.     Defendant Paul A. Pittman ("Pittman") is a co-founder of FPI and has served as the Company's Executive Chairman and Chief Executive Officer since its formation in 2014. Defendant Pittman has also served as FPI's President since May 31, 2018.

32.     Defendant Luca Fabbri ("Fabbri") has served as Chief Financial Officer and Treasurer of FPI since the founding of FPI in 2014.

33.     Defendants Pittman and Fabbri are sometimes referred to herein as the "Individual Defendants."  Each of the Individual Defendants:

(a)     had intimate knowledge of every aspect of FPI's business, including the Loan Program;

(b)     directly participated in the management of the Company;

(c)     was directly involved in the day-to-day operations of the Company at the highest levels;

(d)     was privy to confidential proprietary information concerning the Company and its business and operations;

(e)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(f)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(g)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(h)     approved or ratified these statements in violation of the federal securities laws.

34.     The Company and the Individual Defendants are collectively referred to herein as the "Defendants."

## GENERALLY ACCEPTED ACCOUNTING
## PRINCIPLES GOVERNING RELATED PARTIES

35.     Financial Accounting Standards Board Accounting Standards Codification (ASC) 850-10-50 contains disclosure requirements for related party relationships and transactions.

36.     The ASC glossary (850-10-20) defines related parties as, among other things, "[o]ther parties with which the entity may deal if one party controls *or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.*" (Emphasis added).

37.     ASC 850-10-50-1 requires that financial statements include disclosures of material related party transactions *including, first and foremost, the nature of the relationship involved*. ASC 850-10-50-1 also requires a description of the transaction.

38.     Common related party transactions may include:

   a)   *Loans or guarantees*.

   b)   *Sales, purchases, and transfers of property*.

   c)   *Services provided or received.*

   d)   *Property and equipment leases*.

   e)   Maintenance of compensating bank balances for the benefit of a related party.

   f)   Allocations of common costs.

   g)   Filing consolidated tax returns.

(Emphasis added).

39.     Related party disclosures are material to investors because related party transactions, or as in the case here loans, are often not at arms-length, and thus can carry

increased risk and can be to the detriment of a company.  Moreover, related party transactions can also subject a company to liability and future costs.  For these reasons and more, related party transactions require disclosure.

## SUBSTANTIVE ALLEGATIONS

### A.    Long-time Business Partners Defendant Pittman and Jesse Hough Start FPI

40.    Defendant Pittman and Hough have had extensive business relationships since at least 2011.  In January 2012, Defendant Pittman and Jesse Hough formed Pittman-Hough Farms, LLC as a merger of their personal farmland holdings.  Defendant Pittman owned a 75% controlling interest in Pittman Hough and Hough and certain members of Hough's family owned the remaining 25% interest of Pittman Hough.  In 2014, Defendant Pittman and Hough spun off the majority of their Pittman Hough land holdings into a separate corporate entity – FPI.

41.    Even before the Company's IPO, FPI held out Hough in filings made with the SEC as integral in forming the Company's business strategy.  In a February 12, 2014 letter to the SEC, FPI stated:

> The Company respectfully advises the Staff that the Company ***has formulated its business strategy based on the extensive experience of Messrs. Pittman, Fabbri and Hough as owners of agricultural real estate and operators of farming businesses***. While their views are informed by press articles, which provide additional perspectives and may influence some market participants, ***Messrs. Pittman, Fabbri and Hough develop the Company's strategies*** instead based on thoughtful analysis of published data, market intelligence from expansive and strong relationships throughout the agricultural sector and actual experience of acquiring, operating and leasing farmland. (Emphasis added).

42.     FPI's IPO was on April 11, 2014.  On that date, the Company offered 3,800,000 shares to the public for $13 per share.  At the time of the IPO, FPI's business was renting farmland to farmers.

43.     FPI started out with only two employees and, as of March 1, 2018, FPI had sixteen employees.  In such a small company, employees, and particularly the C-suite, invariably work very closely with one another, and have extensive knowledge of all aspects of the Company's business.   This is particularly true for upper-level management, such as the Individual Defendants here.   For this reason, among others, the Individual Defendants have extensive knowledge about the allegations set forth herein as they relate to, *inter alia*, FPI's related party transactions and the Loan Program.

44.     At the time of FPI's IPO, all but two of the Company's farms were rented to and operated by either Astoria Farms or Hough Farms, both of which the Company considered related parties.[1]  Astoria Farms was a partnership in which Pittman Hough had a 33% interest. Hough had a 4.3% indirect partnership interest in Astoria Farms.  The balance of Astoria Farms was held by limited partnerships in which Defendant Pittman was the general partner.  Defendant Pittman and Hough had indirect 18.75% and 28.3% partnership interests in Hough Farms, respectively.

45.     In its IPO Prospectus, FPI stated that its first two tenants (Astoria Farms and Hough Farms) were related parties.  Hough Farms was deemed related, in part, because Hough was FPI's co-founder and a key consultant:

---

[1] Pittman Hough Farms and Hough Farms are different entities.

> Upon completion of this offering, substantially all of the farmland in our initial portfolio will be leased to either Astoria Farms, which is controlled by Paul A. Pittman, our Executive Chairman, President and Chief Executive Officer, or Hough Farms, in which Mr. Pittman and Jesse J. Hough, who will provide consulting services to us, have an interest….

As discussed below, FPI represented that Hough's consultancy was of the utmost importance to the Company.

**B.    Hough Was A Related Party – Indeed, He Has Been Held Out As Essential to the Company Since Before Its Formation**

46.     The IPO Prospectus explained the nature of Hough's consultancy, making it clear that it went to the heart of FPI's business:

> [E]ffective upon completion of this offering, we will enter into a consulting agreement with Jesse J. Hough, or the Consulting Agreement, pursuant to which Mr. Hough will advise us with respect to business strategies and related matters, including asset underwriting, asset acquisitions and accounting matters, as well as other matters reasonably requested by us during the term of the Consulting Agreement.

47.     FPI trumpeted Hough's extensive experience in the agricultural business at great length in the IPO Prospectus:

> Mr. Hough was previously a partner of Kennedy and Coe, a top 100 accounting firm that focuses on agribusiness accounting, and has worked with Mr. Pittman since late 2011, when Messrs. Pittman and Hough agreed to merge their respective farmland and farming operations holdings…. Messrs. Pittman, Fabbri and Hough have more than ten, three and ten years of experience, respectively, as owners of agricultural real estate and operators of farming businesses and collectively have consummated over 70 transactions to acquire and consolidate various farmland parcels. As a result, we believe Messrs. Pittman, Fabbri and Hough have a deeper understanding of agribusiness fundamentals and greater insight into factors affecting the value of farmland than many of our competitors.

48.     In fact, the IPO Prospectus characterized Hough as equal in importance to the CEO and CFO of the Company (Defendants Pittman and Fabbri):

> The loss of key management personnel, particularly Paul A. Pittman and Luca Fabbri, **_or the loss of Jesse J. Hough, our consultant_**, could have a material adverse effect on

our ability to implement our business strategy and to achieve our investment objectives…

In addition, ***the success of the farm operator that will rent substantially all of our properties upon completion of this offering depends to a significant extent on the continued service of Jesse J. Hough***, who manages the farming operations of our related tenants that will lease substantially all of the farms in our initial portfolio. The loss of services from Mr. Hough under the Consulting Agreement or his departure from or diminishment of his activities at our related tenants could have a material adverse effect on our business.  (Emphasis added).

49.    The IPO Prospectus also touted Hough's relationships and experience in the

agricultural sector and claimed they were important to the Company:

***Expansive Relationships in the Agricultural Sector.*** Messrs. Pittman's, Fabbri's and Hough's extensive experience as owners of agricultural real estate and operators of farming businesses has helped them build expansive and strong relationships across a broad network of businesses and individuals in the agricultural sector, including family and corporate farms, real estate brokers, lenders, auction houses and suppliers of agricultural goods. We believe that these relationships provide us with valuable market intelligence related to agriculture fundamentals and will give us access to acquisition opportunities, many of which may not be available to our competitors….

We believe that Messrs. Pittman's, Fabbri's and Hough's extensive experience as owners and operators of farmland allows us to perform due diligence on smaller farms quickly and efficiently, which provides us with an advantage over larger competitors that we believe do not have the investment focus or flexibility to pursue acquisitions of smaller farms.

50.    The IPO Prospectus even went so far as to state that FPI was "dependent" on

Hough:

The FP Land Merger Agreement, the Shared Services Agreement, the Consulting Agreement and certain other agreements entered into in connection with the formation transactions were not negotiated on an arm's-length basis, and we may pursue less vigorous enforcement of terms of those agreements because of conflicts of interest and ***our dependence on Messrs. Pittman, Fabbri and Hough***. (Emphasis added).

51.    A 2015 FPI presentation from FPI's investor relations website further confirmed

the importance of Hough's consultancy by listing him as part of FPI's "Management Team":

**Management Team is Experienced in Agriculture and Capital Markets**

**Jesse J. Hough**, **Responsible for TRS**[2]

…Jesse currently serves as an owner and CFO of Pittman Hough Farms KLLC.  He was with Kennedy and Coe – a top 100 accounting firm with the main emphasis in agri-business accounting – for 18 years, the last ten of which he served as a member, partner and owner.  While at Kennedy and Coe, Jesse was responsible for consulting with large agri-business operations throughout the United States on their financial models and organizational structures.

52.    According to the Company, Hough was an FPI consultant until April 2018.

**C.    Hough Was Also A Related Party Because He Has a Long – and Ongoing – History Of Business Relationships with Defendant Pittman**

53.    Defendant Pittman and Hough have extensive business relationships beyond FPI.

First, as alleged above, Defendant Pittman and Hough have had business interests together, and

shared ownership, in Pittman Hough Farms, Astoria Farms, and Hough Farms since at least

2011.  *See ¶¶*40,44.

54.    Second, since 2013 (with an exception for Defendant Pittman in 2017),

Defendant Pittman and Hough have served as directors and officers of Wyoming entity Pine

Ridge Holdings, Inc.   Pine Ridge's annual reports list Defendant Pittman and Hough as

directors and officers for the years 2013 through 2016.  *See* Exhibit A.  In 2017, Pine Ridge

removed Defendant Pittman from the annual report, but Hough remained.  *See* Exhibit B.  In

2018, Pine Ridge again listed Defendant Pittman and Hough as officers and directors when Pine

Ridge filed to do business in Nebraska.  *See* Exhibit C.

55.    Importantly, Pine Ridge is connected to the Loan Program.  On August 25, 2017,

FPI loaned Hough $669,000 through Hough Farms.  *See ¶*77.   Pine Ridge was a co-borrower on

---

[2] TRS is FPI Agribusiness Inc., a wholly owned FPI subsidiary.

a loan that secured the very same property as the $669,000 Hough loan.  On May 25, 2017 (three months before FPI loaned Hough the $669,000), Pine Ridge and Hough Farms also borrowed money on a deed of trust for the same property.  *See* Exhibit D.  On October 2, 2017, about one month after Hough's August 25, 2017 loan, the bank reconveyed the deed of trust, evidencing that Hough paid the May 25, 2017 loan.  *See* Exhibit E.  Thus, FPI was apparently loaning Hough and Pine Ridge (for which Defendant Pittman was a director and officer from 2013 through 2016, as well as 2018) money secured by the same property.

56.     In addition to listing Hough and Defendant Pittman as current directors and officers of Pine Ridge in Nebraska (*see* Exhibit C), Hough is also currently listed on a Wyoming business website as a Pine Ridge President and Director.  *See* Exhibit F.  Exhibit F shows that Pine Ridge was recently dissolved on February 8, 2019.  *See id.*

57.     Fulton County Illinois public records further show that Pittman and Hough were transacting business together in the weeks immediately following the publication of the Seeking Alpha Report.  The Illinois Secretary of State shows, for example, that PH Land, LLC (PH Land), which FPI previously disclosed was part owned by Pittman Hough Farms, was involuntarily dissolved on July 13, 2018, just two days after the Seeking Alpha Report.  *See* Exhibit G.

58.     Defendant Pittman and Hough also owned 5% and 25%, respectively, of American Agriculture Corporation, a Colorado corporation, until December 31, 2015.  Defendant Fabbri likewise served alongside Defendant Pittman and Hough as SVP of this corporation.

**D.      Ryan Niebur Was Also a Related Party**

59.      Niebur is also a close associate of Defendants Pittman and Fabbri and a former

FPI manager.  The same 2015 presentation that listed Hough as part of FPI management also

listed Niebur as follows:

**Management Team is Experienced in Agriculture and Capital Markets**

Ryan Niebur, Farm Manager (High Plains, Mountains) Ryan is a fourth generation
farmer from Eastern Colorado. After college, Ryan began his career by returning to his
roots where he started his own family farm and agricultural retail business (Tri-County
Ag Inc.). Although Ryan has pursued other interests in the agricultural industry, he still
is involved in the daily operations of his family farm. He attended Colorado State
University where he received a B.S. in Business Marketing.

60.      In addition, FPI also listed Niebur as the Company's "Director of Acquisitions &

Management – High Plains" in December 2016.  A report for the "Progressive Farmer 2016 Ag

Summit" provided as follows:

Not Your Father's Farmland Market
DTN / The Progressive Farmer 2016 Ag Summit
December 7, 2016 – Chicago, IL
Paul Pittman, Chairman & CEO of Farmland Partners Inc.

Farmland Partners Contact Information

Ryan Niebur – Burlington, CO
Director of Acquisitions & Management – High Plains
rniebur@farmlandpartners.com, (719) 342-2711

61.      FPI once again listed Niebur as part of the Company's "leadership" in a January

23,                              2017                              presentation.

http://www.snl.com/Cache/1500095130.PDF?Y=&O=PDF&D=&FID=1500095130&T=&IID=

4426904.  This presentation contained the same description of Niebur as the 2015 presentation

quoted in ¶59.

62.     Niebur's Linked In profile further states that he worked for FPI as the Company's "Director of Acquisitions, Farm Manager, and Realtor" until January 2018.  Given the small size of FPI, there is little doubt that Niebur worked intimately with Defendants Pittman and Fabbri.  In light of his important role as Director of Acquisitions, his ability to influence management is beyond reasonable dispute.

**E.      The FPI Loan Program**

63.     On August 27, 2015, FPI announced its Loan Program in a Form 8-K filed with the SEC.  Under the Loan Program, FPI originates loans secured by farm real estate.  FPI represented that it expected most loans in the Loan Program to be in principal amounts ranging from $500,000 to $5 million at fixed interest rates and maturities of up to two years.  FPI represented to investors that the Loan Program addressed a market need created by short term cash flow pressure on farmers who otherwise maintain solid balance sheets, and a regulatory environment that FPI claimed restricted traditional bank lenders' ability to make asset-backed loans.  FPI also stated that it would leverage its existing operational infrastructure to perform loan underwriting quickly to meet borrowers' funding needs, while adopting conservative loan-to-value criteria to ensure principal protection.

64.     In FPI's 2015 Form 10-K filed on March 15, 2016, the Company represented to FPI investors that the Loan Program was "synergistic" with the Company's core business, renting land to farmers:

> We believe that the business of making loans secured by mortgages on farmland is highly complementary to and synergistic with our core business of investing in farmland. We generally find potential borrowers during the process of sourcing farm acquisitions. We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same

way we screen potential tenants. The FPI Loan Program also gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

65.     Thus, in addition to bringing in additional revenues for the Company, FPI represented that the Loan Program helped FPI's core business of renting land to farmers.

66.     Throughout the Class Period, Defendants did not, however, inform FPI investors that the Loan Program was, in fact, utilized or designed to benefit related parties such as Hough and Niebur, and that the majority of the loans were made to Hough and Niebur, Pittman's long-time business associates, on terms that were not arms-length and were more risky and potentially detrimental to FPI.

**F.      Unbeknownst to FPI Investors, Related Parties Were the Principal Beneficiaries of Farmland's Loan Program During the Class Period**

67.     Despite FPI's claim that there was a market need for the Loan Program, only a handful of individuals sought a loan under the program.  In fact, the majority of loans under the Loan Program were made to two related parties, Jesse Hough and Ryan Niebur.

68.     When questioned about the status of the Loan Program by an analyst, Defendant Pittman stated in an August 2016 conference call that the Loan Program was "not getting huge inward inquiry" because most farmers were in a strong economic position.  This is ironic since Hough and Niebur were eager to repeatedly utilize the Loan Program to their advantage.

69.     FPI currently has nine loans under the Loan Program.  Of those nine loans, five loans were collectively made to Hough and Niebur.  Those five loans comprise $9.2 million (70%) of the $15.4 million in the Loan Program.

70.     Investors were not informed that the Loan Program was either designed, or utilized, to benefit related parties, *i.e.*, Individual Defendants' business partners Hough and

Niebur.  This was material information to investors, *inter alia*, because FPI would invariably not negotiate at arms-length with these related parties, to the detriment of the Company, and because the Loan Program was purportedly intended to be synergistic with FPI's core business of renting land to farmers.

71.     FPI identifies each of the loans in the Loan Program in its SEC filings.  However, Defendants did not disclose the identity of any of the borrowers in the Loan Program.  ASC 850 states that "if necessary to the understanding of the relationship, the name of the related party shall be disclosed."  In connection with the Loan Program, the identity of the borrower would have materially aided investors and the market to gain a better understanding of the relationships and risks involved in the Loan Program.

72.     FPI had approximately $23.8 million cash on hand as of September 30, 2018.  *See* 3Q2018 Form 10-Q at F-3.  Thus, the monies in the Loan Program stemming from related parties Hough and Niebur ($9.2 million), in addition to being related party transactions, amounted to almost 40% of the Company's cash on hand.

73.     In addition, as set forth below, several of the loans in the Loan Program that were made to related parties Hough and Niebur had significant problems associated with them that were detrimental to FPI, including that they were renegotiated, defaulted, were wrapped into new loans, or were (in Niebur's case) threatened by bankruptcy.

74.     It was material to investors to know that FPI was loaning money to related parties because, as shown by the numerous problems with FPI's loans to Hough and Niebur, FPI was willing to lower the Company's standards on loans to Hough and Niebur, despite its representations to the contrary.

**F.**     **FPI's Loans to Jesse Hough through the Loan Program**

75.     At least three loans in the Loan Program were made to Jesse Hough.

**1.     Hough Loan 1**

76.     On July 25th, 2017, FPI loaned Hough $100,000 through PHS Holdings.  *See* Exhibit H.  The loan was secured by a parcel of Nebraska farmland.  *See id*.  Hough apparently defaulted on this loan as FPI acquired the property on January 12, 2018, two weeks before the loan's January 31, 2018 maturity date.  *See id*.  On January 18, 2018, just six days after the property for this loan was acquired (and presumably when the new lease went into effect), FPI loaned Hough $5.25 million (*see* ¶78 below, relating to Hough Loan 3).

**2.  Hough Loan 2**

77.     On August 25th, 2017, FPI loaned Hough $669,000 through Hough Farms.  *See* Exhibit I.

**3.  Hough Loan 3**

78.     On January 18th, 2018, FPI loaned Hough $5.25 million through Siffring Farms. *See* Exhibit J (the deed of trust for the loan was signed by Jesse Hough as President of Siffring Farms).

**G.**     **FPI's Loans to Ryan Niebur through the Loan Program**

79.     At least two of loans in the Loan Program were to Ryan Niebur.

**1.     Niebur Loan 1**

80.     On October 30th, 2015, FPI loaned Niebur $980,000.  *See* Exhibit K.

### 2.      Niebur Loan 2

81.      In FPI's first quarterly report for 2017, issued on May 10, 2017, the Company stated that "[t]he original note [to Niebur] was renegotiated and a second note was entered into simultaneously, with the borrower during the quarter.  The notes include mortgages on two additional properties in Colorado[.]"   Thus, FPI renegotiated Niebur's $980,000 loan and apparently wrapped it into a second loan dated March 16, 2017, for $2.194 million.  *See* 1Q 2017 10-Q at 16.  This $2.194 million loan was broken down into two loans, one for $801,800 and the other for $1.392 million (totaling $2.194 million).  *See* Exhibit L at 1.  The deed for the $2.194 million loan states that Niebur was in default on the loan.  *See* Exhibit L at 2.

82.      On January 26, 2018, Niebur filed for bankruptcy.  *See* Exhibit M (docket for *In Re: Niebur Farms Inc.*, 1:18-BK-10568 (U.S. Bankr. District of Colorado) (Denver).  Even after this event, FPI did not disclose the identity of Niebur or his bankruptcy status to investors.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

83.      On November 12, 2015, FPI filed its report for the third quarter of 2015 on Form 10-Q.  That report, which was signed by Defendants Pittman and Fabbri, provided:

*FPI Loan Program*

In August 2015, the Company announced the launch of the FPI Loan Program, an agricultural lending product aimed at farmers, as a complement to the Company's current business of acquiring and owning farmland and leasing it to farmers.  ___**Under the**___ ___**FPI Loan Program, we intend to make loans to third-party farmers**___ (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.  (Emphasis added).

84.      These statements were materially false and misleading when made because Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's

October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs. Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business. Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

85.     At all times relevant, Defendants were well aware of their duties regarding related party disclosures. In that regard, the 3Q 2015 Form 10-Q identified FPI's related party transactions, in relevant part, as follows:

Note 4—Related Party Transactions

[***]

As of September 30, 2015, 11% of the acres in the Company's farm portfolio was rented to and operated by Astoria Farms or Hough Farms, both of which are related parties. Astoria Farms is a partnership in which Pittman Hough Farms LLC ("Pittman Hough Farms"), which is 75% owned by Mr. Pittman, has a 33.34% interest. The balance of Astoria Farms is held by limited partnerships in which Mr. Pittman is the general partner. Hough Farms is a partnership in which Pittman Hough Farms has a 25% interest. The aggregate rent recognized by the Company for these entities for the three and nine months ended September 30, 2015 was $685,005 and $2,035,752, respectively, and was $618,710 and $1,856,129 for the three and nine months ended September 30, 2014, respectively. As of September 30, 2015 and December 31, 2014,

the Company had accounts receivable from these entities of $380,122 and $182,763, respectively.

American Agriculture Corporation (''American Agriculture'') is a Colorado corporation that is 75% owned by Mr. Pittman and 25% owned by Jesse J. Hough, who provides consulting services to the Company.

86.     These statements were materially false and misleading when made because Defendants failed to disclose all of FPIs related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.   Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.   Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.   Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

87.     On March 15, 2016, during aftermarket hours, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC.   The 2015 10-K was signed by Defendants Pittman and Fabbri.   The 2015 10-K stated:

> **_Under the FPI Loan Program, we intend to make loans to third-party farmers_** (both tenant and non-tenant) to provide partial financing for working capital requirements and

operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.  (Emphasis added).

88.     These statements were materially false and misleading when made because Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties".  This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.  Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business. Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

89.     The 2015 10-K also touted FPI's due diligence in the Loan Program, giving investors the impression that the underwriting for the Loan Program went through the same rigorous process as for renters on the Company's farm acquisitions:

***Selecting Tenants***

We intend to continue to focus primarily on farmland located in areas with a robust and competitive environment of experienced tenants. In general, the tenant selection process focuses primarily on candidates' experience and reputation based upon background and reference checks of potential tenants, as well as their willingness and ability to pay competitive rental rates….

***Leverage Our Infrastructure to Expand into the Lending Business***. We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Program at little or no additional costs. We believe that the business of making loans secured by mortgages on farmland is highly complementary to and synergistic with our core business of investing in farmland. We generally find potential borrowers during the process of sourcing farm acquisitions. ***We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants***.  (Second emphasis added).

90.     These statements were materially false and misleading when made because several loans in the Loan Program reflected poor borrower screening as they were either renegotiated, defaulted, wrapped into new loans, or the borrower went bankrupt (in the case of Niebur).  *See* ¶¶81-82.  Defendants' statements were also misleading because loans to related parties invariably have more lenient underwriting and due diligence standards than loans to "third parties", and were not arms-length transactions and, thus, were detrimental to the Company.

91.     The 2015 10-K also misleadingly described the risks at issue in the Loan Program:

***Under the FPI Loan Program, we provide loans to third-party farmers, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition***.

Under the FPI Loan Program, which was announced in August 2015, we make loans to third-party farmers (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes. The loans are expected to be collateralized by farm real estate. As of the date of this Annual Report, we have made two senior secured first-lien mortgage loans to farmers totaling $2,980,000, with $2,780,000 outstanding at December 31, 2015, under the FPI Loan Program, and we intend to make similar loans in the future.

92.     These statements were materially false and misleading when made because the Loan Program was threatened by the much more fundamental risks of lending to related parties, including lending on more lenient terms or lowering loan standards with such parties.  These statements were also misleading because the related party loans were not arms-length transactions and, thus, were detrimental to the Company.

93.     The Form 10-K also misled investors about the $980,000 loan to Niebur – including by not disclosing his identity or that he was a related party.  The Form 10-K stated, in relevant part:

> On November 16, 2015, the Company entered into a promissory note agreement with a tenant farmer to provide $980,000 in the form of a mortgage note. The note has a fixed annual interest rate with principal and all accrued interest due at maturity on October 30, 2017. The note is collateralized by a first mortgage on farm real estate.

94.     These statements were materially false and misleading when made because Defendants did not disclose that this $980,000 loan was to a related party and thus was not made at arms-length and was inherently more risky than transactions that satisfied rigorous underwriting.

95.     The 2015 10-K also provided a similar explanation of FPI's related party transactions as that in ¶85, except that it represented that Defendant Pitman no longer owned any interest in Astoria Farms or Hough Farms:

> As of March 31, 2016 and 2015, 6% and 16%, respectively, of the acres in the Company's farm portfolio were rented to and operated by Astoria Farms or Hough Farms, both of which were related parties prior to December 31, 2015.  Astoria Farms is a partnership in which Pittman Hough Farms LLC ("Pittman Hough Farms"), which was previously 75% owned by Mr. Pittman, had a 33.34% interest. The balance of Astoria Farms was held by limited partnerships in which Mr. Pittman previously was the general partner. Hough Farms is a partnership in which Pittman Hough Farms previously had a 25% interest. ***Effective as of December 31, 2015, Mr. Pittman neither owns any direct or indirect interest in, nor has control of, either***

>  ***Astoria Farms or Hough Farms***. The aggregate rent recognized by the Company for these entities for the three months ended March 31, 2016, and 2015 was $617,959 and $670,429, respectively.
>
>  American Agriculture Corporation (''American Agriculture'') is a Colorado corporation that was previously 75% owned by Mr. Pittman and 25% owned by Jesse J. Hough, who provides consulting services to the Company. Effective as of December 31, 2015, Mr. Pittman does not own any interest in American Agriculture and American Agriculture is no longer a related party. (Emphasis added).

96.     These statements were materially false and misleading when made because Defendants failed to disclose all FPI's related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.   Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.  Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.  Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

97.     Defendants Pittman and Fabbri were responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e) and 15(d)-15(e)) pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.  Defendants Pittman and Fabbri both

signed certifications that the 2015 Form 10-K did not contain any untrue statement of material fact or omit to state a material fact.  They also certified that they designed disclosure controls and procedures and that they evaluated the effectiveness of such controls.  Defendants also stated in the 2015 Form 10-K that the Company evaluated the effectiveness of its disclosure controls and procedures and based on its evaluation, Defendants Pittman and Fabbri concluded that the Company's disclosure controls and procedures were effective as of December 31, 2015.  The Company's management also concluded that its internal control over financial reporting was effective as of December 31, 2015.

98.     FPI filed similar certifications in Form 10-Ks and Form 10-Qs throughout the Class Period.

99.     These certifications were materially false and misleading when made because the SEC filings alleged to be misleading herein omitted to state material facts, including the disclosure of related party transactions, and that, as evidenced by the facts revealed at the end of the Class Period, FPI's disclosure controls and procedures were not effective because if they were, such transactions would not have gone undisclosed.

100.     On May 10, 2016, FPI filed its first quarterly report on Form 10-Q.  That report, which was signed by Defendants Pittman and Fabbri, provided as follows:

> ***Under the FPI Loan Program, the Company makes loans to third-party farmers*** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.  (Emphasis added).

101.     These statements were materially false and misleading when made because Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's

October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs. Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business. Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

102.    The 1Q2016 Form 10-Q again touted the Company's purported due diligence for underwriting loans in the Loan Program:

> We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants.

103.    These statements were materially false and misleading when made because several loans in the Loan Program reflected poor borrower screening as they were either renegotiated, defaulted, wrapped into new loans, or the borrower went bankrupt (in the case of Niebur). *See* ¶¶81-82. Defendants' statements were also misleading because loans to related parties invariably have more lenient underwriting and due diligence standards than loans to

"third parties", and were not arms-length transactions and, thus, were detrimental to the Company.

104.    The 1Q16 Form 10Q also listed Niebur's $980,000 loan but again misleadingly failed to disclose Niebur's identity or that he was a related party to investors.

105.    The 1Q2016 10-Q also provided a similar explanation of FPI's related party transactions as that in ¶95.

106.    These statements were materially false and misleading when made because Defendants failed to disclose all of FPI's related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.   Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.   Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.   Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

107.    On August 9, 2016, FPI filed its second quarterly report on Form 10-Q.   That report, which was signed by Defendants Pittman and Fabbri, provided in relevant part as follows:

***Under the FPI Loan Program, the Company makes loans to third-party farmers***
(both tenant and non-tenant) to provide financing for working capital
requirements and operational farming activities, farming infrastructure projects,
and for other farming and agricultural real estate related projects. (Emphasis
added).

108.     These statements were materially false and misleading when made because
Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's
October 2015 loan made through the Loan Program was to Niebur, a related party and risky
borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship
with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was,
upon information and belief, designed or slated to be largely utilized to benefit related parties.
Defendants' statement was also misleading because loans to related parties invariably have more
lenient underwriting and due diligence than loans to "third parties".   This information was
material to investors because transactions with related parties are often not at arms-length and
can subject a company to liability and significant costs.   Moreover, the Loan Program was
designed to be synergistic and benefit FPI's core business by drawing on the same relationships;
thus, problems in the Loan Program could yield reputational harm impacting core business.
Instead of being synergistic, the Loan Program largely benefitted related parties and created
unnecessary risk for FPI.

109.     The 2Q16 Form 10Q again listed Niebur's $980,000 loan but misleadingly failed
to disclose Niebur's identity or that he was a related party.

110.     The 2Q2016 10-Q also provided a similar explanation of FPI's related party
transactions as that in ¶95.

111.   These statements were materially false and misleading when made because Defendants failed to disclose all of related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.   Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.   Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.   Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

112.   On November 7, 2016, FPI filed its third quarterly report on Form 10-Q.   That report, which was signed by Defendants Pittman and Fabbri, provided in relevant part as follows:

> **_Under the FPI Loan Program, the Company makes loans to third-party farmers_**
> (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.   (Emphasis added).

113.   These statements were materially false and misleading when made because Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky

borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs. Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business. Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

114.    The 3Q16 Form 10Q again listed Niebur's $980,000 loan but misleadingly failed to disclose Niebur's identity or that he was a related party.

115.    The 1Q2016 10-Q also provided a similar explanation of FPI's related party transactions as that in ¶95.

116.    These statements were materially false and misleading when made because Defendants failed to disclose all FPI's related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.    Defendants' statement was also misleading because loans to related

parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs. Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business. Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

117.   On February 23, 2017, FPI filed its annual report on Form 10-K. That report (the "2016 Form 10-K"), which was signed by Defendants Pittman and Fabbri, provided as follows:

> ***Under the FPI Loan Program, we provide loans to third-party farmers***, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.

118.   The 2016 Form 10-K had several substantially similar statements about making loans to "third-party farmers" pursuant to rental due diligence.

119.   This statement, as well as the substantially similar statements in the 2016 Form 10-K, were materially false and misleading when made because Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with

related parties are often not at arms-length and can subject a company to liability and significant costs.   Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.   Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

120.   The 2016 Form 10-K also stressed that the Loan Program aided FPI's core business of renting to farmers and touted FPI's standards when screening Loan Program borrowers.  The Form 10-K provided, in relevant part:

### Selecting Tenants

We intend to continue to focus primarily on farmland located in areas with a robust and competitive environment of experienced tenants. In general, the tenant selection process focuses primarily on candidates' experience and reputation based upon background and reference checks of potential tenants, as well as their willingness and ability to pay competitive rental rates….

***Leverage Our Infrastructure to Expand into the Lending Business***. We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Program at little or no additional costs. We believe that the business of making loans secured by mortgages on farmland is highly complementary to and synergistic with our core business of investing in farmland. We generally find potential borrowers during the process of sourcing farm acquisitions. ***We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants***. The FPI Loan Program also gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business
(Second emphasis added).

121.   These statements were materially false and misleading when made because several loans in the Loan Program reflected poor borrower screening as they were either renegotiated, defaulted, wrapped into new loans, or the borrower went bankrupt (in the case of Niebur).  *See* ¶¶81-82.  Defendants' statements were also misleading because loans to related

parties invariably have more lenient underwriting and due diligence standards than loans to "third parties", and were not arms-length transactions and, thus, were detrimental to the Company.

122.   The 2016 Form 10-K also misleadingly represented the risks inherent in the Loan Program, in relevant part as follows:

> ***Under the FPI Loan Program, we provide loans to third-party farmers, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.***
>
> Under the FPI Loan Program, which was announced in August 2015, we make loans to third-party farmers (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes. The loans are collateralized by farm real estate.

123.   These statements were materially false and misleading when made because the Loan Program was threatened by the much more fundamental risks of lending to related parties, including lending on more lenient terms or lowering loan standards with such parties. These statements were also misleading because the related party loans were not arms-length transactions and, thus, were detrimental to the Company.

124.   The 2016 Form 10-K again listed Niebur's $980,000 loan but again misleadingly failed to disclose Niebur's identity or that he was a related party to investors.

125.   The 2016 Form 10-K again provided a misleading explanation of FPIs related party transactions:

> Effective as of December 31, 2015, Mr. Pittman neither owns any direct or indirect interest in, nor has control of, Astoria Farms and Hough Farms. As of December 31, 2016 and 2015, 6% and 11%, respectively, of the acres in the Company's farm portfolio were rented to and operated by Astoria Farms or Hough Farms, both of which were related parties until December 31, 2015. Astoria Farms is a partnership in which

Pittman Hough Farms LLC ("Pittman Hough Farms"), which was previously 75% owned by Mr. Pittman, had a 33.34% interest. The balance of Astoria Farms was held by limited partnerships in which Mr. Pittman was previously the general partner. Hough Farms is a partnership in which Pittman Hough Farms previously had a 25% interest. The aggregate rent recognized by the Company for these entities for the years ended December 31, 2016, 2015 and 2014 was $2,464,905, $2,720,757 and $2,474,839, respectively. As of December 31, 2016 and 2015, the Company did not have any accounts receivable from these entities….

Effective as of December 31, 2015, Mr. Pittman does not own any interest in American Agriculture American Agriculture Corporation (''American Agriculture'') is a Colorado corporation that was 75% owned by Mr. Pittman and 25% owned by Jesse J. Hough, who provides consulting services to the Company.

126.    These statements were materially false and misleading when made because Defendants failed to disclose all of FPI's related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 loan made through the Loan Program was to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶80); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.    Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.   Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.   Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

127.   On May 10, 2017, FPI filed its quarterly report for the first quarter of 2017 on Form 10-Q.   That report, which was signed by Defendants Pittman and Fabbri, provided in relevant part as follows:

> **_Under the FPI Loan Program, the Company makes loans to third-party farmers_** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.   (Emphasis added).

128.   These statements were materially false and misleading when made because Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's October 2015 and March 2017 loans made through the Loan Program were to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶¶80-81); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.   Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.   Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.   Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

129.   The 1Q17 Form 10Q again listed Niebur's $980,000 loan but again misleadingly failed to disclose Niebur's identity or that he was a related party to investors.

130. The 1Q17 Form 10Q also listed a new $2.194 million loan to Niebur but, likewise, misleadingly failed to disclose Niebur's identity or that he was a related party to investors.

131. On July 21, 2017, the Company filed a Form 10-Q for the second quarter ended June 30, 2017 (the "2Q 2017 10-Q") with the SEC, which provided the Company's second quarter 2017 financial results and position. The 2Q 2017 10-Q was signed by Defendants Pittman and Fabbri. The 2Q 2017 10-Q stated the following in relevant part:

> **_Under the FPI Loan Program, the Company makes loans to third-party farmers_** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects. (Emphasis added).

132. These statements were materially false and misleading when made because Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's October 2015 and March 2017 loans made through the Loan Program were to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶¶80-81); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs. Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core

business.  Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

133.    The 2Q17 Form 10Q again listed Niebur's $980,000 loan but misleadingly failed to disclose Niebur's identity or that he was a related party to investors.

134.    The 2Q17 Form 10Q also listed the second $2.194 million loan to Niebur but, likewise, misleadingly failed to disclose Niebur's identity or that he was a related party to investors.

135.    The 2Q 2017 10-Q also stated as follows about related party transactions:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane.  American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman.  The Company incurred costs of $135,478 and $96,469, respectively, during the six months ended June 30, 2017 and 2016 and $51,687 and $49,416, respectively, during the three months ended June 30, 2017 and 2016 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

136.    These statements were materially false and misleading when made because Defendants failed to disclose all of FPI's related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 and March 2017 loans made through the Loan Program were to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶¶80-81); (ii) the nature of the related party relationship with Niebur, as they were required to do

under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs. Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business. Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

137. On August 28, 2017, John C. Conrad resigned from FPI's board of directors.

138. On November 9, 2017, the Company filed a Form 10-Q for the third quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which provided the Company's third quarter 2017 financial results and position. The 3Q 2017 10-Q was signed by Defendants Pittman and Fabbri.

139. The 3Q 2017 10-Q stated the following;

**_Under the FPI Loan Program, the Company makes loans to third-party farmers_** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects. (Emphasis added).

140. These statements were materially false and misleading when made because Defendants failed to disclose all of FPI's related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 and March 2017 loans made through the Loan Program were to Niebur, and that FPI's July and August 2017 loans made through the Loan Program were to Hough, both of whom were related parties and risky borrowers, not "third-party

farmers" (*see* ¶¶80-81, 76-77); (ii) the nature of the related party relationships with Niebur and Hough, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs. Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business. Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

141.    The 3Q17 Form 10Q also listed Niebur's $980,000 and $2.194 million loans under the Loan Program, as well as Hough's $100,000 and $669,000 loans under the Loan Program, but misleadingly failed to disclose their identities or that they were related parties under ASC 850.

142.    The 3Q2017 10-Q also stated as follows concerning Farmland's related party transactions:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. The Company incurred costs of $0.16 million and $0.14 million, respectively, during the nine months ended September 30, 2017 and 2016 and $0.02 million and $0.05 million, respectively, during the three months ended September 30, 2017 and 2016 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were

recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

143.    These statements were materially false and misleading when made because Defendants failed to disclose all of FPI's related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 and March 2017 loans made through the Loan Program were to Niebur, and that FPI's July and August 2017 loans made through the Loan Program were to Hough, both of whom were related parties and risky borrowers, not "third-party farmers" (*see* ¶¶80-81, 76-77); (ii) the nature of the related party relationships with Niebur and Hough, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties. Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties". This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs. Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business. Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

144.    On December 5, 2017, D. Dixon Boardman resigned from FPI's board of directors.

145.    On January 18, 2018, Darell D. Sarff resigned from FPI's board of directors.

146.    On March 5, 2018, FPI filed its annual report on Form 10-K (the "2017 Form 10-K").  That report, which was signed by Defendants Pittman and Fabbri, provided as follows:

> **_Under the FPI Loan Program, we provide loans to third-party farmers_**, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.

147.    The 2017 Form 10-K also contained several substantially similar statements.

148.    The statement and the substantially similar statements in the 2017 Form 10-K were materially false and misleading when made because Defendants failed to disclose – as they were required to do under ASC 850 – (i) that FPI's October 2015 and March 2017 loans made through the Loan Program were to Niebur, and that FPI's July and August 2017 and January 2018 loans made through the Loan Program were to Hough, both of whom were related parties and risky borrowers, not "third-party farmers" (*see* ¶¶80-81, 76-78); (ii) the nature of the related party relationship with Niebur, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.  Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties".  This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.  Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.  Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

149.   The 2017 Form 10-K also provided in relevant part as follows:

***Leverage Our Infrastructure to Expand into the Lending Business.***  We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Programat little or no additional costs. We believe that the business of making loans secured by mortgages on farmland is highly complementary to and synergistic with our core business of investing in farmland.  We generally find potential borrowers during the process of sourcing farm acquisitions.  ***We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants***.  The FPI Loan Program also gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.  (Second emphasis added).

150.   The statements were materially false and misleading when made because several loans in the Loan Program reflected poor borrower screening as they were made to related parties and not at arms-length, either renegotiated, defaulted, wrapped into new loans, or the borrower went bankrupt (in the case of Niebur).  *See* ¶¶81-82, 76-78.  Defendants' statements were also misleading because loans to related parties invariably have more lenient underwriting and due diligence standards than loans to "third parties", and were not arms-length transactions and, thus, were detrimental to the Company.

151.   The 2017 Form 10-K also continued to mischaracterize the nature of the risks at issue in the Loan Program:

***Under the FPI Loan Program, we provide loans to third-party farmers, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.***

Under the FPI Loan Program, which was announced in August 2015, we make loans to third-party farmers (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes. The loans are collateralized by farm real estate.

152.    These statements were materially false and misleading when made because the Loan Program was threatened by the much more fundamental risks of lending to related parties, including lending on more lenient terms or lowering loan standards with such parties.  These statements were also misleading because the related party loans were not arms-length transactions and, thus, were detrimental to the Company.

153.    The 2017 Form 10-K again provided a misleading explanation of FPIs related party transactions:

Note 4—Related Party Transactions

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman, the Company's CEO.  During the years ended December 31, 2017, 2016 and 2015, the Company incurred costs of $0.2 million,  $0.2 million and $0.1 million, respectively, from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's Consolidated Statements of Operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's Consolidated Statements of Operations. As of December 31, 2017 and 2016 the Company had outstanding payables to American Agriculture Aviation LLC of $0.01 million and $0.01 million, respectively.

Effective as of December 31, 2015, Mr. Pittman neither owns any direct or indirect interest in, nor has control of, Astoria Farms and Hough Farms. As of December 31, 2017 and 2016, 4% and 6%, respectively, of the acres in the Company's farm portfolio were rented to and operated by Astoria Farms or Hough Farms, both of which were related parties until December 31, 2015. Astoria Farms is a partnership in which Pittman Hough Farms LLC ("Pittman Hough Farms"), which was previously 75% owned by Mr. Pittman, had a 33.34% interest. The balance of Astoria Farms was held by limited partnerships in which Mr. Pittman was previously the general partner. Hough Farms is a partnership in which Pittman Hough Farms previously had a 25% interest. The aggregate rent recognized by the Company for these entities for the years ended December 31, 2017, 2016 and 2015 was $2.0 million, $2.5 million and $2.7 million,

respectively. As of December 31, 2016 and 2015, the Company did not have any accounts receivable from these entities.

154.    These statements were materially false and misleading when made because Defendants failed to disclose all of FPI's related party transactions – as they were required to do under ASC 850 – and (i) that FPI's October 2015 and March 2017 loans made through the Loan Program were to Niebur, a related party and risky borrower, not a "third-party farmer" (*see* ¶¶80-82, 76-78); and (ii) the nature of the related party relationships with Niebur and Hough, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.  Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and due diligence than loans to "third parties".  This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.  Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.  Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

155.    On March 10, 2018, FPI inexplicably dismissed PricewaterhouseCoopers LLP ("PwC") as its independent registered public accounting firm.

156.    On the same day, FPI engaged EKS&H LLLP ("EKS&H") as its new independent registered public accounting firm.

157.    On March 19, 2018, Thomas S.T. Gimbel, an independent FPI board member, resigned and notified FPI that would not stand for reelection to the Board when his current term was to expire at the time of the Company's 2018 annual meeting of stockholders.

158.    On April 10, 2018, FPI entered into a separation agreement (the "Separation Agreement") with Robert L. Cowan, FPI's President.  Pursuant to the Separation Agreement, Cowan retired as FPI's President on May 31, 2018.

159.    In total, four FPI directors and its President – who had come to FPI from two of its largest acquisitions (Forsythe Farms and American Farmland Company), and who had significant experience in farmland investing – had now resigned.

160.    Moreover, four of these resignations – three directors and FPI's President – resigned between December 2017 and April 2018 – right on the cusp of FPI's January 2018 $5.25 loan to Hough, which caused the amount of FPI's loans to related parties to more than double from $4 million to $9.25 million.

161.    On May 10, 2018, FPI filed its first quarterly report on Form 10-Q.  That report, which was signed by Defendants Pittman and Fabbri, provided as follows:

> ***Under the FPI Loan Program, the Company makes loans to third-party farmers*** (both tenant and non-tenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects and for other farming and agricultural real estate related projects.  (Emphasis added).

162.    These statements were materially false and misleading when made because (i) FPI's October 2015 and March 2017 loans in the Loan Program were to Niebur and its July 2017, August 2017, and January 2018 loans in the Loan Program were to Hough, both of whom were related parties – not "third-party farmers" (*see* ¶¶80-81, 76-78); (ii) Defendants did not disclose the nature of the related party relationships with Niebur and Hough, as they were required to do under ASC 850; and (iii) that the Loan Program was, upon information and belief, designed or slated to be largely utilized to benefit related parties.  Defendants' statement was also misleading because loans to related parties invariably have more lenient underwriting and

due diligence than loans to "third parties".  This information was material to investors because transactions with related parties are often not at arms-length and can subject a company to liability and significant costs.  Moreover, the Loan Program was designed to be synergistic and benefit FPI's core business by drawing on the same relationships; thus, problems in the Loan Program could yield reputational harm impacting core business.  Instead of being synergistic, the Loan Program largely benefitted related parties and created unnecessary risk for FPI.

**THE MARKET LEARNS FOR THE FIRST TIME**
**THAT FPI WAS LENDING MONEY TO RELATED PARTIES**
**AND THAT MOST LOANS IN THE LOAN PROGRAM HAD SERIOUS PROBLEMS**

163.    On July 11, 2018, before market hours, Rota Fortunae, which means "Wheel of Fortune" and is the pseudonym of an investment analyst, published the Seeking Alpha Report on the *Seeking Alpha* website revealing for the first time to investors, *inter alia*, that FPI had been loaning money in the Loan Program to Hough and Niebur.  The Seeking Alpha Report is lengthy, well-documented and contains extensive documentary evidence.  The Seeking Alpha Report provided, in pertinent part:

> **Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible**
>
> FPI…has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now-bankrupt tenant (not disclosed),…Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant.

164.    The Seeking Alpha Report also revealed that numerous loans in the Loan Program had defaulted, been renegotiated, wrapped into new loans, or, in the case of Niebur, the borrower went bankrupt – showing serious problems in FPI's screening process for loans in the Loan Program:

Ryan Niebur is a now-bankrupt tenant (not disclosed), who after defaulting on an FPI loan (not disclosed) was bailed out when FPI acquired his properties.

Niebur's [first] loan remained unchanged until the 1Q2017 10-Q (pg. 16) when FPI disclosed that it 'renegotiated' the loan while simultaneously entering into a new $2.194 Million loan… collateralized by two additional properties and in which the deed specifically states that Niebur was in default on the loan.

165.    The Seeking Alpha Report also stated that, in light of the foregoing, "[w]e believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up."

166.    The Seeking Alpha Report also predicted that FPI would cut its dividend: "[W]e think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency." One month later, on August 8, 2018, FPI did, in fact, cut its quarterly dividend – by more than half – to 5 cents a share compared with its most recent dividend of 12.75 cents.

167.    The market was floored by the revelations in the Seeking Alpha Report, which unearthed related party transactions that suggested a betrayal of trust and the realization that the Loan Program had, instead of benefitting the Company by aiding FPI's core renting business, only benefitted – and perhaps was even designed to benefit – related parties.

168.    After the Seeking Alpha Report, FPI common stock plummeted almost 40%, from a July 10, 2018 closing price of $8.49 to close at only $5.18 on July 11, 2018. FPI's preferred stock also fell from a July 10, 2018 closing price of $23.73 to close at only $17.53 on July 11, 2018.

### POST-CLASS PERIOD EVENTS

169.    In an attempt to mitigate the harm the Seeking Alpha Report had on FPI's stock price, on July 17, 2018, FPI issued a purported "rebuttal" of the Seeking Alpha Report on FPI's

website.   Among other things, the rebuttal by FPI mis-framed the key question concerning whether Hough and Niebur are indeed related parties and simply stating in conclusory fashion that they are not.  The rebuttal provided, in pertinent part:

> …Hough was not a "related party" under…SEC and FASB rules at the time [of the] loans….  Hough is a tenant and a borrower of [FPI].  From April 16, 2014 through April 16, 2018, Mr. Hough was a consultant of the Company.  He was a business partner of…CEO, Paul Pittman, prior to t[IPO] and during the first couple of years subsequent to the [IPO]….  ***Hough never had decision-making authority over any matters or transactions involving the Company***.
> (Emphasis added).

170.    In fact, FASB (ASC 850) states that a related party is someone "who can significantly influence the management or operating policies" – not someone with "decision-making authority".

171.    In addition to filing its purported rebuttal, FPI also sued Rota Fortunae for, *inter alia*, defamation in connection with the Seeking Alpha Report.  That action (*Farmland Partners, Inc. v. Rota Fortunae*, No. 1:18-cv-02351-KLM (D. Col.)), is currently pending.

172.    On August 8, 2018, as Rota Fortunae predicted, FPI cut its quarterly dividend – by more than half – to 5 cents a share compared with its most recent dividend of 12.75 cents.

173.    On August 9, 2018, FPI held a conference call with analysts.  Defendant Pittman was asked about the Seeking Alpha Report and its claim that FPI had been lending to related parties.  Pittman pounced – but again mis-framed the related party issue:

> We – related parties has a specific definition, and we have not made any loans to related parties. Now if you think related parties means we only loan money to people we know, that's certainly true. But his allegation when he made it, and I say him, I don't even know if it's a him, a she or a they. They knew that was false when they wrote it. Okay?

174.    As alleged above, the "specific definition" of a related party under ASC 850 is someone who "can significantly influence the management or operating policies of the other to

an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests." ¶10. Pittman never discussed whether Hough or Niebur were related parties under the only definition that matters – ASC 850.

175.    Not surprisingly, therefore, FPIs purported rebuttal did not succeed in discrediting the Seeking Alpha Report or convincing shareholders that the Company was issuing proper disclosures. Accordingly, FPI stock remains at depressed levels due to the news revealed by the Seeking Alpha Report. FPI currently trades at $5.35 per share.

## ADDITIONAL SCIENTER/FALSITY ALLEGATIONS

176.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading when made.

177.    Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

178.    Defendants, by virtue of their receipt of information reflecting the true facts regarding the Loan Program, and/or receipt and/or modification of FPI's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

179.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the

knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

180.   The Individual Defendants, because of their positions with FPI and the small size of the Company, made and/or controlled the contents of the Company's public statements during the Class Period.   Each Individual Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information, these defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading when made.   As a result, each of these defendants is responsible for the accuracy of FPI's corporate statements and is therefore responsible and liable for the representations contained therein.

181.   Defendants repeatedly made public statements about related parties.   *See* ¶¶85, 95, 122, 132, 139, 150.   Thus, Defendants knew of their duties to disclose transactions with related parties, including parties who could significantly affect FPI's operating policies such as Hough and Niebur.

182.   Defendant Pittman benefitted by helping related parties Hough and Niebur.

183.   In August 2017, director Boardman resigned.

184.   Between December 2017 and April 2018, three more FPI directors and its President resigned.

185.   In March 2018, FPI inexplicably switched auditors.

186.     Four of these resignations, as well as the change in auditors, occurred between December 2017 and April 2018 – right on the cusp of FPI's January 2018 $5.25 loan to Hough, causing the amount of loans to related parties to jump from $4 million to $9.25 million – almost half of FPI's $20 million cash on hand as of September 30, 2018.  *See* 3Q2018 Form 10-Q at 3.

## LOSS CAUSATION / ECONOMIC LOSS

187.     During the Class Period, as detailed herein, FPI securities were artificially inflated due to Defendants' misleading public statements.  When Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of FPI securities fell as the prior artificial inflation came out.

188.     As a result of their purchases of FPI securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

189.     The decline in the price of FPI securities after the corrective disclosure on July 11, 2018 was a direct result of Defendants' misrepresentations being revealed to investors and the market.

190.     The decline in the price of FPI securities was also the result of the materialization of the concealed investment risks concerning FPI.

191.     Defendants' materially false and misleading statements relate to undisclosed related transactions in the Company's Loan Program, as well as undisclosed dangers with many of the loans in the Loan Program.  The Loan Program, as set forth *supra*, was also supposed to be synergistic to FPI's core renting business, when instead it was either utilized or designed to benefit related parties to the detriment of FPI.

192.    The corrective disclosure on July 11, 2018 revealed that FPI had been loaning money to related parties in its Loan Program and that many of the loans in the Loan Program had serious problems.

193.    After the adverse July 11, 2018 announcement, FPI stock fell almost 40% – from a July 10, 2018 closing price of $8.49 to close at only $5.18 on July 11, 2018.  FPI's preferred stock fell from a July 10, 2018 closing price of $23.73 to close at only $17.53 on July 11, 2018.

194.    Defendant Pittman attributed FPI's stock drop to the Seeking Alpha Report.  *See* August 9, 2018 conference call at 3.

195.    The timing and magnitude of the price decline in FPI securities negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of FPI securities when Defendants' misrepresentations were revealed.

## CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Farmland during the Class Period and who were damaged upon the revelation of the alleged corrective disclosure (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

197.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

198.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

199.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs has no interests antagonistic to or in conflict with those of the Class.

200.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.     whether Defendants' acts as alleged herein violated the federal securities laws;

    b.     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the Loan Program, operations, and management of the Company;

c.      whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e.      whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.      whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

201.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

202.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.      Defendants made public misrepresentations and/or failed to disclose material facts during the Class Period;

b.      the omissions and misrepresentations were material;

c.      the Company's securities are traded in efficient markets;

d.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

e.      Plaintiffs and members of the Class purchased the Company's securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

f.   unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

203.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

204.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

205.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.   This Count is asserted against the Company and the Individual Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

207.   During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

208.    The Company and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

209.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading when made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Company and the Individual Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

210.    The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and

disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

211.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated, as a result of the Company's and the Individual Defendants' false and misleading statements.

212.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

213.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

214.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act Against The Individual Defendants**

215.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

216.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

217.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's operations, and to correct promptly any public statements issued by the Company which were materially false or misleading.

218.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

219.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being directors of the

Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

220.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: March 11, 2019

Respectfully Submitted,

**BERENS LAW LLC**

/s/ Jeffrey A. Berens

_____

Jeffrey A. Berens
2373 Central Park Blvd.
Suite 100
Denver, CO 80238
Telephone: (303) 861-1764
Email: jeff@jberenslaw.com

*Liaison Counsel for Lead Plaintiffs and the Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Laurence J. Hasson
Joseph R. Seidman, Jr.
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Email:  bernstein@bernlieb.com
            lhasson@bernlieb.com
            seidman@bernlieb.com

*Lead Counsel for Lead Plaintiffs and the Proposed Class*

# Certification and Authorization of Plaintiff Pursuant to Federal Securities Laws

The individual or entity listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by Bernstein Liebhard LLP, retains Bernstein Liebhard LLP to file an action under the federal securities laws to recover damages and to seek other relief against Farmland Partners Inc. Bernstein Liebhard LLP will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Farmland Partners Inc. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by Bernstein Liebhard LLP.

| | |
|---|---|
| **First Name:** | Cecilia |
| **Middle Name:** | M |
| **Last Name:** | Turner |
| **If Representing Corporation, Trust, Partnership or other entity, Name of Entity:** | |
| **If Representing an Entity, Position at Entity:** | |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Phone:** | |
| **Email:** | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing and/or the filing of a Lead Plaintiff motion on Plaintiff's behalf.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. The following sets forth all of the transactions of the Plaintiff in the securities that are the subject of the complaint during the class period specified in the complaint:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 2017-02-06 | 1000 | 11.20 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 2018-07-20 | 1000 | 6.5067 |

7. Plaintiff has not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below.

I declare under penalty of perjury, under the laws of the United States of America, that the information entered is accurate: **YES**

By clicking on the "submit" button below, I agree to execute this agreement and retain Bernstein Liebhard LLP to proceed on Plaintiff's behalf on a contingent fee basis consistent with the retainer agreement. **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States of America.

Date of signing: August 22nd, 2018

_Cecilia Turner_

# Certification and Authorization of Plaintiff Pursuant to Federal Securities Laws

The individual or entity listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by Bernstein Liebhard LLP, retains Bernstein Liebhard LLP to file an action under the federal securities laws to recover damages and to seek other relief against Farmland Partners Inc. Bernstein Liebhard LLP will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Farmland Partners Inc. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by Bernstein Liebhard LLP.

| | |
|---|---|
| **First Name:** | Kurt |
| **Middle Name:** | F |
| **Last Name:** | Turner |
| **If Representing Corporation, Trust, Partnership or other entity, Name of Entity:** | Turner Insurance Agency, Inc. |
| **If Representing an Entity, Position at Entity:** | President/Owner |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Phone:** | |
| **Email:** | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing and/or the filing of a Lead Plaintiff motion on Plaintiff's behalf.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. The following sets forth all of the transactions of the Plaintiff in the securities that are the subject of the complaint during the class period specified in the complaint:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 2017-02-10 | 2000 | 11.30 |

| Common Stock | 2017-02-13 | 3000  | 11.42 |
| Common Stock | 2017-02-14 | 5000  | 11.32 |
| Common Stock | 2017-03-08 | 10000 | 10.83 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 2018-07-12 | 20000 | 6.11 |

7. Plaintiff has not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below.

| | |
|---|---|
| I declare under penalty of perjury, under the laws of the United States of America, that the information entered is accurate: | **YES** |
| By clicking on the "submit" button below, I agree to execute this agreement and retain Bernstein Liebhard LLP to proceed on Plaintiff's behalf on a contingent fee basis consistent with the retainer agreement. | **YES** |

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States of America.

Date of signing: August 21st, 2018



# Certification and Authorization of Plaintiff Pursuant to Federal Securities Laws

The individual or entity listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by Bernstein Liebhard LLP, retains Bernstein Liebhard LLP to file an action under the federal securities laws to recover damages and to seek other relief against Farmland Partners Inc. Bernstein Liebhard LLP will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Farmland Partners Inc. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by Bernstein Liebhard LLP.

| | |
|---|---|
| **First Name:** | Dermot |
| **Middle Name:** | |
| **Last Name:** | Greally |
| **If Representing Corporation, Trust, Partnership or other entity, Name of Entity:** | Obelisk Capital Management, Managing Director and Owner |
| **If Representing an Entity, Position at Entity:** | |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Phone:** | |
| **Email:** | |



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing and/or the filing of a Lead Plaintiff motion on Plaintiff's behalf.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. The following sets forth all of the transactions of the Plaintiff in the securities that are the subject of the complaint during the class period specified in the complaint:

    Acquisitions:

    *See Attachment A hereto.*

Sales:

*See Attachment A hereto.*

7. Plaintiff has not sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below.

| | |
|---|---|
| I declare under penalty of perjury, under the laws of the United States of America, that the information entered is accurate: | **YES** |
| By clicking on the "submit" button below, I agree to execute this agreement and retain Bernstein Liebhard LLP to proceed on Plaintiff's behalf on a contingent fee basis consistent with the retainer agreement. | **YES** |

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States of America.

Date of signing: July 12th, 2018

| Attachment A | | | |
|---|---|---|---|
| **Obelisk Capital Management** | | | |
| **Class Period Transactions in Farmland Partners Inc.** | | | |
| **TRANSACTION TYPE** | **DATE** | **SHARES** | **PRICE ($)** |
| **PURCHASES** | | | |
| FPI | 1/5/2018 | 600 | $8.53 |
| FPI | 1/17/2018 | 2,500 | $8.51 |
| FPI | 1/17/2018 | 1,000 | $8.48 |
| FPI | 1/18/2018 | 1,000 | $8.35 |
| FPI | 1/19/2018 | 3,000 | $8.33 |
| FPI | 1/26/2018 | 1,500 | $8.26 |
| FPI | 1/29/2018 | 4,222 | $8.19 |
| FPI | 1/29/2018 | 2,500 | $8.20 |
| FPI | 1/30/2018 | 778 | $8.19 |
| FPI | 2/1/2018 | 1,100 | $8.03 |
| FPI | 2/2/2018 | 1,400 | $8.03 |
| FPI | 2/2/2018 | 2,500 | $8.02 |
| FPI | 2/6/2018 | 2,500 | $7.40 |
| FPI | 2/6/2018 | 800 | $7.39 |
| FPI | 2/13/2018 | 1,602 | $7.29 |
| FPI | 2/13/2018 | 2,500 | $7.32 |
| FPI | 2/14/2018 | 898 | $7.29 |
| FPI | 4/23/2018 | 2,000 | $7.61 |
| FPI | 4/23/2018 | 500 | $7.61 |
| FPI | 4/23/2018 | 500 | $7.62 |
| FPI | 4/24/2018 | 2,000 | $7.52 |
| FPI | 4/25/2018 | 1,000 | $7.51 |
| | | | |
| FPI PRB | 1/2/2018 | 2,104 | $25.51 |
| FPI PRB | 1/10/2018 | 292 | $25.51 |
| FPI PRB | 1/17/2018 | 4,704 | $25.51 |
| FPI PRB | 1/18/2018 | 1,000 | $25.45 |
| FPI PRB | 1/18/2018 | 30 | $25.41 |
| FPI PRB | 1/24/2018 | 300 | $25.41 |
| FPI PRB | 1/29/2018 | 1,170 | $25.41 |
| FPI PRB | 1/29/2018 | 1,400 | $25.33 |
| FPI PRB | 2/1/2018 | 600 | $25.33 |
| FPI PRB | 2/6/2018 | 5,000 | $25.10 |
| FPI PRB | 7/11/2018 | 1,000 | $22.29 |
| FPI PRB | 7/11/2018 | 1,000 | $22.50 |
| FPI PRB | 7/11/2018 | 1,000 | $22.33 |
| FPI PRB | 7/11/2018 | 1,000 | $22.20 |
| FPI PRB | 7/11/2018 | 1,000 | $19.33 |
| FPI PRB | 7/11/2018 | 1,000 | $19.40 |
| FPI PRB | 7/11/2018 | 1,000 | $19.77 |
| FPI PRB | 7/11/2018 | 1,000 | $19.64 |
| FPI PRB | 7/11/2018 | 1,000 | $19.50 |
| FPI PRB | 7/11/2018 | 2,000 | $19.50 |
| | | | |
| **SALES** | | | |
| FPI | 06/12/18 | 2,500 | $8.78 |
| FPI | 06/20/18 | 1,000 | $9.12 |
| FPI | 06/20/18 | 1,000 | $9.11 |
| FPI | 06/20/18 | 1,000 | $9.11 |
| FPI | 06/20/18 | 2,000 | $9.12 |
| FPI | 06/21/18 | 1,000 | $9.16 |
| FPI | 06/21/18 | 600 | $9.16 |
| FPI | 06/21/18 | 100 | $9.16 |
| FPI | 06/26/18 | 400 | $9.16 |
| FPI | 06/26/18 | 300 | $9.16 |
| FPI | 06/27/18 | 6,000 | $9.16 |
| FPI | 06/27/18 | 1,100 | $9.16 |

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
BERENS LAW LLC
2373 Central Park Boulevard, Suite 100
Denver, CO  80238-2300
(303) 861-1764 (Telephone)
(303) 395-0393 (Facsimile)
jeff@jberenslaw.com