**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

THE TURNER INSURANCE AGENCY, INC.,
CECILIA TURNER, and
OBELISK CAPITAL MANAGEMENT, Individually
and on behalf of all others similarly situated,
                                    Plaintiff,

        v.

FARMLAND PARTNERS INC.,
PAUL A. PITTMAN, and
LUCA FABBRI,

                            Defendants.

Case No: 1:18-cv-02104-DME-NYW

STATE OF NEW YORK        )
                         )  ss:
COUNTY OF MONROE         )

**REPLY REPORT**

**of**

**GREGG M. EDWARDS**

**March 10, 2021**

# TABLE OF CONTENTS

**I. INTRODUCTION AND SUMMARY OF OPINIONS** ............................................................ 1

**II. RESPONSES TO CRITICISMS CONTAINED IN THE DUARTE-SILVA REPORT ... 4**

    **A. Responses to Duarte-Silva's Criticisms of My Indirect Evidence of Market Efficiency** ........................................................................................................................ 4

        i) **Duarte-Silva Opines that My Benchmarking Analysis Is Unsupported and Unreliable** ........................................................................................... 10

            a) **Benchmarking Analyses Provide an Empirical Basis for Determining Appropriate Thresholds for Efficiency** ..................................... 11

            b) **My Benchmarking Analysis is Consistent with Duarte-Silva's Written Work** ............................................................................................... 13

            c) **My Benchmarking Analysis is Consistent with Those Discussed in Published Research** ................................................................................. 15

            d) **My Benchmarking Analysis Is Consistent with Those Used in the Courts** ......................................................................................................... 16

        ii) **Duarte-Silva Opines that I Overstate Farmland's Market Capitalization Over a Substantial Portion of the Class Period** ......................................... 18

        iii) **Duarte-Silva Opines that NYSE DMMS are Irrelevant and that There is No Evidence that Institutional Holdings of Farmland Suggest Market Efficiency** ........................................................................................................ 21

        iv) **Duarte-Silva Opines That It Is Impossible to Conclude that the Level of Short Interest in Farmland's Shares Was Consistent with an Efficient Market** ............................................................................................................. 28

        v) **Conclusion Regarding Duarte-Silva's Criticisms of My Indirect Factors** 33

    **B. Responses to Duarte-Silva's Criticisms of My Cause-and-Effect Evidence of Market Efficiency** ...................................................................................................... 33

        i) **Duarte-Silva Opines that Farmland's Market Model is Incapable of Establishing a Cause-And-Effect Relationship Between Macro-Economic News and a Corresponding Change in Farmland's Stock Price** ............. 36

        ii) **Duarte-Silva Opines that Standard Event Study Analyses Are Incapable of Establishing a Cause-and-Effect Relationship Between Firm-Specific News and a Corresponding Change in Farmland's Stock Price** ............. 41

        iii) **Duarte-Silva Provides Erroneous and Misleading Criticisms of My Event Study Analyses** ........................................................................................... 47

            a) **Duarte-Silva Ignores Commonly Used and Well-Accepted Tests for Establishing Statistical Significance** ....................................................... 49

            b) **Duarte-Silva Makes Erroneous Claims Regarding My Thresholds for Establishing Informational Efficiency** ................................................. 65

            c) **Duarte-Silva's Claims Regarding My Use of Objective Criteria for Assessing the Value Content of News are Erroneous and Contrary to Well-Accepted Literature and Court Precedent** ..................................... 66

            d) **Duarte-Silva Makes Misleading Claims Regarding the Proportion of**

Statistically Significant Days With and Without News ....................... 71

    e) **Duarte-Silva Makes Misleading Claims Regarding Farmland's Reaction to News Early in the Class Period** ......................... 74

**III. DUARTE-SILVA'S OPINIONS ON PRICE IMPACT ARE FLAWED AND UNRELIABLE** ................................................................................ 76

  A. **Duarte-Silva's Opinion of No Front-End Price Impact** ......................... 77

  B. **Duarte-Silva's Opinion that the Information Regarding the Recipients of the At-Issue Loans Was Already in the Public Domain** ..................................... 79

  C. **Duarte-Silva's Opinion that the Risks Created by the Loan Program Was Not Value Relevant Is Contradicted by the Research** .................................... 87

  D. **Duarte-Silva's Opinion that the July 11, 2018 Stock-Price Reaction was Due to Confounding Information** ......................................................... 91

# I. INTRODUCTION AND SUMMARY OF OPINIONS

1. I am a vice president of Forensic Economics Inc. I have been retained by Lead Plaintiffs' Counsel, Bernstein Liebhard LLP ("Counsel"), to opine on issues relating to market efficiency and class-wide damages for the common stock of Farmland Partners Inc. in the above captioned matter. I previously submitted a declaration in this Action dated December 16, 2019, in which I set forth my qualifications and compensation. On February 5, 2021, I submitted a Declaration in which I corrected a typo in my December 16, 2019 report (the "Edwards Report").[1]

2. In the Edwards Report, I analyzed the factors set forth in *Cammer, Krogman,* and *Polymedica* and concluded that Farmland's common stock traded in an informationally efficient market during the Class Period. Table 1 below summarizes the results of the analyses for market efficiency found in the Edwards Report:

---

[1] Capitalized terms undefined herein have the meaning ascribed to them in the Edwards Report.

TABLE 1
SUMMARY OF MARKET EFFICIENCY FINDINGS

*Cammer v. Bloom*

| Factor | Name | Results | Supports Efficiency |
|---|---|---|---|
| 1 | Avg. Weekly Trading Volume | 4.08% | Yes |
| 2 | Analyst Coverage | 5 | Yes |
| 3 | Market Makers | DMM | Yes |
|  | Inst. Ownership as % of Shares Out. | 42.2% | Yes |
| 4 | SEC Form S-3 | Met Rec. | Yes |
| 5 | Cause-and-Effect Relationship |  |  |
|  | Market Model t-statistics | Significant | Yes |
|  | Event Study – Analyst Actions | As Expected | Yes |
|  | Event Study – Earnings Surprises | As Expected | Yes |

*Krogman v. Sterritt*

| Factor | Name | | |
|---|---|---|---|
| 1 | Market Capitalization | $228.8 Million | No |
| 2 | Public Float | $218.6 Million | Yes |
| 3 | Bid-Ask Spread | 0.16% | Yes |

*PolyMedica Corp. Sec. Litig.*

| Factor | Name | | |
|---|---|---|---|
| 1 | Autocorrelation | No | Yes |
| 2 | Short Interest | 5.8% | Yes |
|  | Days to Cover Shorts | 7.4 | Yes |
| 3 | Put-Call Parity | Few Violations | Yes |

3.      I also opined that damages under Section 10(b) of the Exchange Act caused by the alleged misrepresentations and omissions in this Action are measurable on a class-wide basis using an out-of-pocket measure, which will reflect the purchase price less the true value on the date of purchase of Farmland's shares, where the true value incorporates the information that was alleged to have been misrepresented or omitted.

4.      For this Reply Report, I have been asked to respond to the opinions and criticisms of my work presented in the Expert Report of Tiago Duarte-Silva, Ph.D dated February 8, 2021 (the "Duarte-Silva Report"). Specific documents and information relied upon in reaching my opinions are cited throughout this reply report.

5.     I first note that, after reviewing and criticizing the work performed in the Edwards Report, nowhere in the Duarte-Silva Report does Duarte-Silva opine that the market for Farmland's common stock was not informationally efficient at any point throughout the Class Period.  This lack of an affirmative opinion of inefficiency was confirmed by Duarte-Silva at his deposition.[2]  Instead, Duarte-Silva provides the following primary opinions:

a) As a general matter, with the exception of the fifth *Cammer* factor, the *Cammer, Krogman,* and *Polymedica* factors do not provide any scientific bases for evaluating market efficiency;

b) Even though the *Cammer, Krogman,* and *Polymedica* factors do not provide any scientific bases for evaluating market efficiency in the absence of the fifth *Cammer* factor, the evidence provided in the Edwards Report on these factors "are far weaker than [Edwards] suggests";

c) The tests of cause-and-effect provided in the Edwards Report are flawed and unreliable and do not support a finding of market efficiency; and

d) There is no evidence of price impact related to the alleged misrepresentations.[3]

6.     After reviewing the Duarte-Silva Report, I continue to hold the opinions I expressed in the Edwards Report.  In particular, as detailed in the sections that follow:

a) Duarte-Silva's opinions as to the analyses required for establishing an informationally efficient market are contradicted by decades of well-established research and court precedent;

b) Many of Duarte-Silva's criticisms are based on misleading and erroneous descriptions of my analyses and results; and

c) Duarte-Silva's opinions regarding the lack of price impact relating to the alleged misrepresentations in the matter are based on incomplete analyses and are inconsistent with the economic evidence.

---

[2] *See* Duarte-Silva Dep., p. 7:10-21: "Q Okay. So is it your opinion here that the market for Farmland common stock was not informationally efficient? A *My opinion is that Mr. Edwards hasn't shown that the market is efficient*. Q Okay. But is it your opinion that it's, in fact, inefficient? A *I'm not offering an affirmative opinion in my report*." (emphasis added)

[3] *See* Duarte-Silva Report, ¶¶8-9.

7.     I understand that discovery in this case is ongoing.  Therefore, I reserve the right to amend this report to reflect new information available to me in light of the ongoing discovery process, information provided by other experts in the litigation, documents provided by Counsel, future rulings from the Court in this Action, and trial proceedings.

## II.  RESPONSES TO CRITICISMS CONTAINED IN THE DUARTE-SILVA REPORT

8.     In the sections that follow, I respond to the numerous criticisms that Duarte-Silva provides of my work.  In Section II. A. I respond to Duarte-Silva's criticisms of my analyses of *Cammer's* first four factors, as well as the six factors examined in *Krogman and Polymedica*, which Duarte-Silva refers to as "indirect indicia of efficiency."  In Section II. B. I respond to Duarte-Silva's criticism of my event study analyses of a cause-and-effect relationship under *Cammer* 5.

### A.  Responses to Duarte-Silva's Criticisms of My Indirect Evidence of Market Efficiency

9.     As discussed above, I examined *Cammer's* first four factors, as well as the six factors examined in *Krogman and Polymedica*.  The results of these factors are shown in Table 1 above and summarized below:

a) *Cammer 1*: Farmland's weekly trading volume as a percent of shares outstanding ranged from 0.63% to 14.83%, with an average of 4.08%, which is significantly greater than the 2 percent "strong presumption" discussed in *Cammer*.[4]

b) *Cammer 2*: Farmland's coverage by research analysts ranged from four to six, with an average of five.  These research analysts issued over 50 reports during the Class Period further disseminating and interpreting information disclosed by the Company;[5]

c) *Cammer 3*: The presence of a NYSE DMM during the Class Period provided liquidity and facilitated a market for Farmland's common stock.  There was

---

[4] *See* Edwards Report, ¶¶27-30; Exhibit 3.
[5] *See* Edwards Report, ¶¶31-36; Exhibit 3.

also significant interest in Farmland's common stock by institutional investors who held 25.9% to 56.6%, with an average of 42.2%, of Farmland's common stock during the Class Period;[6]

d) _Cammer 4_: Farmland met the requirements for the filing of a Form S-3 with the SEC during the Class Period.[7]

e) _Krogman 2_: Farmland's $218.6 million average public float represented approximately 96% of Farmland's average market capitalization during the Class Period;[8]

f) _Krogman 3_: Farmland's bid-ask spread ranged from 0.09% to 1.14%, with an average of 0.16% during the Class Period, indicating that there were not excessive trading costs that would deter investor activity in Farmland's common stock during the Class Period;[9]

g) _Polymedica 1_: Farmland's common stock returns exhibited no evidence of autocorrelation, which indicates that investors could not earn systematic arbitrage profits in excess of trading costs based on past movements in Farmland's stock price;[10]

h) _Polymedica 2_: Farmland's level of short interest suggests that there were no constraints on short selling that would prevent investors from attempting to profit from any perceived mispricing of Farmland's common stock during the Class Period;[11] and

i) _Polymedica 3_: Farmland's stock exhibited strict adherence to put-call parity theory during the final two years of the Class Period when option data was available, providing further evidence that there were no constraints on short selling during this portion of the Class Period.[12]

10. I opined that the only factor that did not provide independent support for a finding of informational efficiency was the relatively small market capitalization of Farmland's common stock, which ranged from $120.1 million to $368.3 million, with an average of $228.8 million during the Class Period (_Krogman 1_). I then opined, however, that the preponderance of the

---

[6] _See_ Edwards Report, ¶¶37-41; Exhibit 3.

[7] _See_ Edwards Report, ¶¶42-47.

[8] _See_ Edwards Report, ¶98; Exhibit 3.

[9] _See_ Edwards Report, ¶¶100-103; Exhibit 3.

[10] _See_ Edwards Report, ¶¶105-108.

[11] _See_ Edwards Report, ¶¶109-114; Exhibit 3.

[12] _See_ Edwards Report, ¶¶115-119; Appendix C.

evidence clearly demonstrates that Farmland's common stock traded in an informationally efficient market during the Class Period.[13]

11.    In the Edwards Report, I referenced the U.S. Supreme Court decision in *Halliburton II* which endorsed the concept recognized in *Basic* that "market efficiency is a matter of degree,"[14] and that "[t]he markets for some securities are more efficient than the markets for others."[15]  I then opined that one way to judge the degree of efficiency for a publicly-traded stock is to compare various measures of market efficiency to those same measures for a large population of stocks that trade on a major exchange.  If the measures of efficiency for the individual stock compare favorably to the population of stocks which are generally considered to be efficient, then these comparisons provide evidence of market efficiency for the individual stock.  Therefore, for many of the factors for market efficiency that I examined, I compared how Farmland's common stock ranked among similar U.S. exchange-traded stocks (*i.e.,* constituents of the Russell 3000 Index) during the same period.[16]

12.    As stated in the Edwards Report, my benchmarking analysis is consistent with Campbell, Lo and MacKinlay, who state that:

> The notion of *relative* efficiency – the efficiency of one market measured against another, e.g., the New York Stock Exchange vs. the Paris Bourse, futures markets vs. spot markets, or auction vs. dealer markets – may be a more useful concept than the all-or-nothing view taken by much of the traditional market-efficiency literature.  The advantages of relative efficiency over absolute efficiency are easy to see by way of an analogy.  Physical systems are often given an efficiency rating based on the relative proportion of energy or fuel converted to useful work.  Therefore, a piston engine may be rated at 60% efficiency, meaning that on average

---

[13] *See* Edwards Report, ¶¶25, 96-99; Exhibit 3.

[14] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, (2014) ("*Halliburton II*") at 2403; and Edwards Report, ¶22.

[15] *See Halliburton II* at 2409; and Edwards Report, ¶22.

[16] *See* Edwards Report, ¶¶23-24.

60% of the energy contained in the engine's fuel is used to turn the crankshaft, with the remaining 40% lost to other forms of work such as heat, light, or noise.

Few engineers would ever consider performing a statistical test to determine whether or not a given engine is _perfectly efficient_ – such an engine exists only in the idealized frictionless world of the imagination. But measuring relative efficiency – relative to the frictionless ideal – is commonplace. Indeed, we have come to expect such measurements for many household products: air conditioners, hot water heaters, refrigerators, etc. _Similarly, market efficiency is an idealization that is economically unrealizable, but that serves as a useful benchmark for measuring relative efficiency._[17]

13.     To assess whether a factor compared favorably to (_i.e.,_ not significantly different than) the population of stocks which are generally considered to be efficient, I used a widely accepted hypothesis testing methodology. Specifically, after calculating where each available factor ranked among other U.S. exchange-traded stocks, I compared each factor's rank to the median (50th percentile). In financial economics, it is common practice to consider an observation statistically significantly different than the mean if the t-statistic associated with the observation corresponds with a p-value of 5%.[18] For a one-tailed test, this t-statistic equals ±1.65.[19] For my benchmarking analysis, I conservatively selected my threshold to be 16% (instead of 5%), which corresponds with a t-statistic of ±1.00. In so doing, my benchmarking

---

[17] _See_ John Y. Campbell, Andrew W. Lo and A. Craig MacKinlay, _The Econometrics of Financial Markets_, Princeton University Press, 1997, pp. 24-25 (emphasis in original and added); and Edwards Report, ¶23.

[18] _See_ David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in Reference Manual on Scientific Evidence, Third Edition, National Academy of Sciences, 2011, pp. 211-302 at 251 ("In practice, statistical analysts typically use levels of 5% and 1%. The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure." (footnote omitted)).

[19] _See_ D. Anderson, D. Sweeney, and T. Williams, <u>Statistics for Business and Economics</u>, nineth edition, Thomson, 2005, p. 931.

analysis is biased in favor of a finding of market <u>inefficiency</u> for Farmland's common stock.[20] The results of my benchmarking analysis are discussed in detail in the Edwards Report and summarized in Figure 1 below:

FIGURE 1
COMPARISON OF EFFICIENCY FACTORS TO THOSE FOR CONSTITUENTS OF RUSSELL 3000 INDEX[21]



14.     As can be seen in Figure 1 above, with the exception of Farmland's relatively low average market capitalization (discussed above), the remaining factors analyzed compared favorably to those for other U.S. exchange-traded stocks during the Class Period.

15.     For example, Farmland's average weekly trading volume as a percentage of shares outstanding of 4.08%, which was over twice the strong-presumption threshold in *Cammer*, was at the 57th percentile of U.S. exchange-traded stocks. This indicates that Farmland's relative trading volume was <u>greater</u> (more liquid) than that for the typical U.S. exchange-traded stock.

---

[20] *See* Edwards Report, ¶24; fn 23.

[21] Sources: Edwards Report, Section V.; and Bloomberg.

16.     Farmland's average analyst coverage of 33%, while lower than the median (50th percentile), does meet my conservative 16% threshold, or any other reasonable threshold, for weighing against a finding of market efficiency.  Indeed, although it is common practice to consider an observation statistically significantly different than the mean if the t-statistic associated with the observation corresponds with a p-value of 5%, financial economic researchers often also indicate whether an observation meets the threshold for statistical significance at the 10% level.  Farmland's average analyst coverage being at the 33rd percentile is over three times the most conservative 10% threshold for statistical significance found in the financial economic literature, and over twice my even more conservative 16% threshold, indicating that there is no economic or statistical basis for concluding that this factor is abnormally low as compared to other U.S. exchange-traded stocks.

17.     Farmland's average bid-ask spread of 0.16%, which is a small fraction of the 2.44% the court in *CyberGuard* found "…weighs in favor of market efficiency ...", was at the 38th percentile, indicating that Farmland's bid-ask spread was less than 62% of U.S. exchange traded stocks during the Class Period.  This indicates that the cost of trading in Farmland's common stock was more favorable than the typical (50th percentile) U.S. exchange-traded stock during the Class Period.

18.     Finally, my two metrics for measuring Farmland's relative levels of short interest (as a percent of shares outstanding and days to cover), at the 56th and 53rd percentiles, are approximately equal to that of the typical (median) U.S. exchange-traded stock, which suggestes that there were no constraints on short selling that would prevent investors from attempting to profit from any perceived mispricing of Farmland common stock during the Class Period.

19.     Although Duarte-Silva provides no claim nor suggestion that I made any errors in my calculations of these factors, nor in the rankings of these factors within the population of

other U.S. exchange-traded stocks, he nonetheless opines that the results of my above analyses "do not support a finding of efficiency."[22]  Instead, Duarte-Silva opines that: "[a]s a matter of financial economics, these indirect indicia of efficiency are insufficient to establish efficiency in light of the absence of empirical evidence of a cause-and-effect relationship."[23]  Duarte-Silva then states:

> Nonetheless, I understand that some courts have concluded that a "compelling" showing as to the indirect factors may be sufficient in some cases to establish efficiency even without empirical evidence of a cause-and-effect relationship.  As explained below, Edwards' findings on the indirect factors are not compelling.[24]

20.     I respond to Duarte-Silva's various criticisms of my analyses of these indirect factors below.

### i) Duarte-Silva Opines that My Benchmarking Analysis Is Unsupported and Unreliable

21.     Duarte-Silva first criticizes my analyses of these indirect factors by opining that my benchmarking analysis is arbitrary and unscientific stating:

> Obviously, being above or below a given percentile indicated by Edwards has absolutely no bearing on whether a stock trades in an efficient market. Edwards has not provided any, nor am I aware of any, evidence that stocks above or below a certain threshold are, or even are more likely to be, efficient. I am unaware of any peer-reviewed academic evidence of the informativeness of percentiles of a large universe of stocks like the Russell 3000 being used as a basis to establish market efficiency. Edwards is assuming the conclusion that stocks above a certain arbitrary percentile threshold trade in an efficient market and then goes on to observe that Farmland's shares were above that arbitrary threshold.[25]

---

[22] *See* Duarte-Silva Report, Section V. B.

[23] *See* Duarte-Silva report, ¶54.  I note that Duarte-Silva provides no reference to academic research or court precedent that supports his assertion that, as a matter of financial economics, indirect indicia of efficiency are insufficient to establish informational efficiency.

[24] *See* Duarte-Silva report, ¶55 (footnote omitted).

[25] *See* Duarte-Silva report, ¶57.

22.     I disagree with Duarte-Silva's assertion that a *Cammer, Krogman,* or *Polymedica* factor being above or below a given threshold for a large universe of U.S. exchange-traded stocks, such as the constituents of the Russell 3000, has no bearing on forming an opinion of whether the stock trades in an informationally efficient market for several reasons.

a) *Benchmarking Analyses Provide an Empirical Basis for Determining Appropriate Thresholds for Efficiency*

23.     First, the benchmarking methodology is based on two principles and precedents that are well accepted by the courts: i) stocks that trade on major U.S. exchanges, such as the NYSE and Nasdaq are generally considered to be efficient;[26] and ii) the *Cammer*, *Krogman*, and *Polymedica* factors are appropriate for demonstrating the efficiency of stocks that traded on these

---

[26] *See, for example, Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) fn 68 citing *Lapin v. Goldman Sachs & Co*., 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument can be made that the [NYSE] is not an efficient market."); *In re Initial Pub. Offering Secs. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency*"); RMED Int'l v. Sloan's Supermarkets*, 185 F. Supp. 2d 389, 404-05 (S.D.N.Y. 2002) ("Indeed, research has failed to reveal any case where a stock traded on the AMEX was found not to have been traded in an open and efficient market. . . . Rather, to the contrary, numerous courts have held that stocks trading on the AMEX are almost always entitled to the presumption.") (citations omitted); and *In re DVI, Inc. Securities Litigation*., 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *In re Merck & Co., Inc. Sec. Litig.*, MDL No. 1658, 2013 U.S. Dist. LEXIS 13511, at 59 (D.N.J. 2013) (finding efficiency where stock traded on the NYSE, without employing a Cammer analysis, because the NYSE is "consistently recognized by courts - including the Third Circuit and other United States Court of Appeals - as . . . 'well suited for application of the fraud on the market theory'"); *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013) ("[D]efendant [has not] identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market."); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (noting that "Basic itself recognized the NYSE was an efficient market"); *Cheney v. Cyberguard Corp*., 213 F.R.D. 484, 498 (S.D. Fla. 2003) ("NASDAQ . . . is more likely than not to be considered an efficiently traded market"); *Levine v. SkyMall, Inc*., No. 99 Civ. 166, U.S. Dist. LEXIS 24705, at 13 (D. Ariz. 2001) ("Although not dispositive, the fact that SkyMall stock is traded on the NASDAQ stock market's National Market System also contributes to finding that the market is efficient."); *O'Neil v. Appel,* 165 F.R.D. (W.D. Mich. 1995) (stating that "[t]he market system upon which a particular stock trades provides some insight as to the likelihood that the market for that stock is efficient").

or other exchanges.[27]  Indeed, because stocks that trade on major U.S. exchanges are generally

considered to be efficient by the courts, benchmarking the results of these well-accepted factors

against those for a universe of U.S. exchange-traded stocks provides the court with a logical and

objective methodology for assessing the relative efficiency of individual stocks.  If the results of

a factor are consistent with those for a typical U.S exchange-traded stock, this provides the court

with objective evidence that the specific factor weighs in <u>favor</u> of a finding of market efficiency.

If, on the other hand, the results of a factor are significantly different than those for a typical U.S.

exchange-traded stock, this provides the court with objective evidence that the specific factor

weighs <u>against</u> a finding of market efficiency.

24.     As discussed in the Edwards Report, the Russell 3000 Index measures the

performance of the largest 3,000 U.S. equities.  Inclusion in the Russell 3000 requires that the

---

[27] *See, for example, Willis v. Big Lots, Inc.,* U.S. Dist. LEXIS 38933 (S.D. OH 2017) at 9
stating:  "It may be that many financial economists, including Dr. Gompers, dispute the
relevancy of the first four *Cammer* factors to a determination of market efficiency, but the
*Cammer* factors nonetheless reflect the *legal* standard for market efficiency and have been
considered by the Sixth Circuit in such determinations."; *Monroe County Employees'
Retirement System v. Southern Co*., 332 F.R.D. 370, 383 (N.D. GA. 2019, stating: "In addition,
although the Eleventh Circuit has not 'adopt[ed] the *Cammer* factors as the mandatory analytical
framework for market efficiency inquiries,' it acknowledges that 'some of those factors might
prove particularly useful when a District Court considers a stock for which the more traditional
indicia of efficiency . . . are not present…' Courts also look to the following three additional
factors set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. TX 2011): '(1) the
capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock
not held by insiders (the 'float').'; and *In re DVI, Inc. Securities Litigation*., 249 F.R.D. 196, 208
(E.D. PA 2008) stating: "In determining whether the market for DVI's common stock and Senior
Notes are efficient the Court will consider several different factors: whether these securities (1)
traded on a public exchange; (2) had large trading volumes; (3) were followed by market
analysts; (4) had several market makers; (5) could be and were registered on SEC Form S-3; and
(6) responded quickly to the release of company-specific information. See *Cammer v. Bloom*,
*711 F. Supp. 1264, 1286-87 (D.N.J. 1989)*. Additionally, the Court will assess the (7) size of
market capitalization of DVI; (8) size of the public float for the security; and (9) ability to short
sell the security, see *Krogman v, Sterritt, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)*, and (10) the
level of autocorrelation, see *In re PolyMedica Corp. Secs. Litig., 453 F. Supp. 2d 260, 276-77
(D. Mass. 2006)*. Both Defendants and Lead Plaintiffs have put forth several expert reports to
analyze these ten factors."

security be traded on a major U.S. exchange.[28]  During the Class Period, the constituents of the Russell 3000 Index traded on the NYSE and/or the Nasdaq.[29]  Although Duarte-Silva characterizes the 16% threshold I selected for determining that the result for a given factor is significantly different than the typical U.S. exchange traded stock as "arbitrary,"[30] as stated above and in the Edwards Report, this threshold (which corresponds with a t-statistic of $\pm 1.00$ instead of the standard $\pm 1.65$) was conservatively selected so as to bias my analysis in favor of finding for market <u>inefficiency</u> for Farmland's common stock.[31]

> ### *b)  My Benchmarking Analysis is Consistent with Duarte-Silva's Written Work*

25.  Second, my benchmarking analysis and statistical thresholds are also consistent with a *Bloomberg Law* article co-authored by Duarte-Silva titled: "The *Cammer* Turnover Factor in Securities Class Actions."[32]  In this article, Duarte-Silva discussed the 1% and 2% weekly trading volume thresholds set forth in *Cammer* and stated:

> When *Cammer* was decided 30 years ago, the average weekly share turnover across all publicly traded stocks was 1.4%.  Today, that figure has more than tripled to 5.2% (Figure 1). This shows that share turnover has increased significantly since 1989 and that more companies pass the court's turnover factor test for efficiency. The increase in share turnover in the last 30 years is not surprising. Reasons for the increase in stock trading volume include the increased participation in the stock market by domestic and foreign investors, the decline in trading costs, the rise of automated trading algorithms, the substitution away from the NYSE's specialist system to trading mediated by broker-dealers, and other factors.

---

[28] *See* Edwards Report, fn 52.

[29] There were 3,014 (3,003) constituents of the Russell 3000 as of the start (end) of the Class Period, with 1,417 (1,488) listed on the Nasdaq and the remaining 1,597 (1,515) listed on the NYSE.  Source: Email from FTSE Russell.

[30] *See* Duarte-Silva Report, ¶57.

[31] *See* Edwards Report, fn 23.

[32] *See* A. Koev and T. Duarte-Silva, "The *Cammer* Turnover Factor in Securities Class Actions," *Bloomberg Law*, July 2019.

In 1989, only 20% and 44% of stocks met the 2% and 1% thresholds set by the court, respectively. In 2017, those percentages were 70% and 87%, respectively (Figure 2). While the numbers point to a significant increase in the fraction of stocks satisfying the *Cammer* share turnover requirement, they also show that 13% of publicly traded common stocks fail to meet the less stringent of the two share turnover thresholds.

\*\*\*

The finding that 13% of U.S. traded stocks did not meet the *Cammer* turnover threshold in 2017 contrasts with the claim that simply trading on a major U.S. exchange (NYSE, AMEX, NASDAQ) ensures efficiency. The data seems to suggest that such a claim is overly simplistic, at least as far as the *Cammer* turnover factor is concerned.[33]

26.     As can be seen above, in this paper, Duarte-Silva benchmarked *Cammer's* 1% substantial presumption threshold against a large sample of U.S. exchange-traded stocks and found the 1% threshold to be at the 13th percentile of these stocks.  Consequently, according to Duarte-Silva's writings, my 16% threshold is more conservative (more likely to find in favor of inefficiency) than that implied by *Cammer's* 1% "substantial presumption" threshold during this same period.

27.     Moreover, Duarte-Silva's finding that just 30% of U.S. exchange-traded stocks did not meet the higher, 2% weekly trading volume threshold is also supportive of my analysis in that, with the exception of market capitalization, each of Farmland's remaining factors also meet this higher "strong-presumption" threshold implied by Duarte-Silva's analysis.

28.     Duarte-Silva confirmed these findings at his deposition when providing the following testimony:

Q        Right. If you include the cover, it's 3.

---

[33] *See* A. Koev and T. Duarte-Silva, "The *Cammer* Turnover Factor in Securities Class Actions," *Bloomberg Law*, July 2019, pp. 2-4.

So that I just read from your report, am I interpreting the section from your report I just read to mean that, in 2017, the 1 percent trading volume was at the 13th percentile of U.S. exchange-traded stocks, and the 2 percent was at the 30th percentile; is that correct?

A       It shows that 13 percent of publicly traded common stocks failed to meet the less stringent of the two share turnover thresholds, which is 1 percent. Yes, it says that.

***

Q       Right. So, I mean, am I interpreting the chart correctly to say that the 2 percent threshold was at the 30th percentile?

A       This chart shows that 70 percent of stocks in 2017 exceeded 2 percent in weekly turnover.[34]

c)   *My Benchmarking Analysis is Consistent with Those Discussed in Published Research*

29.     Third, my benchmarking analysis and selected thresholds are also supported by a recent paper co-authored by two of my colleagues in the *University of Illinois Law Review* titled: "Benchmarking Market Efficiency Indicators for Securities Litigation."[35]  In the article, the authors state:

> To make use of the fraud-on-the-market theory in securities litigation, a plaintiff must demonstrate that the security in question trades in an efficient market. To do so, economic experts routinely present measures of various commonly-accepted factors or indicators of efficiency such as trading volume, bid-ask spread, analyst coverage etc. for the stock in question as evidence for efficiency. Such quantification of factors, however, does not provide insight into how a particular value of a factor relates to the efficiency of the stock. Our objective in this paper is to provide this information. *We present a means to benchmark a stock against the universe of stocks considered to trade in open and well-developed markets. The universe of stocks consists of stocks listed on the NYSE and Nasdaq stock exchanges.* For the commonly-accepted factors, we rank the stocks in this universe from best to

---

[34] *See* Duarte-Silva Dep., pp. 40:15-42:5.

[35] *See* B. Bhole, S. Surana, and F. Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review*, Spring, 2020, 96-116.

worst. This allows the researcher to assess, relative to the universe of stocks, the percentile ranking of the stock that is the subject of the efficiency inquiry. *If the percentile ranking is an outlier for a given factor, then that factor does not support a finding of market efficiency.* On the other hand, if the percentile ranking is within the norm of the universe of stocks, then that factor does support a finding of market efficiency. *We propose that if a security falls within the 10th percentile for a factor in the opposite direction of what one would expect for an efficient stock, then that factor does not weigh in favor of market efficiency.*[36]

30.     As can be seen in the passage above, the researchers present a benchmarking analysis using a similar set of U.S. exchange traded stocks and a slightly more stringent threshold (10%) for determining whether the results of a factor weigh against a finding of market efficiency.  This research is supportive of my benchmarking analysis.

### d)   *My Benchmarking Analysis Is Consistent with Those Used in the Courts*

31.     Fourth, benchmarking analyses such as those presented in the Edwards Report and described above have been used for decades by experts for both plaintiffs and defendants as a basis for determining market efficiency.  Indeed, one must look no further than the court in *Krogman*, which relied on a similar benchmarking analysis performed by defendant's expert in which he compared the results of several factors to those of a random sample of 100 of stocks that traded on the Nasdaq, the American Stock Exchange (now NYSE MKTD), and the NYSE (*i.e.,* a similar but smaller sample of U.S. exchange-traded stocks than used in the Edwards

---

[36] *See* B. Bhole, S. Surana, and F. Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review*, Spring, 2020, 96-116, at 96 (emphasis added and removed).

Report).[37]  The court then concluded that two factors, which fell within the 10th and 25th

percentile deciles, weighed against a finding of efficiency.[38]

32.     Likewise, the court in *Polymedica* relied on an analysis by Defendant's expert in

which he compared the average put-call parity disparity during a contested period of the class

period to those from a sample of other stocks, and found the factor to be less favorable than 95%

of those reported in a published study (equivalent to the 5th percentile).[39]  The court in

*Polymedica* then determined that this evidence "lends support to PolyMedica's argument that the

market for its stock was not information efficient."[40]

33.     Numerous additional courts have relied on benchmarking analyses such as those

presented in the Edwards Report as a basis for determining market efficiency in fraud on the

market cases.[41]

---

[37] *See Krogman*, at 478 stating: "Cox analyzed CIC's stock on these indicia of market efficiency, including market capitalization, bid-ask spread, and float, by comparing CIC stock to a random sample of one hundred stocks traded on NASDAQ, the American Stock Exchange, and the New York Stock Exchange."

[38] *See Krogman*, at 478.

[39] *See Polymedica*, at 275.

[40] *See Polymedica*, at 276.

[41] *See, for example¸ Cosby v. KPMG, LLP*,  U.S. Dist., LEXIS 113424 (E.D. Tenn. 2020) at 59 finding that total market capitalization between the 16th and 41st percentile, and bid-ask spreads above the average of NYSE and Nasdaq-listed stocks weighs in favor of market efficiency; *In Re NII Holdings, Inc. Securities Litigation*, 311 F.R.D. 401, 413 (E.D. VA. 2015) finding that average bid ask spreads within the 42nd percentile of 100 randomly sampled NYSE and Nasdaq-listed securities weighs in support of a finding of market efficiency; *KB Partners I, L.P. v. Barbier*, U.S. Dist. LEXIS 78108, (W.D. TX. 2013) at 31 finding that an analysis performed by my colleague in which he concluded that an average bid-ask spread at the 33rd percentile of other Nasdaq listed-stocks supports market efficiency was "thorough" and that "his methods are supported by references to academic literature and industry practices…"; *Rougier v. Applied Optoelecronics, Inc*., U.S. Dist. LEXIS 198919 (S.D. TX 2019) at 38-39 finding that AOI's average market capitalization being at the 45th percentile and average bid ask spread being at the 21st percentile of Nasdaq and NYSE firms supported a finding of efficiency.

34.     Duarte-Silva is seemingly unaware of the frequent reliance on benchmarking

analyses when examining the efficiency of the market in securities class actions.  Indeed, when

questioned about the topic at deposition, Duarte-Silva provided the following testimony:

> Q       Have you ever seen any expert perform such an analysis in
> a class certification report.
>
> A       I'm not aware of economic experts providing an analysis of
> whether a stock is above or below a certain percentile of the
> Russell 3000 or another index to support market efficiency.
>
> Q       Okay. But not specifically in the context of Russell 3000.
>
> Do you have a problem with benchmarking, per se?
>
> A       I don't have a problem with benchmarking, per se. I think
> you want to narrow that question to hear.
>
> Q       I started out on purpose with it broad. I mean, when you --
> when experts do reports on class certification, isn't there invariably
> some benchmark being utilized?
>
> A       *I don't think so*. I have seen expert reports that talk about,
> say -- I have seen experts say I think six analysts is plenty of
> analysts, *without looking at what's the percentile relative to the
> overall calculation of stocks*.[42]

35.     For the above reasons, I continue to believe that my benchmarking analysis is

scientific and reliable, and that the results of this analysis are supportive of a finding of

informational efficiency for Farmland's common stock during the Class Period.

### ii)  Duarte-Silva Opines that I Overstate Farmland's Market Capitalization Over a Substantial Portion of the Class Period

36.     Duarte-Silva states:

> The first *Krogman* factor is market capitalization. Farmland's
> market capitalization during the Class Period ranged between
> approximately $120 million and $368 million. According to
> Edwards, Farmland's average market capitalization during the
> Class Period was $228.8 million. Edwards acknowledges that this
> average places Farmland's market capitalization in only the 9th

---

[42] *See* Duarte-Silva Dep., pp. 36:24-38:5 (objection omitted).

percentile of the Russell 3000—well below Edwards' own artificial and unsupported benchmark. However, Edwards seeks to minimize this fact, saying that he did "not find this factor to be significant." In fact, Farmland's small market capitalization weighs heavily against Edwards' criteria of finding market efficiency.[43]

37.    Duarte-Silva then references Farmland's February 2, 2017 acquisition of another farmland REIT, American Farming Company ("AFC"), which caused the Company's market capitalization to increase by 84% from $197 million to $364 million.[44]  Duarte-Silva then states:

> …Edwards inappropriately dismisses the significance of Farmland's small market capitalization [prior to the acquisition of American Farming Company]. As the scholarly authority on which Edwards himself relies notes, when "evidence consistent with market inefficiency" is observed in stocks trading on major exchanges, "almost without exception, the inefficiencies appear characteristic of primarily *smaller stocks* on those major exchanges, or by stocks with little institutional following."[45]

38.    As can be seen above, Duarte-Silva's primary criticism of my calculation of Farmland's market capitalization under *Krogman* was that I relied on a Class-Period average, which in my experience is a typical metric used by economic experts and the courts.  In the body of the Edwards Report, however, I clearly acknowledged the variation in Farmland's market capitalization during the Class Period when stating that "Farmland's market capitalization ranged from approximately $120.1 million to $368.3 million."[46]  Moreover, in Exhibit 3 to the Edwards Report, I presented not only the range of Farmland's market capitalizations, but also a calculation of Farmland's market capitalization on every trading day during the Class Period.

39.    Additionally, although Duarte-Silva references an article cited in the Edwards Report that states that "when 'evidence consistent with market inefficiency' is observed in stocks

---

[43] *See* Duarte-Silva Report, ¶60 (footnote omitted).

[44] *See* Duarte-Silva Report, ¶61.

[45] *See* Duarte-Silva Report, ¶64.

[46] *See* Edwards Report, ¶96.

trading on major exchanges, 'almost without exception, the inefficiencies appear characteristic of primarily smaller stocks on those major exchanges, or by stocks with little institutional following,'"[47] Duarte-Silva performs no analyses to determine whether these indirect factors provide any evidence of market inefficiency during this pre-acquisition period as his reference to the quote seems to imply. I perform this analysis, the results of which are summarized in Table 2 below.

TABLE 2
COMPARISON OF AVERAGE INDIRECT FACTORS OVER VARIOUS TIME PERIODS[48]

| Period | Weekly Volume | Num. Analysts | Market Cap. | Bid-Ask Spread | Institutional Holdings | Short Interest % | Days |
|---|---|---|---|---|---|---|---|
| Pre Acquisition | 4.19% | 6 | $147m | 0.21% | 39.1% | 3.0% | 3.5 |
| Post Acquisition | 3.99% | 5 | $298m | 0.11% | 44.9% | 8.1% | 10.7 |
| Class Period | 4.08% | 5 | $229m | 0.16% | 42.2% | 5.8% | 7.4 |

40.     As can be seen in Table 2 above, there is no discernable difference between the indirect factors measured over Duarte-Silva's pre-acquisition period and those measured over the subsequent period or the Class Period as a whole. In addition, with coefficients of 0.01 and 0.03 and t-stats of 0.15 and 0.55, I also find no statistically significant evidence of autocorrelation in Farmland's common stock returns during either of the sub periods above. As such, with no evidence of market inefficiency from any of my other indirect factors during Duarte-Silva's pre-acquisition period, his criticism of my calculation of Farmland's average market capitalization under *Krogman* appears to be no more than a criticism of a factor that I already acknowledged in

_____

[47] *See* Duarte-Silva Report, ¶64 (footnote omitted)

[48] *See* Exhibit 3 to the Edwards Report. I note that the post-acquisition period includes the full week ending February 3, 2017 for weekly trading volume as a percent of shares outstanding.

the Edwards Report did not provide independent support for a finding of informational efficiency.

### iii) Duarte-Silva Opines that NYSE DMMS are Irrelevant and that There is No Evidence that Institutional Holdings of Farmland Suggest Market Efficiency

41.     With respect to my analysis of *Cammer's* third factor (market makers and arbitrageurs) Duarte-Silva has two criticisms of my work which lead him to the conclusion that this factor "does not support a finding of efficiency."[49]

42.     First, Duarte-Silva explains that "*Cammer* considered the number of market makers because the relevant stock in that case traded in the over-the-counter market."[50]  As such, Duarte-Silva concluded that, because the NYSE is not a dealer market, the third *Cammer* factor does not apply to Farmland's common stock.[51]  As stated in the Edwards Report, however, stocks listed on the NYSE are assigned a Designated Market Maker ("DMM") who is required to provide liquidity for the listed security.[52]  Indeed, according to the NYSE:

> The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value.
>
> DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery.[53]

---

[49] *See* Duarte-Silva Report, ¶66.

[50] *See* Duarte-Silva Report, ¶66 (footnote omitted).

[51] *See* Duarte-Silva Report, ¶66 (footnote omitted).

[52] *See* Edwards Report, ¶38.

[53] *See* https://www.nyse.com/market-model.

43.     As can be seen above and discussed in the Edwards Report, the DMM performs

largely the same function for NYSE securities as market makers perform for those stocks that

trade on the Nasdaq - providing liquidity and facilitating a market in securities.[54]  It is for this

reason that courts have ruled that the presence of a DMM for NYSE-traded stocks satisfies the

market-maker requirement discussed in *Cammer*.[55]

44.     When questioned about the function of the NYSE DMM at his deposition,

Duarte-Silva conceded that the NYSE DMM plays essentially the same role as Nasdaq market

makers when testifying:

> Q     Do you agree that The DMM performs largely the same
> role for NYSE securities as market makers perform for those that
> traded on the Nasdaq providing liquidity facilitating the market?
>
> Do you agree with that?
>
> A     A designated market maker is an agent that makes a market
> for a particular security, and in that process, aids in providing
> liquidity to a stock.
>
> Q     Isn't that basically the same role as a market maker did on
> Nasdaq?
>
> A     *I would agree it's essentially the same*.[56]

45.     Moreover, to the extent that Farmland's DMM was not performing its function of

maintaining an orderly market, facilitating price discovery, and providing liquidity to market

---

[54] *See* Edwards Report, ¶38.

[55] *See, for example, Villella v. Chem. & Mining Co. of Chile*, 333 F.R.D. 39, 54 (S.D. NY. 2019)  stating: "There is a designated market maker that executes ADS transactions, satisfying *Cammer* 3"; and *In Re Banc of California Securities Litigation*, 326 F.R.D. 640, 649 (C.D. CA. 2018)  stating: "Third, Banc stock was traded on the NYSE, where all traded securities are assigned to a 'designated market maker' or 'DMM.' During the relevant period, Banc's DMM was Global Trading Systems, which acquired the trading business of Banc's former DMM, Barclays Capital. The NYSE imposes specific obligations on DMMs to maintain fair and orderly markets for their assigned securities. The oversight of a DMM favors market efficiency."

[56] *See* Duarte-Silva Dep., pp. 16:25-17:18 (emphasis added, objection omitted).

participants, this would have manifested itself in high costs of trading and low reported trading volume for Farmland's shares – both of which would weigh against a finding of efficiency for Farmland's shares. But, as shown above and in the Edwards Report, Farmland's common stock exhibited a higher-than-average (57th percentile) weekly trading volume of 4.08%, and a lower-than-average (38th percentile) bid-ask spread of 0.16% during the Class Period.[57] Nowhere in the Duarte-Silva Report does Duarte-Silva criticize my calculation of Farmland's weekly trading volume or bid-ask spreads, nor assert or imply in any way that these factors are inconsistent with an informationally efficient market for Farmland's shares. Moreover, when questioned at deposition, Duarte-Silva testified that Farmland's average weekly volume of 4.08% exceeded *Cammer's* 2 percent strong presumption threshold, and that the average bid-ask spread of 0.16% "[didn't] strike [him] as abnormally high…"[58]

46. Second, with respect to arbitrage activity in Farmland's shares during the Class Period, Duarte-Silva asserts that:

> Second, Edwards observes that institutions held 25.9% to 56.6% of all Farmland shares during the Class Period, but he provides no evidence that those institutions "attempt to profit from trading mispriced securities," as he asserts. I am unaware of any evidence that the institutions holding Farmland shares were attempting to profit from mispricing of Farmland shares.[59]

47. Duarte-Silva again ignores the implications of his assertion. Specifically, if institutional holders (or other market participants) were not acting as arbitrageurs, this would manifest itself in arbitrage opportunities in Farmland's common stock and related securities. But, as discussed above and in the Edwards Report, no such opportunities existed as evidenced by: i) the lack of autocorrelation in Farmland's common stock returns during the Class Period or

---

[57] *See* Edwards Report, ¶¶27-30, 100-103; Exhibit 3.

[58] *See* Duarte-Silva Dep., pp. 10:2-9 and 19:8-10.

[59] *See* Duarte-Silva Report, ¶67 (footnote omitted).

during Duarte-Silva's pre-acquisition period during which Duarte-Silva implies Farmland's common stock was less likely to be informationally efficient; and ii) the strict adherence to put-call parity during the period June 22, 2016, through July 10, 2018, when call and put options were available for Farmland's common stock (which also includes the final approximately seven months of Duarte-Silva's pre-acquisition period).[60] Again, nowhere in the Duarte-Silva Report does Duarte-Silva criticize my analyses of autocorrelation or put-call parity, nor assert or imply in any way that the results of these analyses are inconsistent with an informationally inefficient market for Farmland's shares over the periods measured.

48.  Furthermore, if it was not the trading of institutions that eliminated such arbitrage opportunities then, by definition, it was the trading of other market participants. Therefore, it is unclear why Duarte-Silva would seem to be arguing that it is necessary to present evidence that institutions were attempting to arbitrage mispricing in Farmland's common stock and related securities when he tacitly agrees that no such mispricing existed during the Class Period because these arbitrage opportunities had already been eliminated by the trading of other market participants.

49.  Third, Duarte-Silva criticizes my analysis by referencing that the Edwards Report did not include a benchmarking statistic for institutional holdings in Farmland's stock, the reason for which I testified to at my deposition.[61] Duarte-Silva then states:

---

[60] *See* Edwards Report, ¶105-108, 115-119 and Appendix C.

[61] *See* Duarte-Silva Report, ¶68 (footnote omitted). As I testified at deposition (pp. 80:13-83:6), prior to performing the benchmarking analysis in this matter, I learned from colleagues that the institutional data from Bloomberg on which we rely for purposes of benchmarking is unreliable and often reports significantly higher than 100% of a company's shares being held by institutions (what Bloomberg refers to as "double counting"). I note that the institutional data on which I rely to calculate the total number of shares held by institutions on each day during the Class Period is sourced from Thomson Eikon. Because Thomson Eikon does not provide a field for bulk downloading the number or percentage of shares held by institutions, I am unable to use this source for benchmarking.

> According to a paper written by Edwards' colleagues at Forensic
> Economics, however, the level of institutional holdings was, at
> times, as low as the 10th to 25th percentile of Russell 3000 stocks,
> below Edwards' artificial and unsupported benchmark. In other
> words, according to Edwards' colleagues, at times, up to 90% of
> all Russell 3000 companies had a higher percentage of institutional
> holdings than Farmland during portions of the Class Period.[62]

50.     Duarte-Silva criticisms are disingenuous and erroneous.  Specifically, in footnote

101 of his report, Duarte-Silva notes that the minimum level of institutional ownership in

Farmland's was 25.9% (which he asserts corresponds with the 10th percentile of my colleagues'

study).  But, as can be seen in Exhibit 3 to the Edwards Report, this abnormally low level of

institutional holding was simply an artifact of a mismatch between the reporting of the shares

issued in the AFC acquisition which occurred on February 2, 2017, and the reporting of the

holdings of institutional investors who received these same shares until the next report date of

February 28, 2017, or March 31, 2017.  Indeed, because the AFC acquisition was "stock-for-

stock," the shares issued by Farmland in the acquisition were received by AFC's then existing

shareholders, with approximately 37.6% of these shares being held by institutions.[63]  But,

because most of the former AFC institutional holders did not report their new Farmland holdings

until March 31, 2017, although the approximately 5.5 million Farmland shares issued to these

institutions in the acquisition were included in the denominator of the fraction (shares

outstanding) as of February 2, 2017, the majority of these same shares were not included in the

numerator (shares held by institutions) for the entire two-month period from February 2, 2017,

through March 30, 2017, thus understating the percentage of Farmland's shares outstanding held

---

[62] *See* Duarte-Silva Report, ¶68.

[63] 37.6% = 7,378,182 shares held by institutions as of December 31, 2016, divided by
19,609,309 shares outstanding as of November 14, 2016.  Sources: Thomson Eikon and
American Farming Company Form 10-Q filed with the SEC on November 14, 2016, cover page.

by institutions during this period.[64]  When including these 5.5 million Farmland shares issued to institutional holders of AFC in the calculation, the average number of Farmland shares held by institutional investors over the period February 2, 2017, through March 30, 2017, equals 43.7%, nearly identical to the 42.2% average measured over the entire Class Period.

51.    When questioned at deposition about whether his criticism regarding the minimum level of Farmland's shares being held by institutions may be erroneous because shares issued to AFC's institutional shareholders were not reflected in the institutional ownership count in Exhibit 3 to the Edwards Report until reported at the end of the quarter or month, Duarte-Silva testified as follows:

> Q      It would not reflect the share -- okay. I'm sorry, my question is getting too circuitous.
>
> The bottom line I'm trying to get, I guess, an answer from you. There was a AFCO merger here in February 2017, right? So we started on that up above.
>
> Now, you do agree that in that merger, there were shares, Farmland shares, new shares issued, but that these shares may not have been reflected in the downward jump and then the spike of institutional holdings because of reporting periods?
>
> You did agree with that?
>
> A      *I agreed it's a possibility that I have not examined.*[65]

52.    Moreover, Duarte-Silva's assertion that, according to my colleagues' study, "up to 90% of all Russell 3000 had a higher percentage of institutional holdings than Farmland

---

[64] 5.5 million = 7,378,182 shares of American Farming Company held by institutions as of December 31, 2016, multiplied by the exchange ratio of 0.7417.  *See* Farmland Form 8-K filed with the SEC on February 3, 2017, p. 3.

[65] *See* Duarte-Silva Dep., pp. 66:14-67:7 (emphasis added).

during portions of the Class Period,"[66] is erroneous. Table 3 below presents the data from the study on which Duarte-Silva relies:

TABLE 3
SUMMARY OF INSTITUTIONAL OWNERSHIP FINDINGS OF BHOLE ET AL. (2020)[67]

| Years | No. | 5th | 10th | 25th | 50th | 75th | 90th | 95th |
|---|---|---|---|---|---|---|---|---|
| | | | | | Percentiles | | | |
| 2010-2012 | 2,428 | 6.25% | 11.97% | 30.08% | 64.73% | 87.71% | 98.69% | 104.75% |
| 2013-2015 | 2,493 | 8.24% | 13.86% | 32.96% | 68.26% | 89.59% | 98.85% | 103.56% |
| 2016-2018 | 2,733 | 7.78% | **13.48%** | **33.58%** | 68.26% | 88.89% | 98.68% | 103.98% |

53.     As can be seen in Table 3 above, for years 2016 to 2018 (the three-year period that most closely matches the Class Period in this matter), the level of institutional ownership that corresponds with the 10th percentile of the large sample of U.S. exchange-traded stocks is 13.48%, <u>nearly half</u> the 25.9% Duarte-Silva relies upon for his erroneous claim that "*up to 90%* of all Russell 3000 companies had a higher percentage of institutional holdings than Farmland during portions of the Class Period."  Linearly extrapolating between the ownership levels at the 10th and 25th percentiles suggests that 25.9% corresponds with approximately the <u>20th percentile</u> of these firms.  This indicates that, even when failing to correct for this mismatch between the reporting of shares issued and shares received by AFC's institutions, Farmland's <u>lowest</u> institutional holdings still meets my stated threshold of 16%, as well as the threshold suggested in Bhole et al. (2020) and the 13% threshold implied by *Cammer's* "substantial presumption" as determined by Duarte-Silva in his written work.

54.     When questioned at deposition, Duarte-Silva seemingly conceded his erroneous claim that "*up to 90%* of all Russell 3000 companies had a higher percentage of institutional

---

[66] *See* Duarte-Silva Report, ¶68.

[67] *See* B. Bhole, S. Surana, and F. Torchio, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review*, Spring, 2020, 96-116, Table 4.

holdings than Farmland during portions of the Class Period" by testifying that the 25.9% and

56.6% "corresponds to _between_ the 10th and [50][th] percentile, according to that paper what is

mentioned there."[68]  Indeed, at no point during the Class Period did the percentage of shares held

by institutions decline to the approximately 13% shown in his quoted study.  In fact, the Class

Period <u>minimum</u> of 29.5% (before adjusting for shares issued to AFC's institutional owners), is

closer to the 25th percentile shown in the above study of approximately 33%.

55.     In my opinion, however, it is reasonable and appropriate to measure Farmland's

relative ownership by institutional investors using the standard approach – the Class Period

average.  Without correcting for the timing mismatch in Exhibit 3, linearly extrapolating between

the 25th and 50th percentiles would suggest that my Class Period average of 42.2% corresponds

with approximately the 30th percentile of these firms, significantly greater than my stated

threshold of 16%, as well as _Cammer's_ implied thresholds of 13% and 30% as determined by

Duarte-Silva in his written work.

### iv)  Duarte-Silva Opines That It Is Impossible to Conclude that the Level of Short Interest in Farmland's Shares Was Consistent with an Efficient Market

56.     Duarte-Silva also opines that it is not possible to conclude that the level of short

interest in Farmland's shares is consistent with an informationally efficient market during the

Class Period.[69]  In support of this opinion, Duarte-Silva references my finding that Farmland's

relative level of short interest corresponds with the 56th percentile of the U.S. exchange-traded

stocks and states:

> The level of short selling compared to the Russell 3000 Universe
> says nothing about whether there were constraints on short selling.
> It may be that the level of short selling reflects the level that would
> have occurred in the absence of constraints. But it is also possible

---

[68] _See_ Duarte-Silva Dep., p. 64:14-24.

[69] _See_ Duarte-Silva Report, ¶¶69-70.

that the level of short selling that is observed is only as high as possible given how difficult or costly it was to short Farmland's shares and would have been higher still if short-selling were unconstrained. Although I do not have access to evidence of how difficult or costly it was to short Farmland's shares, I notice that Edwards' collection of news about Farmland includes three articles titled "SLB Update: Hardest to Borrow Per Sector," which seems to offer support to this interpretation that is directly opposite of Edwards' and contrary to a showing of market efficiency under this *Polymedica* factor.[70]

57.     Duarte-Silva's opinion that the level of short interest in Farmland's common stock "seems" to be contrary to a showing of informational efficiency is flawed for numerous reasons.

58.     First, as can be seen above, Duarte-Silva acknowledges that he did not have access to evidence of how difficult or costly it was to short Farmland's shares.

59.     Second, Duarte-Silva conceded at his deposition that, because the articles he referenced were "behind the paywall," he didn't read any of the articles[71] and, therefore, is unaware of their contents.

60.     Third, in the next section of his report, Duarte-Silva states:

As discussed in the previous paragraph, it is reasonable to consider that short selling was constrained. If this is the case, the Edwards Report suggests that one examine the next *Polymedica* factor, put-call parity: "if short selling was constrained in Farmland's common stock during the Class Period, it would manifest itself as relative mispricing between the Company's common stock and traded options."

The Edwards Report calculates the number of violations in put-call parity but Farmland's options only started trading in June 2016, i.e., 7 months after the start of the Class Period.  This period represents 22% of the Class Period.

In summary, the inexistence of options during the first 7 of the 32 months of the Class Period, coupled with indicia of difficulty to

[70] *See* Duarte-Silva Report, ¶70.

[71] *See* Duarte-Silva Dep., p. 30:4-14.

short Farmland's shares, contradict the Edwards Report's
purported finding that Farmland was trading in an efficient market
during the Class Period.[72]

61.    Figure 2 below presents a graph of Farmland's short interest as a percentage of

shares outstanding during the Class Period, as well as the timing of the three articles cited by

Duarte-Silva and the period during which I analyzed put-call parity.

FIGURE 2
FARMLAND'S SHORT INTEREST AS A PERCENT OF SHARES OUTSTANDING



62.    As can be seen in Figure 2 above, my put-call parity analysis was performed over

the period June 22, 2016, to July 10, 2018, when call and put option data was available for

Farmland's shares.  As discussed in the Edwards Report, during this period, Farmland's common

stock exhibited <u>strict adherence</u> to put-call parity theory, indicating that there were <u>no constraints</u>

on short selling during this portion of the Class Period that would be inconsistent with

informational efficiency.[73]  Importantly, as can also be seen in Figure 2 above, the three articles

<hr />

[72] *See* Duarte-Silva Report, ¶¶71-73 (footnotes omitted).

[73] *See* Edwards Report, ¶115-119; and Appendix C.

that Duarte-Silva cites as the basis for his opinion that "it is reasonable to consider that short selling was constrained,"[74] occurred during <u>this same period</u> in which Farmland's shares and traded options showed strict adherence to put-call parity.

63.     Duarte-Silva provides no criticism in his report of my put-call parity analysis, nor my opinion that, had there been constraints on short selling during the period measured, these constrains would have manifested themselves as violations of put-call parity.[75]  When questioned at his deposition about how these three articles could suggest constraints on short selling despite the lack of put-call parity violations during this period, however, Duarte-Silva then seemingly contradicts the wide body of economic literature and court precedent on the topic when testifying as follows:

> Q       Right.  Now, if there were such constraints, what I was asking, wouldn't that have resulted in mispricing?
>
> A       Not necessarily.
>
> Q       Well, why not necessarily?
>
> A       If you have restrictions on short selling, that doesn't mean necessarily that the options will show put-call parity violations.
>
> Q       Why not?
>
> A       *I just don't see the link between the two*.[76]
>
> \*\*\*
>
> Q       In general, do you think it's fair to say short-selling constraints do result in put-call parity violations?

---

[74] *See* Duarte-Silva Report, ¶71.

[75] *See, also,* Duarte-Silva Dep., pp. 57:25-58-9: "Q    But Edwards did discuss put-call parity with relation to Farmland, didn't he? A    Yes, he did, yes. Q    And you didn't take issue with the post-June 2016 period; is that right? A    *I didn't describe the post June 2016 period*." (emphasis added).

[76] *See* Duarte-Silva Dep., pp. 25:20-26:8 (emphasis added).

A      I don't agree with that.  And also what I understand matters here is this stock in this class period, and that has not been shown.[77]

64. As can be seen above, Duarte-Silva's opinion that "it is reasonable to consider that short selling was constrained,"[78] is based on the existence of three articles that he did not read.  Moreover, Duarte-Silva's opinion that the lack of violations of put-call parity does not provide evidence of a lack of short sale constraints during this period is based on either a misunderstanding of: i) the wide body of literature on the subject; or ii) how this literature relates to informational efficiency in the courts.  Indeed, as discussed by the Court in *Polymedia*:

> The ability of arbitraguers *simultaneously* to effectuate a short sale along with the options transactions is critical. Barriers to short selling inhibit this process... Theoretically, arbitrageurs should have effectuated trades which would have returned the market in PolyMedica stock and options to put-call parity. Dunbar suggests, however, that the barriers to short selling prevented this from happening.[79]

65. As discussed in the Edwards Report and above, Farmland's stock exhibited strict adherence to put-call parity, which indicates that the level of short selling in Farmland's stock did not result in mispricing, or arbitrage opportunities between Farmland's common stock and traded call and put options that would be consistent with an inefficient market.  While, in theory, it is possible that the costs of borrowing Farmland's shares may have been higher than average at some point during the Class Period, the lack of violations of put-call parity provides direct evidence that these costs did not result in arbitrage opportunities, which is a necessary condition for an informationally efficient market.

---

[77] *See* Duarte-Silva Dep., p. 57:17-24.

[78] *See* Duarte-Silva Report, ¶71.

[79] *See Polymedica,* at 275.

### *v) Conclusion Regarding Duarte-Silva's Criticisms of My Indirect Factors*

66.     After reviewing Duarte-Silva's various criticisms of my indirect *Cammer, Krogman,* and *Polymedica* factors, it is still my opinion that, with the exception of Farmland's relatively small market capitalization, these factors provide evidence of an informationally efficient market for Farmland's common stock.

### B. Responses to Duarte-Silva's Criticisms of My Cause-and-Effect Evidence of Market Efficiency

67.     As discussed in the Edwards Report, the fifth and most salient factor for an efficient market according to *Cammer* is "[a] cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[80] According to *Cammer*: "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."[81]

68.     In the Edwards Report, I conducted empirical analyses that provide evidence of a cause-and-effect relationship between the disclosure of new information and corresponding movements in Farmland's common stock price.  As stated in the Edwards Report, new information generally comes in one of three forms: i) information related to the overall market; ii) information related to the industry in which a company competes; and iii) firm-specific information.  Each of these analyses utilized my two-factor market model described in the Edwards Report.[82]

69.     To establish that Farmland's stock consistently reacted to the release of the first two forms of information – overall market and industry information – I explained that the two-

---

[80] *See Cammer*, at 1287.
[81] *See Cammer*, at 1291; Edwards Report, ¶48.
[82] *See* Edwards Report, ¶¶58-67.

factor market model I utilize in my event study analyses produced beta coefficients that quantify the sensitivity of Farmland's common stock returns to the returns on both the Market Index and the REIT Industry Index. The coefficient on the Market Index is 0.43 with a t-statistic of 6.07, and the coefficient on the net-of-market REIT Industry Index is 0.47 with a t-statistic of 5.95. Thus, both these market and industry variables are statistically significant at greater than the 1% significance level (0.0000002% and 0.0000004%, respectively), indicating a strong causal relationship between movements in the overall market and the market for REITs, and changes in the prices of Farmland's common stock. I then concluded that this provides strong economic evidence of a cause-and-effect relationship between the release of new, value-relevant macroeconomic information and a corresponding change in the prices of Farmland common stock.[83]

70.     To demonstrate a cause-and-effect relationship between the disclosure of firm-specific news and a corresponding change in Farmland's stock price, I also performed two event study analyses based on commonly used and well-accepted objective criteria: i) initiations of coverage by research analysts and changes in investment recommendations; and ii) quarterly earnings surprises. The results of my event study analyses provided strong evidence that Farmland's common stock traded in an informationally efficient market during the Class Period.

71.     For example, consistent with the wide body of literature cited in the Edwards Report, on average, Farmland's common stock reacted positively to positive ratings actions and earnings surprises, and negatively to negative ratings actions and earnings surprises.[84]

72.     In addition, of the 17 event dates analyzed, Farmland's stock price moved in the expected direction on 15 dates (88%),[85] far exceeding the approximately 55% to 70% for

---

[83] *See* Edwards Report, ¶¶65-67.
[84] *See* Edwards Report, ¶¶80-93.

earnings surprises and 75% for analyst ratings actions found in the literature of other U.S. exchange-traded stocks.[86]

73.     Moreover, on eight of the 17 event dates (47%),[87] Farmland's common stock reacted by a statistically significant amount, far exceeding the approximately 12% found in the literature of other U.S exchange-traded stocks.[88]

74.     Based on these findings, I concluded that the results of my event studies of analyst ratings actions and earnings surprises demonstrate a clear cause-and-effect relationship between the release of new, value-relevant company-specific information and a corresponding change in Farmland's common stock price.[89]

75.     Although Duarte-Silva provides no claim nor suggestion that I made any computational errors in my event study analyses, nor that I did not faithfully perform these event study analyses in accordance with the wide body of research presented in the Edwards Report, he nonetheless opines that he "do[es] not find the Edwards Report's assessment of cause-and-effect to be sufficient to establish that Farmland shares traded in an efficient market" and that the above analyses "do not support a finding of efficiency."[90]

---

[85] *See* Edwards Report, Table 2 showing seven of seven (100%) of initiations of coverage and changes in investment recommendations moving in the expected direction; and Table 3 showing eight of 10 (80%) of earnings surprises moving in the expected direction.

[86] *See* Edwards Report, ¶¶71, 74, 86-88.

[87] *See* Edwards Report, Table 2 showing three of seven (43%) of initiations of coverage and changes in investment recommendations were statistically significant; and Table 3 showing five of 10 (50%) of earnings surprises were statistically significant.

[88] *See* Edwards Report, ¶75 citing to Loh and Stulz (2011) who found that approximately 12% of changes in investment recommendations result in statistically significant stock-price reactions at the individual firm level.

[89] *See* Edwards Report, ¶¶83 and 94.

[90] *See* Duarte-Silva Report, ¶¶8 and 29.

76.     As I will show below, Duarte-Silva's opinions as to the analyses required for establishing an informationally efficient market are contradicted by decades of well-established research and court precedent, as well as misleading, erroneous, and sometimes disingenuous descriptions of my analyses and results.  Moreover, the type of analysis Duarte-Silva opines is necessary to establish an informationally efficient market for Farmland's common stock would render it virtually impossible to establish an informationally efficient market for any stock over any time period.

### i)   Duarte-Silva Opines that Farmland's Market Model is Incapable of Establishing a Cause-And-Effect Relationship Between Macro-Economic News and a Corresponding Change in Farmland's Stock Price

77.     Duarte-Silva criticizes my analysis of the cause-and-effect relationship between macro-economic news and a corresponding change in Farmland's stock price stating:

> …contrary to this claim in the Edwards Report, the statistical significance of the coefficients on market and industry do not imply that Farmland's shares trade in an efficient market or that there is a cause-and-effect relation. That statistical significance means merely that Farmland's returns are correlated with the overall market and its industry.

> First, correlation does not imply causation. *The Edwards Report does not show that market and industry returns cause a reaction in Farmland's returns*.[91]

78.     As can be seen above, Duarte-Silva acknowledges that there is a highly statistically significant relationship between daily changes in the price of Farmland's common stock and daily changes in the overall market and REIT industry.  Duarte-Silva's criticism is instead that "correlation does not imply causation," which is disingenuous.

79.     It is true that statistics tells us that a correlation indicates that a relationship exists between two variables – A and B – but does not indicate the causal direction of the relationship.

---

[91] *See* Duarte-Silva Report, ¶¶52-53 (emphasis added).

Indeed, a correlation between A and B indicates that it is possible that: i) A causes B; ii) B causes A; or iii) both A and B are caused by some other factor C. Therefore, to accept Duarte-Silva's opinion that the highly statistically significant relationships between these factors do not indicate a causal relationship between changes in macro-economic factors and changes in Farmland's common stock prices, one must accept one of two alternative hypotheses is true: i) that changes in Farmland's common stock prices _cause_ changes in the entire U.S. market for common stocks and REITs; or ii) that there are some _other_ economic factors that drive the changes in all three variables, and that the highly statistically significant relationship between Farmland and these unknown factors are spurious. But, when questioned at deposition, Duarte-Silva seemingly dismissed these alternative hypotheses testifying:

> Q    If there is 2 things A and B right and they're correlated I guess aren't there 3 possibility the A could cause B or B could cause A or something else could cause both is that fair to say?

> A    There is correlation one could imply the other the other could imply the other and there could be a common cause.

> Q    If the market and industry movements are causing the movements in Farmland stock, right as evidenced by the statistically significant relationship are you saying that possibly the movements in Farmland stock are causing the movements in the market?

> A    If I heard your question correctly started from a premise that statistical significance implies causation between these 2 portions so maybe I misheard if you don't mind just.

> Q    Let me clarify. Is there a do you believe there is a chance here that Farmland stock caused the market to move?

> A    _I find that unlikely_.

> Q    So are you saying that something else could be causing movements in the market industry and Farmland?

> A    I don't know the answer to that. I mean, I haven't looked I have to think some more about that.

Q    Okay well information released into the market is not causing Farmland stock to move, what would cause Farmland stock to move there must be some cause right what could that be?

A    *I don't know I can't think of another reason right now.*[92]

80.    Moreover, Duarte-Silva himself has discussed the well-accepted causal connection between movements in the market and industry and changes in company stock prices in his prior published work.  For example, in describing the market model in one writing, Duarte-Silva states:

> The usual statistical model used in an event study relies on the premise that observed price changes result from news in the marketplace and random variability commonly known as "noise." See A. Craig MacKinlay, "Event Studies in Economics and Finance," 35 J. Econ. Literature 13, Mar. 1997.  This model (also known as the market model) *describes and estimates how investors expect a stock price to react to changes in market, industry, and selected company specific factors*. Such a model produces an estimate of a stock's expected return. The remainder of any observed price change is known as excess return and may be attributed to known company-specific news or to noise.[93]

81.    Likewise, in an article discussing the U.S. Supreme Court decision in *Haliburton,* Duarte-Silva states:

> Event studies require due care to establish the exact timing when the truth about the alleged misrepresentations was revealed. This is clearer in some situations than others, and it can be done by examining information sources, such as news articles, Securities and Exchange Commission filings, and analyst reports.
>
> Experts also control for *extraneous effects* on the security's price that may confound conclusions about price impact. *For example, market and industry factors are routinely included as controls in event studies*.[94]

---

[92] *See* Duarte-Silva Dep, (rough), pp. 42:9-44:5 (emphasis added, objections omitted).

[93] *See* A. Dolgoff and T. Duarte-Silva "Event Studies Using Contemporaneous Forward-Looking Information," *Securities Litigation*, 25(4), 2015, 7-25, at 7 (emphasis added).

[94] *See* N. Morgan, C. McElroy, DLA Piper, and T. Duarte-Silva, "*Haliburton* Fallout: Fate of the 'Efficient Market' Hypothesis and Event Studies in Securities Litigation," Westlaw

82.     In a third article discussing the efficacy of using intra-day stock-price movements to eliminate the effect of confounding information on event study results, Duarte-Silva similarly states:

> It is also typical in event studies to evaluate returns in excess of benchmarks or risk factors, such as the returns in the overall market. However, the short intervals of intraday analyses might not allow enough time for _market factors to move enough to have a material effect on the stock price being analyzed_.[95]

83.     Duarte-Silva provides no explanation how his opinion in this matter squares with those expressed in his prior written work, nor with the general acceptance of this causal relationship within the academic community.[96]

---

Journal Securities Litigation & Regulation, 20(5), 2014, p. 2 (emphasis added footnote omitted).

[95] _See_ A. Dolgoff and T. Duarte-Silva, "Price impact of disclosures before, during, or after a trading day: Implications for event studies," Working Paper, 2014, p. 4.

[96] _See, for example,_ W. Mikkelson and R. Ruback, "An Empirical Analysis of the Interfirm Equity Investment Process," _Journal of Financial Economics_, 14, 1985, 523-553, at 531 stating: "The event study method pioneered by Fama , Fisher, Jensen, and Roll (1969) is used to measure the price effects of the initial investment, intermediate and outcome announcements. Since most stocks tend to move up or down with the market, the realized stock returns are adjusted for market-wide movements to isolate the component of the returns due to events related to the investment… The term $B_jR_{mt}$ in equation (1) is the portion of the return to security $j$ that is _due to market-wide factors_."; _See_ similar passages in W. Mikkelson and R. Ruback, "Targeted Repurchases and Common Stock Returns," _Journal of Economics_, 22(4), 1991, 544-561; W. Mikkelson and R. Ruback, "Corporate Investments in Common Stock," MIT Working paper, 1985, p. 11; and R. Ruback, "The Conoco Takeover and Stockholder Returns," _Sloan Management Review (Pre-1986)_, 23(2), 1982, 13-33, at 30.  _See, also,_ M. Mitchell and J. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," _The Business Lawyer_, 49, 1994, 545-590, stating: "The market model decomposes the return on a stock into two parts, _one part due to factors influencing the market_ and one part due to variables specifically related to the firm itself."; B. Cornell and R. Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," _UCLA Law Review_, 37, 1990, 883-924, at 903 stating: "The trouble with the comparable index approach, as Finkelstein, Fischel, Easterbrook, and Leas all recognize, is that it attributes any decline in the security price that is _not due to movements in the market or the industry_ to disclosure of the fraud." D. Tabak and C. Okongwu, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," NERA Working Paper, July 2002, p. 10, stating: "In fact, many courts have determined that it is necessary to use an event study to distinguish between stock-price movements due to fraud and movements _due to other factors_." (emphasis added)

84.     Duarte-Silva also criticizes my analysis of the cause-and-effect relationship between macro-economic news and a corresponding change in Farmland's stock price by arguing that "the vast majority of Farmland's returns are for reasons other than market and industry," as evidenced by the R-squared of my market model being slightly less than 10%.[97] That Farmland's common stock was more influenced by firm-specific information during the Class Period in no way invalidates the fact, which Duarte-Silva appears to agree, that the relationship between changes in macro-economic factors and changes in Farmland's common stock prices were statistically significant at a minimum of the 0.0000004% significance level during the Class Period.

85.     Moreover, common stocks are typically more influenced by firm-specific information than by macro-economic factors (*i.e.,* $R^2$ less than 50%) has been well accepted by the academic community for more than three decades.  Indeed, in a seminal 1988 paper titled "$R^2$," Professor Richard Roll set out to answer that specific question.  Professor Roll determined that the average $R^2$ for market models estimated using daily data is approximately 20%, indicating that, on average, just 20% of changes in companies' stock prices can be explained by changes in macro-economic factors.[98]  In  my experience, an $R^2$ of approximately 10% is not abnormal and provides no indication of an informationally inefficient market for Farmland's stock during the Class Period.

86.     It is still my opinion that the highly statistically significant coefficients in my market model indicate a strong causal relationship between movements in the overall market and

---

[97] *See* Duarte-Silva Report, ¶53.
[98] *See* R. Roll, "$R^2$," *The Journal of Finance,* 43(3), 1988, 541-566.

the market for REITs, and changes in the prices of Farmland's common stock, an opinion that has been shared by the courts.[99]

### ii) Duarte-Silva Opines that Standard Event Study Analyses Are Incapable of Establishing a Cause-and-Effect Relationship Between Firm-Specific News and a Corresponding Change in Farmland's Stock Price

87.     As discussed in the Edwards Report and above, to provide evidence of the cause-and-effect relationship between the disclosure of new information and corresponding movements in Farmland's common stock price, I performed two event studies analyses: i) an event study of earnings surprises; and ii) an event study of initiations of coverage and changes in investment recommendations by research analysts.

88.     As discussed in the Edwards Report, these information events are among the most widely studied in the field of financial economics, and the near-universal finding of multiple decades of research on the topic is that earnings disclosures and research analysts are <u>two of the most influential information channels for investors as evidenced by their ability to influence stock prices</u>.[100]  Despite this research, Duarte-Silva dismisses the efficacy of event studies of

---

[99] *See, for example, Petrie v. Electronic Game Card, Inc.*, LEXIS 100666, (C.D. CA. 2015) stating: "The Fifth *Cammer* factor is the essence of an efficient market and the foundation for the fraud on the market theory. *Event studies are by far the most common test for a causal connection*. An event study typically partitions a company's security price movement on each trading day in the class period into three parts: *the movement caused by market-wide factors*, or the market effect; *the movement caused by industry-wide factors*, or the industry effect; and the movement caused by firm-specific effect."

[100] *See, for example,* Daniel Bradley, Jonathan Clarke, Suzanne Lee, and Chayawat Ornthanalai, "Are Analysts' Recommendations Informative? Intraday Evidence on the Impact of Time Stamp Delays," *The Journal of Finance*, 69(2), April 2014, 645-673, p. 669 stating: "Our multivariate framework allows us to estimate the relative importance of analyst recommendations, earnings announcements, and management guidance in corresponding stock markets. These events are among the most studied in finance and accounting, but typically are analyzed independently. Because they are often issued on the same day, it is difficult to determine the relative importance of each event on a daily basis. Our method using intraday data overcomes this problem. We find that analyst recommendation revisions are the most important and influential information disclosure channel examined."

earnings surprises and analyst ratings actions by claiming that these studies are not used to establish market efficiency in academia. For example, at his deposition, Duarte-Silva testified as follows:

> Q    Okay. But isn't it pretty well accepted that earnings announcements are important event dates? Isn't that well accepted in the literature?
>
> A    Important for what? I think that's the problem you're saying important for what.
>
> _The literature does not examine whether a stock price is efficient when it looks at earnings dates_. What normally the literature is doing simply completely different. The literature is looking how the market reacts to earning and not to draw conclusion. Therefore, efficient.[101]

89.    Duarte-Silva is mistaken. Indeed, it is hard to imagine a more universally-accepted concept in financial economics than that event study analyses are used to determine whether stock-prices react to objectively determined information events in a manner that is consistent with an informationally efficient market. Kothari (2001) explains this well-accepted concept as follows:

> Fama et al.(1969) conducted the first event study in financial economics. _Event studies are joint tests of market efficiency and the model of expected rates of return used in estimating abnormal returns._
>
> ***
>
> _Event studies are tests of market efficiency_. _They test the impact, speed, and unbiasedness of the market's reaction to an event_. _In an efficient capital market, a security's price reaction to an event is expected to be immediate and subsequent price movement is expected to be unrelated to the event-period reaction or its prior period return_. The modern literature on event studies originates with Fama et al. (1969) and Ball and Brown (1968), who examine

---

[101] _See_ Duarte-Silva Dep., pp. 119:18-120:9 (emphasis added). _See, also,_ Duarte-Silva Dep., pp. 85:12-87:20.

security return behavior surrounding stock splits and earnings announcements. *Since then hundreds of event studies have been conducted in the legal, financial economics, and accounting literatures*. There are two types of event studies: short-window event studies and long-horizon post-event performance studies. The inferential issues for the short-window event studies are straightforward, but they are quite complicated for the long-horizon performance studies. I discuss the salient issues of each type of study below.

*Short-window event studies provide relatively clean tests of market efficiency*, in particular when sample firms experience an event that is not clustered in calendar time (e.g., earnings announcement day returns or merger announcement day returns). The evidence from short-window event studies is generally consistent with market efficiency. *The evidence using intra-day, daily, and weekly returns to wide ranging events like earnings announcements, accounting irregularities, mergers, and dividends suggests the market reacts quickly to information releases*. In some cases, the reaction appears incomplete and there is a drift, which contradicts market efficiency.[102]

90.     As can be seen above, Duarte-Silva's opinion that standard event studies are incapable of establishing an efficient market for Farmland is based, in part, on his fundamental disagreement with over 50 years of academic literature on the subject.

91.     Instead, Duarte-Silva asserts that an alternative, higher threshold is "required" for establishing informational efficiency under *Cammer* 5 stating:

My understanding of this factor is that it requires Plaintiffs to show through empirical evidence "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *This factor requires a detailed review of the news during the Class Period and an assessment of the change in stock price (i.e., stock return) that such news would imply*. Then, *this factor requires an analysis of whether the company-specific stock returns (i.e., after controlling for contemporaneous market and industry returns*; also known as excess returns) upon those news were actually consistent with a cause-and-effect relationship. *To be consistent, such returns would have to be statistically significant*, i.e., sufficiently distant from a

---

[102] *See* S.P. Kothari, "Capital Markets Research in Accounting," *Journal of Accounting and Economics,* 31, 2001, 105-231, at 115 and 187 (emphasis added).

0% return that it can be interpreted as not due to random chance. *To be consistent, such statistically significant returns should also at least be in the direction that the news would predict on a consistent basis.*[103]

92.     Duarte-Silva then opines that:

According to the Edwards Reports' own evidence, there were 313 days with news during the Class Period, or 46.9% of the Class Period. However, *the Edwards Report does not examine the information that was being released on those days to ascertain if that information was material, what its price impact should be, and then examine if the stock price reacted accordingly.*[104]

93.     As can be seen above, to establish a cause-and-effect relationship under Duarte-Silva's "required" standard of proof, an event study analysis must be performed not just on a subset of dates based on pre-determined objective criteria, but on every day of the Class Period with news. Then, to be "consistent" with an informationally efficient market, the stock price must move not only in direction expected based on subjective assessments of value, but also by a statistically significant amount on every day during the class period with news.[105]

94.     In my opinion, Duarte-Silva's suggested cause-and-effect requirement to satisfy *Cammer* 5 is erroneous for numerous reasons.

95.     First, because Duarte-Silva's suggested event study analysis is not grounded in any pre-determined objective criteria of what constitutes "news," the analysis would require countless subjective determinations and assumptions, and the results of which would be unreliable and nearly impossible to replicate. Indeed, as discussed further below, in the absence of objective criteria, when analyzing a complex disclosure which includes numerous pieces of

---

[103] *See* Duarte-Silva Report, ¶27 (emphasis added footnotes omitted).

[104] *See* Duarte-Silva Report, ¶31 (emphasis added footnote omitted).

[105] *See, also,* Duarte-Silva Report, ¶36 stating: "This fact [that Farmland's stock moved opposite the expected direction on 2 of 17 days] is not discussed in the Edwards Report but it makes clear that, overall, either there is more to analyze to arrive at an expected direction of price movement or Farmland shares did not trade in an efficient market."

potentially value-relevant information, ten highly capable economists could come to ten different conclusions regarding the totality of the news. Duarte-Silva's suggested requirement that one must perform an event study analysis of <u>every day</u> of the Class Period could, therefore, draw the Court into a "battle of experts" over the correct interpretation of news on over 300 "news" days in this matter.[106]

96.     Second, as stated in the Edwards Report:

> The lack of a statistically significant response to the disclosure of new information, however, does not necessarily indicate market inefficiency. Indeed, a statistically significant stock-price reaction is only expected when the magnitude of the valuation effect of the information is so large that it exceeds the threshold for statistical significance. For example, consider a company with a market capitalization of $1 billion. If the standard error from a properly-specified market model is 3%, then only unexpected disclosures that would cause investors to alter their valuation of the company's equity by at least $60 million ($1 billion x 3% x 2) would be expected to result in an excess return that reaches the threshold for statistical significance at the 5% level.[107]

97.     Therefore because, in an efficient market, not every news event would be expected to alter the market's expectations for Farmland's future financial prospects by the amount necessary to elicit a statistically significant response,[108] Duarte-Silva erroneously disregards event dates with information that may not cause large enough value changes, but

---

[106] I also note that, because Appendix B does not contain all news stories, analyst reports, or other public information regarding Farmland, an exhaustive search for all news on each day of the Class Period would be required for Duarte-Silva's suggested analysis. *See* Edwards Report, fn 28.

[107] *See* Edwards Report, ¶55 (footnote omitted).

[108] *See, for example,* Edwards Report, ¶75 referencing Loh and Stulz (2011) which found that approximately 12% of change in investment recommendations by research analysts are found to be accompanied by statistically significant stock-price reactions at the individual firm level.

where Farmland's stock still moved in the expected direction.  This erroneously biases the analysis towards a finding of informational inefficiency.[109]

98.    Third, Duarte-Silva's requirement that the stock price must also move by a statistically significant amount is inconsistent with the wide-body of empirical research discussed in the Edwards Report and summarized above.  Indeed, in <u>none</u> of the cited studies do the authors require that the stock-price movement at the individual firm level meet the threshold for statistical significance when determining whether the direction of stock-price movement was consistent with expectations.[110]

99.    Fourth, Duarte-Silva's assertion that a company's stock price must react as one might expect on every event date (*i.e.*, exhibit perfect efficiency) is a concept that is contradicted by researchers[111] and rejected by the U.S. Supreme Court.  Indeed, as the U.S. Supreme Court stated in *Halliburton II*:

> *The markets for some securities are more efficient than the markets for others*, and even a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood.

---

[109] Consider an example of a disclosure that the hypothetical company above secured an unexpected contract with a net present value of $50 million.  Even if the company's market capitalization increased by $50 million in response to the news, Duarte-Silva would reject this reaction as evidence of an informationally efficient market even though the company's stock price moved in the expected direction by the expected amount.

[110] When questioned about this research at his deposition, Duarte-Silva testified that he did not recall whether the research discussed in the Edwards Report required a stock-price reaction to be statistically significant in order to determine whether the stock-price moved in the expected direction.  *See* Duarte-Silva Dep., pp. 85:12-86:5.

[111] *See, for example,* J. Campbell, A. Lo and A. MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, pp. 24-25 stating: "The notion of *relative* efficiency – the efficiency of one market measured against another, e.g., the New York Stock Exchange vs. the Paris Bourse, futures markets vs. spot markets, or auction vs. dealer markets – may be a more useful concept than the all-or-nothing view taken by much of the traditional market-efficiency literature... Similarly, market efficiency is an idealization that is economically unrealizable, but that serves as a useful benchmark for measuring relative efficiency."

\*\*\*

To recognize the presumption of reliance, the Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic's presumption of reliance thus does not rest on a "binary" view of market efficiency. Indeed, in making the presumption rebuttable, Basic recognized that market efficiency is a matter of degree and accordingly made it a matter of proof.*[112]

100.    Duarte-Silva provides no reference to academic literature suggesting, nor am I aware of any matter in which an expert performed or a court required an event study analysis of every day of the Class Period, nor that every event date must not only move in the expected direction but by a statistically significant amount to establish information efficiency.  In my opinion, such an extreme threshold requirement would render it impossible to establish informational efficiency for any company over any time period.

### iii) Duarte-Silva Provides Erroneous and Misleading Criticisms of My Event Study Analyses

101.    Throughout the Duarte-Silva Report and his deposition, Duarte-Silva asserts that, to establish that Farmland's stock-price reaction was consistent with the news disclosed on the day, the price movement must not only move in the expected direction based on the news, but by a statistically significant.  For example, Duarte-Silva testified:

> Q      Okay. So basically your criticism is that if a stock price movement was not statistically significant, then it doesn't provide evidence of informational efficiency; is that correct?
>
> A      If a stock price didn't move in a statistically significant way, it means it's not possible to say that the return was different from zero.

---

[112] *See Halliburton II* at 2403 and 2410 (emphasis added), citing to *Basic*, 485.

Q	Okay.

A	Meaning that it was possibly just simply zero.   And what we observed in the column called Excess Return here, in those circumstances, is a return that was likely driven by just noise.

Q	Okay.

A	So if that is the case, then when we look at, for example, at the first row, we see expected effect on price, positive.

We look at excess return, we see it's not statistically significant; therefore, the expected effect on price was positive, but it's not possible to tell that the return was actually positive.  It's most likely just zero with a little bit of noise.

So in that sense, the return does not support a cause-and-effect relationship between the news and the stock price and, therefore, does not support market efficiency.[113]

102.	When criticizing my event study analysis, Duarte-Silva then applies his direction

and statistical significance requirement to <u>each</u> of my 17 event study dates and concludes that:

Based on Edwards' own regression analysis, Farmland's share price moved in a direction apparently consistent with the arrival of new information on only 6 of those 17 days. Thus, even on the small number of days that Edwards examined, he found a cause-and-effect relationship on only 35% of his selected news days.[114]

103.	Duarte-Silva similarly applies his direction and statistical significance

requirement when criticizing the results of my event study analyses elsewhere in his report.

Below are some examples (actual results shown below):

---

[113] *See* Duarte-Silva Dep., pp. 83:14-84:24.  *See, also,* Duarte-Silva Report, fn 49 stating "This comment and other comments on returns or price movements in this report pertain to statistically significant returns as, by definition, returns that are not statistically significant are not statistically distinguishable from zero."

[114] *See* Duarte-Silva Report, ¶32 (footnote omitted).  Duarte-Silva also deems one of my event study dates where Farmland's stock price moved in both the expected direction and by a statistically significant amount to be inconclusive because of the presence of purportedly confounding news, which I address in detail below.

**Duarte-Silva (¶45)**: The results in [Table 3] above show that, before February 2017, the Edwards Report does not identify a single event that supports a cause-and-effect relationship...

**Actual result**: six of the seven (86%) event dates moved in the expected direction.

**Duarte-Silva (¶46)**: Further, only 6 out of 10 events from February 2017 onwards had a price reaction that was consistent with Edwards' expectation of price reaction. In total, on 11 out of the 17 dates selected by Edwards, Farmland's share price did not react in a direction consistent with Edwards' expected direction of effect on price. So, only in 35% of the dates selected by Edwards (6 out of 17) did Farmland's share price move in the expected direction. (footnotes omitted)

**Actual result**: nine of the 10 (90%) from February 2017 onwards and 15 of the 17 (88%) event dates in total moved in the expected direction.

**Duarte-Silva (¶49)**: Similarly, Edwards states that "[i]n an efficient market, I would expect that, on average, Farmland's common stock would react positively to positive earnings surprises and negatively to negative earnings surprises." However, the evidence in Table 3 of the Edwards Report (and displayed in the table below) shows that, before February 2017, Farmland's share price never moved in the direction that Edwards would have expected.

**Actual result**: three of four (75%) event dates moved in the expected direction.

104.    Duarte-Silva's criticisms of my event study analysis are misleading, statistically erroneous, and contradicted by an extensive body of empirical research.

### a)    Duarte-Silva Ignores Commonly Used and Well-Accepted Tests for Establishing Statistical Significance

105.    When performing an event study of a single event such as an alleged corrective disclosure, it is common practice in financial economics to require that the excess return on the day be statistically significant. This ensures that, because the statistical likelihood of experiencing a stock-price reaction of that magnitude is so small (5% or less when using the 5% threshold for statistical significance), it is much more likely that the exceptionally large stock-

price reaction is the result of the disclosure of value-relevant news than simply due to chance. But, when performing event studies of multiple event dates, there are multiple additional statistical tests that can be performed to determine whether stock prices are reacting to news.

106.     To illustrate this point, consider a hypothetical example of an FDA clinical trial of a new potential treatment for an aggressive form of cancer.  Suppose the average lifespan for newly diagnosed patients is one year under the current standard of care, with 95% of patients dying within two years.  If the new treatment is administered to a single patient, and this patient lives for 18 months, this provides no statistical basis for concluding that the new treatment is more effective than the current standard of care because the patient's 18-month survival was not statistically distinguishable from the one-year average.  But, if the patient were to survive three years after receiving the treatment, because the likelihood of surviving that long by chance is so low (significantly less than 5%), this would provide statistical evidence that the new treatment was responsible for the patient's extended life.  This is equivalent to an event study of a single event date.

107.     Now let us assume that, instead of administering the new treatment to just one patient, the drug was instead administered to 20 patients.  Under Duarte-Silva's standard of proof, each patient outcome would need to be examined individually.  To provide statistical evidence of treatment efficacy (reaction to news), each patient's survival would not only be required to exceed one year (expected direction), but also to exceed two years (statistical significance).  And, if any patient's outcome did not meet these two threshold requirements, under Duarte-Silva's standard of proof, the patient's outcome would be inconsistent with efficacy for the new treatment (cause-and-effect relationship).

108.     Requiring such a high threshold for determining efficacy is illogical for several reasons.  For example, when administering the treatment to 20 patients, it is likely that at least

some of these patients will have other unrelated conditions that could negatively affect their survival (confounding news). By dismissing these patient outcomes as inconsistent with efficacy if these patients survive longer than one year (expected direction) but not longer than two years (statistical significance), one is dismissing the possibility that the new treatment was in fact efficacious for these patients (reacted to news), but that the efficacy was masked by the negative impact of their underlying conditions (confounding news).

109.    Moreover, because the potential new treatment was administered to multiple patients in the above example, there are several well-accepted tests that can be used to provide statistical evidence of efficacy even in the presence of potential unrelated conditions. These same tests can be applied to the results of the event study analyses contained in the Edwards Report to establish a cause-and-effect relationship under *Cammer* 5. By asserting that it is "required" that Farmland's stock-price reaction on each event date both move in the expected direction and by a statistically significant amount to be consistent with efficiency, Duarte-Silva effectively dismisses each of these statistical tests as irrelevant.

   *i.*   *Statistical Significance of Average Stock-Price Reactions to Positive and Negative News Provides Strong Evidence of a Cause-and-Effect Relationship*

110.    In the above hypothetical example, one statistical test that can be performed to establish efficacy of the new potential treatment is a comparison of the average survival of the treatment group to that of patients receiving the current standard of care. Under the null hypothesis that the new treatment is no better than the current standard of care, one would expect the average survival of patients in the treatment group to be less than or equal to that of patients receiving the current standard of care. If, however, the average survival of patients in the treatment group is statistically greater than that of patients receiving the current standard of care, this would provide statistical evidence of efficacy.

111.    This same statistical test can be performed using my event study results to establish a cause-and-effect relationship under *Cammer* 5.  Specifically, under the null hypothesis that Farmland's common stock did not react to news, one would expect the average stock-price reaction to positive (negative) news to be statistically indistinguishable from zero.  If, however, the average stock-price reaction to positive (negative) news is statistically significantly positive (negative), this would provide statistical evidence that Farmland's stock price reacted to news as one would expect in an efficient market.  Indeed, this is the standard event study methodology that has been used by researchers to test market efficiency for over 50 years.[115]

### *Statistical Significance of Average Stock-Price Reaction to Analyst Downgrades*

112.    In support of his opinion that the results of my event study analyses do not provide evidence of an informationally efficient market for Farmland's common stock during the Class Period, Duarte-Silva attempts to perform such an analysis by calculating the statistical significance of Farmland's average stock-price reaction to analyst downgrades.  Specifically, Duarte-Silva states:

> Further, Edwards' results do not support the conditions that he himself set to conclude that Farmland's share price shows a cause-and-effect relation. For example, Edwards notes that "[i]n an efficient market, I would expect that, on average, Farmland's common stock would react … negatively to downgrades in investment recommendations." However, the average price reaction to downgrades displayed in Table 2 of the Edwards Report (and displayed in the table below) was -2.28%, which is not statistically distinguishable from zero under his own criteria for

---

[115] The Plaintiff's expert in *Flamel Technologies* performed a similar, but less robust analysis in which he ignored the direction of the stock-price reactions and instead determined that the average absolute value of the stock-price reactions on news days was over three times greater than on non-news days.  The Court conclude that "…the event study methodology utilized by Plaintiff's expert is based on accepted scientific, peer-reviewed protocols," and that "Plaintiff has established by the preponderance of the evidence that Flamel's ADRs traded in an efficient market during the Class Period and accordingly that the class is entitled to the presumption of reliance afforded by the fraud-on-the-market theory." *See Christel Billhofer, et al v. Flamel Technologies, S.A., et al*, 281 F.R.D. 150 (S.D. N.Y. 2012) at 163.

statistical significance. In other words, his evidence does not support his own conditions to conclude that Farmland's shares traded in an efficient market.[116]

113.    In support of his lack of statistical significance claim, Duarte-Silva provides the following explanation:

> The average excess return shown in Table 2 of the Edwards Report is -2.28%. Dividing this average excess return by Edwards' standard error of 1.41% results in a t-statistic of -1.62, which is closer to zero than -1.96 and therefore not statistically significant.[117]

114.    As can be seen above, the basis for Duarte-Silva's opinion that Farmland's average stock-price reaction was inconsistent with an informationally efficient market is incorrect because Duarte-Silva made a fundamental statistical error when calculating his t-statistic.  Indeed, the standard error of a market model (1.41%) provides a measure of the typical volatility of <u>individual excess returns</u>.  It is for this reason that the standard error of a market model is used to measure the statistical significance of <u>individual returns</u>.[118]

115.    But, when measuring the statistical significance of a <u>sample mean</u> (*i.e.,* average of a sample of individual returns such as analyst downgrades), the measurement of statistical significance is properly made by reference to the <u>standard error of the mean</u>, which is approximately equal to the standard error of the market model divided by the square root of the number of observations in the sample mean.[119]

---

[116] *See* Duarte-Silva Report, ¶48 (footnotes omitted).

[117] *See* Duarte-Silva Report, fn 69.

[118] *See, for example,* Exhibit 1 to the Duarte-Silva Report, p. 12 of 12, Notes and Sources: [K].

[119] *See, for example,* R. Leekley, <u>Applied Statistics for Business and Economics</u>, CRC Press, 2010 pp. 304-305 stating: "As before, we can think of $\hat{Y}$ ($\widehat{Salary}$) as an estimate of the mean or expected value of Y (Salary), given these values for education, experience, and sex. Or we can think of it as a prediction for an individual employee given these values. The predictions are the same—about $34,027—*but the confidence intervals around them are different*.  Both

116.     When questioned about this calculation at his deposition, Duarte-Silva provided

the following testimony:

> Q      Okay. Now, so when measuring the statistical significance
> of an average return, there are no adjustments that need to be made
> of the standard error?
>
> (Pause in proceedings.)
>
> A      I don't recall any for adjustment.
>
> Q      Okay. But have you ever heard of a term called the
> "standard error of the mean"?
>
> A      Yes.
>
> Q      Okay. So generally, when do you use the standard error of
> the mean?
>
> A      *When you are testing the statistical significance of a mean,
> but I don't recall exactly what are the conditions for that right
> now*.
>
> Q      Okay. But is it your opinion that when measuring the
> statistical significance of a mean, is it improper to divide it by the
> standard error of the mean?
>
> A      *I think there is a small adjustment, if I recall correctly, now
> that you ask about it*. But I don't -- I'm not sure that there is a
> small adjustment. I just don't remember that.

---

confidence intervals are centered on $\hat{Y}$ and are $t_{(n-k)}$ standard errors around $\hat{Y}$. (See Figure 13.5.) *The only difference is in the standard errors*. *The standard error for the mean is smaller* because there is only one source of error—we are using a sample regression line, which is bound to be somewhat wrong. *The standard error for an individual case is larger* because—in addition to this source of error—the individual points are scattered around the line even in the population." (emphasis added)  *See, also,* p. 394 stating: "The first [confidence interval for an *estimate*] assumes that the sample data follow roughly a normal distribution. *It is based on the standard deviation of the sample and tells us roughly how scattered the data are*. The second [confidence interval of a *mean*] assumes that all possible *sample means* for samples of size *n* follow a normal distribution. *It is based on the standard error of the mean and tells us how precise our estimate of the mean is*. The standard error (s$\hat{x}$) = the standard deviation (*sx*) divided by $\sqrt{n}$." *See, also,* D. Anderson, D. Sweeney, and T. Williams, Statistics for Business and Economics, nineth edition, Thomson, 2005, p. 345 stating that the standard error of the mean $\hat{x}$ is equal to the standard deviation divided by the square root of the number of observations in the sample mean.

Q        Okay. But do you believe it was proper here to divide by the standard error of the market model instead of the standard error of the mean?

A        Yes. I find that proper here, and I don't recall that it was necessary to divide by the standard error of the mean.

Q        Okay. And why not?

A        *I didn't see why it would be materially different here.*[120]

117.     I correct Duarte-Silva's error below by dividing the average excess return of -2.28% by the standard error of the mean, which equals the standard error of the market model divided by the square root of the number of observations in the sample mean (5):

TABLE 4
CORRECTION OF DUARTE-SILVA'S CALCULATION OF STATISTICAL SIGNIFICANCE

t-statistic = avg. excess return / [standard error / sqrt (sample size)]

t-statistic = -2.28% / [1.41% / sqrt (5)]

**t-statistic = -3.62**

118.     As can be seen above, correcting Duarte-Silva's error <u>does</u> have a material effect on his calculation of the level of statistical significance.  In fact, correcting Duarte-Silva's error by appropriately measuring the statistical significance of the sample <u>mean</u> using the standard error of the <u>mean</u> results in a t-statistic of -3.62, which indicates that, not only did Farmland's stock price move in the expected direction on <u>five out of five</u> (100%) dates on which research analysts downgraded their investment recommendations for Farmland, but the average excess return is statistically significant at the 0.03% significance level (1-in-3,333).  In my opinion, these findings provide strong empirical support for a cause-and-effect relationship between these information events and a corresponding change in Farmland's stock price.

---

[120] *See* Duarte-Silva Dep., pp. 95:2-96:20 (emphasis added).

119.     An alternative methodology that is often used in financial economics to measure the statistical significance of an average excess return is the inclusion of an "indicator" or "dummy" variable for the event dates in a market model regression.[121]  To further illustrate the statistical significance of the Farmland's average stock-price reaction to analyst downgrades, I perform this analysis and present the results in Table 5 below:

TABLE 5
CALC. OF STATISTICAL SIGN. OF AVG. STOCK-PRICE REACTION TO ANALYST DOWNGRADES

| | | |
|---|---|---|
| Intercept (t-statistic) | 0.000 | (-0.19) |
| Coefficient on the RU30INTR Index (t-statistic) | 0.427 | (6.09) |
| Coefficient on the Orthogonalized FNCOTR Index (t-statistic) | 0.462 | (5.87) |
| **Coefficient on Dummy Variable for Analyst Downgrades (t-statistic)** | **-2.31%** | **(-3.67)** |
| | | |
| Adjusted R-Squared | | 11.2% |
| Standard Error | | 1.40% |
| Observations (November 12, 2015 to July 10, 2018) | | 668 |

120.     As can be seen in Table 5 above, the t-statistic associated with the average stock-price response to downgrades in investment recommendations is -3.67, approximately equal to the t-statistic of -3.62 calculated in the prior section after correcting the statistical error in

[121] *See, for example,* P. Asquith, M. Mikhail, and A. Au, "Information content of equity analyst reports," *Journal of Financial Economics*, 75, 2005, 245-282, at 266 stating: "In addition to disaggregating our strength-of-arguments variable into its positive and negative components, we consider each of our 28 justification variables independently. That is, we add 28 dummy variables to the regression, such as positive revenue growth, negative revenue growth, positive cost savings, negative cost savings, etc"; C. Demiroglu and M. Ryngaert, "The First Analyst Coverage of Neglected Stocks," *Financial Management*, Summer 2010, 555-584, at 573 stating: "In this section, we use regression analysis to control for all the determinants of initiation abnormal returns. In all of the specifications, we include dummy variables for the strength of recommendation rating and the type of firm the initiating analyst is affiliated with. We also add a dummy variable, *Conflict*, set equal to one if a preinitiation investment banking relationship exists between the analyst's firm and the covered firm"; J. Gerlach and J. Lee, "How Information Transmits to Equity Markets: Earnings Announcements and Volatility," Working Paper, March 2010, at 12 stating: "We estimate a regression in which the dependent variable is the absolute value of the difference between the actual return $R_{jt}$ for one-minute interval j on day t and the mean return $R_j$ for interval j over all announcement and control days. Dummy variable $D_t$ is defined to be 1 if the earnings announcement is released prior to the market open on day t and zero otherwise."

Duarte-Silva's calculation, and indicating a less than 1-in-3,800 chance of occurring if Farmland's common stock was not reacting to news. This provides further evidence of the highly statistically significant cause-and-effect relationship between these information events and a corresponding change in Farmland's common stock price.

### Statistical Significance of Average Stock-Price Reaction to Positive and Negative Event Dates

121. Because my event study also included Farmland's stock-price reaction to earnings surprises and initiations of coverage by research analysts, the same statistical test can be applied to all 17 of my event dates. Specifically, to measure the statistical significance of the average excess returns on all positive and negative event dates in my event study analyses, I include two dummy variables in my market model regression: i) a dummy variable for positive news defined as a positive earnings surprises or ratings actions; and ii) a dummy variable for negative news defined as a negative earnings surprises or ratings actions.[122] The results of this analysis are shown in Table 6 below:

---

[122] I note that Duarte-Silva has used dummy variables under similar circumstances in his published work. *See, for example,* T. Duarte-Silva, H. Fu, C. Noe, and R. Ramesh, "How Do Investors Interpret Announcements of Earnings Delays," *Journal of Applied Corporate Finance*, 25(1) 2013, 64-71 at 67-69 stating: "Previous research has shown that management earnings forecasts affect stock prices. As a result, we wanted to ensure that the univariate results reported above were not driven by contemporaneously provided earnings guidance. To do so, *we estimated a multiple regression model with earnings guidance indicator variables in addition to delay reason categories. We classified earnings guidance as positive, neutral, or negative. We defined earnings guidance as positive (negative)* if the earnings delay announcement included a statement about *earnings beating (missing) management or analyst expectations or historical earnings*, the company reporting a profit (loss), the earnings effect of the delay being positive (negative), or general positive (negative) statements about the company's prospects." (emphasis added footnote omitted).

| | | |
|---|---|---|
| Intercept (t-statistic) | 0.000 | (-0.68) |
| Coefficient on the RU30INTR Index (t-statistic) | 0.449 | (6.55) |
| Coefficient on the Orthogonalized FNCOTR Index (t-statistic) | 0.469 | (6.07) |
| **Coefficient on Dummy Variable for Positive Events (t-statistic)** | **3.28%** | **(5.84)** |
| **Coefficient on Dummy Variable for Negative Events (t-statistic)** | **-1.31%** | **(-3.14)** |
| | | |
| Adjusted R-Squared | | 15.0% |
| Standard Error | | 1.37% |
| Observations (November 12, 2015 to July 10, 2018) | | 668 |

122.    As can be seen in Table 6 above, the average stock-price responses to positive and negative event dates within my event study analyses were 3.28% and -1.31%, respectively. With t-statistics of 5.84 and -3.14, the probability that Farmland would experience these average stock-price reactions if not reacting to news is less than 1-in-120,000,000 and 1-in-500, respectively, greatly exceeding even the 1% (1-in-100) threshold requirement for statistical significance. In my opinion, these findings provide strong empirical support for a cause-and-effect relationship between these information events and a corresponding change in Farmland's stock price.

*ii.    Statistical Significance of the Proportion of Stock-Price Reactions that Moved in the Expected Direction Provides Strong Evidence of a Cause-and-Effect Relationship*

123.    In the above hypothetical example, a second statistical test that can be performed to establish efficacy of the potential new cancer treatment is a comparison of the proportion of patients in the treatment group that survive longer than the average for those receiving the current standard of care (one year). Under the null hypothesis that the new treatment is no better than the current standard of care, one would expect that approximately 50% (or lower) of the patients in the treatment group would survive longer than one year with the remaining 50%

---

[123] Source: Table 2 and Table 3 to the Edwards Report.

surviving less than one year. If, however, the proportion of patients in the treatment group that lived longer than one year is statistically significantly greater than 50% (*i.e.,* so large that there is a remote probability of it occurring by chance), this too would provide statistical evidence of efficacy.

124. For Farmland, this same statistical test can be performed using my event study results to establish a cause-and-effect relationship under *Cammer* 5. Specifically, in a directional study such as the event studies presented in the Edwards Report, the null hypothesis being tested is that there is no cause-and-effect relationship between the information events and a corresponding change in the company's stock price. In a binary world where a stock price can either increase or decrease each day, if no such relationship existed, the probability that the stock price would move in the expected direction on any given event date is 50%. If, on the other hand, a stock price moves in the expected direction on a sufficient proportion of event dates such that the probability of occurrence by chance is less than the given threshold for statistical significance, this would provide statistical evidence that the null hypothesis should be rejected – *i.e.,* that a cause-and-effect relationship exists between these information events and a corresponding change in the Company's stock price.[124]

125. As discussed above, I performed two standard event study analyses to test for a cause-and-effect relationship under *Cammer* 5. My first event study, initiations of coverage and changes in investment recommendations, contained seven event dates on which Farmland's stock price moved in the expected direction based on the pre-determined objective criteria on <u>all seven dates</u> (100%). This compared favorably to the published empirical finding that, for other U.S.

---

[124] This is the equivalent of testing a coin for bias by flipping the coin multiple times. If the coin lands on heads in a proportion so great that it could only happen by chance less than 5% of the time, the researcher would reject the null hypothesis that the coin is fair in favor of the alternative hypothesis that the coin is biased. I testified at length on this topic at deposition. *See* Edwards Dep., pp. 130:4-135:18.

exchange traded-stocks, stock-prices move in the expected direction on approximately 75% of the event dates using the same objective criteria.

126.    My second event study, earnings surprises, contained 10 event dates on which Farmland's stock price moved in the expected direction based on the pre-determined objective criteria on <u>eight dates</u> (80%).  Again, this compared favorably to the published empirical finding that, for other U.S. exchange traded-stocks, stock-prices move in the expected direction on between 55% and 70% of the event dates using the same objective criteria.

127.    In Table 7 below, I calculate the probability that Farmland's stock price could have moved in the expected directions based on the pre-determined objective criteria if Farmland's common stock was not reacting to this news:

<small>TABLE 7</small>
<u><small>PROBABILITY THAT FARMLAND'S STOCK MOVED IN THE EXPECTED DIRECTION BY CHANCE</small></u>[125]

|  | <u>Analyst Actions</u> | <u>Earnings Surprises</u> | <u>Aggregate</u> |
|---|---|---|---|
| Number of Passes | 7 | 8 | 15 |
| Number of Events | 7 | 10 | 17 |
| Proportion of Passes | 100% | 80% | 88% |
| Probability by Chance | 0.78% | 5.47% | 0.12% |

128.    As can be seen above, the probability that Farmland's common stock could move in the direction expected on all seven event dates in my event study of initiations of coverage and changes in investment recommendations by chance is less than 1%, suggesting a strong cause-and-effect relationship between these information events and a corresponding change in Farmland's stock price.  At 5.47%, the probability that Farmland's stock price would move in the direction expected on eight or more of the 10 earnings surprise dates is marginally significant at

---

[125] $0.78\% = 1/2^{\wedge}7$;  $5.47\% = \frac{1}{2^{10}}(\frac{10!}{8!2!} + \frac{10!}{9!1!} + \frac{10!}{10!0!})$; and $0.12\% = \frac{1}{2^{17}}(\frac{17!}{15!2!} + \frac{17!}{16!1!} + \frac{17!}{17!0!})$.

the 5% significance level. This is not surprising given the empirical finding that "contrarian" returns are slightly more common for these information events than for changes in investment recommendations. When aggregating the results as Duarte-Silva did in his report,[126] at 0.12%, the probability that Farmland's common stock would move in the expected direction on 15 or more of 17 event dates if no cause-and-effect relationship existed is nearly 1-in-1,000, greatly exceeding even the 1% (1-in-100) threshold requirement for statistical significance. In my opinion, these findings provide strong empirical support for a cause-and-effect relationship between these information events and a corresponding change in Farmland's stock price.

### iii. *Statistical Significance of Proportion of Statistically Significant Stock-Price Reactions Provides Strong Evidence of a Cause-and-Effect Relationship*

129. In the above hypothetical example, a third statistical test that can be performed to establish efficacy of the above treatment is a comparison of the proportion of patients in the treatment group that survived longer than two years to the same proportion of patients that received the current standard of care. Under the null hypothesis that the new treatment is no better than the current standard of care, one would expect the proportion of patients that survived longer than two-years to be no greater than 5% (the proportion of patients who live longer than two years while receiving the current standard of care). If, however, the proportion of patients in the treatment group that survived longer than two years is statistically significantly greater than that for those receiving the current standard of care, this would provide statistical evidence of efficacy.

130. For Farmland, the same statistical test can be performed using my event study results to establish a cause-and-effect relationship under *Cammer* 5. Specifically, under the null hypothesis that Farmland's common stock was not reacting to news, one would expect the

---

[126] *See, for example,* Duarte-Silva Report, ¶¶32-33, 46, and Table 3.

proportion of statistically significant stock-price reactions on news days to be equal to that on non-news days. If, however, the proportion of statistically significant stock-price reactions on news days is statistically significantly greater than that on non-news days, this would provide statistical evidence that Farmland's stock price was reacting to news as one would expect in an efficient market. This statistical test is commonly used by experts for both plaintiffs and defendants and is commonly accepted by the courts as providing sufficient support of a cause-and-effect relationship under *Cammer* 5.[127]

131. As discussed above, my first event study, initiations of coverage and changes in investment recommendations, contained seven event dates on which Farmland's stock price moved by a statistically significant amount on three dates (43%). This compared favorably to the published empirical finding that, for other U.S. exchange traded-stocks, stock-prices move by a statistically significant amount on approximately 12% of dates on which a change in investment recommendation is made. My second event study, earnings surprises, contained 10 event dates on which Farmland's stock price moved by a statistically significant amount on five dates (50%).

---

[127] The Court in *Polymedica* accepted a similar analysis performed by defense expert Dr. Frederick Dunbar calling his testimony "particularly credible and informative," and concluded that "To approach usefulness, an analysis should statistically compare all news days with all non-news days." *See In Re Polymedica Corporation Securities Litigation*, 453 F. Supp. 2d 260 (D. Mass 2006), at 269; Citing a similar analysis performed in *Alstom,* the Court quoted plaintiff's expert stating that: "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news." *See In re Alstom SA Securities Litigation*, 253 F.R.D. 266 (S.D. N.Y. 2008), at 279; Regarding a similar analysis where days with company issued press releases were four times more likely to have a statistically significant stock return than days without, the Court in *Radient* stated that the Plaintiff's expert's analyses "support a finding of market efficiency for the core *Cammer* factor." *See Vinh Nguyen v. Radient Pharmaceuticals Corporation et al.*, 287 F.R.D. 563 (S.D. CA. 2012), at 30; and the court in CenturyLink cited a similar analysis in which plaintiff's expert found that "...CenturyLink's common stock price exhibited significant price movements nine times as frequently on 'news' days than on 'no-news' days." *See In Re: Centurylink Sales Practices and Securities Litigation*, WL 5517483, Civil File No. 18-296 (MJD/KMM), (D. MN. 2020) at 10.

132.     There are numerous statistical tests that can be used to determine whether the proportions of statistically significant stock-price reactions found in my event study analyses are statistically significantly different than on non-event dates and, thus, provide evidence of a cause-and-effect relationship between these information events and a corresponding change in Farmland's stock price.  One such statistical test that is commonly used by experts for both plaintiffs and defendants and accepted by the court is the Fisher's Exact Test.[128]  I perform this analysis and present the results in Table 8 below:

TABLE 8
FISHER EXACT TEST OF DIFFERENCE OF PROPORTIONS OF STATISTICALLY SIGNIFICANT RETURNS

|  | Analyst Actions | Earnings Surprises | Aggregate |
|---|---|---|---|
| Event Dates: | | | |
| Number of Significant Returns | 3 | 5 | 8 |
| Number of Events | 7 | 10 | 17 |
| Proportion of Significant Returns | 43% | 50% | 47% |
| Non-Event Dates: | | | |
| Number of Significant Returns | 35 | 33 | 30 |
| Number of Events | 661 | 658 | 651 |
| Proportion of Significant Returns | 5% | 5% | 5% |
| Probability by Chance | 0.5% | <0.01% | <0.01% |

[128] *See, for example, Monroe County Employees' Retirtement System v. Southern Co*., 332 F.R.D. 370, 386 fn 18(N.D. GA. 2019)  stating: "Professor Feinstein conducted a Fisher's Exact Test and found that 'the probability of observing five of seven earnings announcements eliciting statistically significant one-day stock price reactions would be only 0.003%.' Put differently, observing significant reactions on five of the seven event dates rejects 'to the 99.997% confidence level' the hypothesis that Southern Company stock did not react to new, value-relevant information. The Court finds that Professor Feinstein's empirical analysis analyzing exclusively one-day event windows is strong evidence of market efficiency… Professor Feinstein conducted a Fisher's Exact Test to test the probability of observing three of seven earnings announcement eliciting statistically significant one-day stock price reactions. Professor Feinstein concluded that the probability of observing Professor Gompers' results (i.e., three of seven event dates eliciting statistically significant price reactions) in an inefficient market would be only 0.502%. Thus, at a 99.498% confidence level, Professor Gompers' event seemingly study [sic] rejects the hypothesis that Southern Company stock did not trade in an efficient market."

133. As can be seen above, the difference in the proportion of statistically significant returns on my objectively determined event dates vs. non-event dates is statistically significant at greater than the 1% significance level under both definitions of news, again indicating a strong cause-and-effect relationship between these information events and a corresponding change in Farmland's stock price. Moreover, when aggregating the results as Duarte-Silva did in his report, at less than 0.01%, the probability that Farmland's common stock would move by a statically significant amount on eight or more of the 17 event dates if no cause-and-effect relationship existed is less than 1-in-10,000, greatly exceeding even the most strict 1% (1-in-100) threshold requirement for statistical significance.

134. In my opinion, these findings provide strong empirical support for a cause-and-effect relationship between these information events and a corresponding change in Farmland's stock price.

iv. *Conclusion Regarding Statistical Significance of the Results of My Event Study Analyses of a Cause-and-Effect Relationship*

135. As can be seen above, by requiring that each of my 17 event dates not only move in the expected direction, but also by a statistically significant amount to be consistent with efficiency, Duarte-Silva sets an implausibly high and erroneous threshold for establishing a cause-and-effect relationship under *Cammer* 5. In my opinion, the results of my event study analyses provide overwhelming evidence that Farmland's common stock reacted to news during the Class Period as evidenced by the following:

a) Consistent with the wide body of empirical research, on average, Farmland's stock price reacted positively to positive earnings surprises and ratings actions and negatively to negative earnings surprises and ratings actions. With t-statistics of 5.84 and -3.14, the probability that Farmland would experience these average stock-price reactions is less than 1-in-120,000,000 and 1-in-500 if Farmland was not reacting to news;

b) Farmland's stock price moved in the expected direction on 88% of the objectively determined event dates, which not only exceeds the proportions found in the literature of other U.S. exchange-traded stocks, but had a nearly 1-in-1,000 chance of happening by chance if Farmland was not reacting to news; and

c) Farmland's stock price moved by a statistically significant amount on 47% of the objectively determined event dates, which not only exceeds the proportions found in the literature of other U.S. exchange-traded stocks, but had a less than 1-in-10,000 chance of happening by chance if Farmland was not reacting to news.

*b)* *Duarte-Silva Makes Erroneous Claims Regarding My Thresholds for Establishing Informational Efficiency*

136. Duarte-Silva also makes erroneous claims regarding the thresholds set forth in the Edwards Report for establishing a cause-and-effect relationship under *Cammer* 5. Specifically, when describing my event study analyses, Duarte-Silva provides the following criticism:

> To show cause-and-effect in support of a conclusion that Farmland shares traded in an efficient market, I would expect to find tests that the share price reacted to news quickly and consistently throughout the Class Period. *The Edwards Report sets a lower threshold in that it only expects prices to move in the same direction as the cause of that price movement on average.* I do not find the Edwards Report's assessment of cause-and-effect to be sufficient to establish that Farmland shares traded in an efficient market, for the following reasons.
>
> *First, generally consistent price reactions "on average" in the same direction as the news on a small number of days during the Class Period is not an assessment of whether Farmland's share price reacted in the correct direction throughout the Class Period.*[129]

137. Duarte-Silva's characterization of my analysis is false. As stated in the Edwards Report, there is a wide body of research which shows that, although stock-price movements are reliably positive (negative) for positive (negative) earnings surprises and analyst ratings actions on average, researchers have found that, at the individual firm level, the direction of the stock-

---

[129] *See* Duarte-Silva Report, ¶¶29-30 (emphasis added).

price reaction is less predictable, with between 55% and 70% of earnings surprises and 75% analyst ratings actions being associated with stock-price movements in the expected direction.[130] Therefore, <u>in addition</u> to requiring that Farmland's stock prices move in the expected direction on average, I <u>also</u> required that, <u>at the individual event level</u>, Farmland's stock price move in the expected direction in proportions consistent with those found in the wide-body of empirical research cited in the Edwards Report.[131]   As such, the objective criteria used in my event study analyses were consistent with the wide body of empirical research at both the aggregate level and the individual event level.   Duarte-Silva ignores these additional thresholds clearly set forth in the Edwards Report.

<u>c)</u>   <u><i>Duarte-Silva's Claims Regarding My Use of Objective Criteria for Assessing the Value Content of News are Erroneous and Contrary to Well-Accepted Literature and Court Precedent</i></u>

138.   Duarte-Silva also criticizes the results of my event study analyses because he claims that purportedly confounding news existed on two dates which, according to Duarte-Silva, rendered the stock-price reaction on those dates inconclusive.   Specifically, Duarte-Silva states:

> Each of the data points in this table is from Edwards' own analysis, with one exception. On 12/14/2016 (marked in italics), Farmland's share price posted a statistically significant decline, which may seem consistent with Edwards' description that the news that day was negative: an analyst downgrade of Farmland's shares. However, I notice that, based on news that day of a farm purchase by Farmland, another analyst (Janney) reiterated its Buy rating. This news informs me that such news was positively interpreted by the market. Therefore, I observe the negative news identified by Edwards (analyst downgrade) but also news that can reasonably be assessed as positively interpreted by the market. I conclude that the expected effect on price is inconclusive on that date and, therefore, Edwards has not shown that that date's decline in Farmland's share

---

[130] *See* Edwards Report, ¶¶68-75, 84-88.

[131] *See* Edwards Report, ¶¶78, 91.

price is consistent with an efficient response to the mix of positive and negative information released that day.[132]

139. Duarte-Silva similarly states:

> For example, the Edwards Report expected a positive effect on price on 3/2/2018 from the 3/1/2018 earnings release after market hours (because actual earnings were higher than analyst-predicted earnings), but the total mix of information released was not as clear as the Edwards Report makes it look. In fact, two analysts lowered their price targets within four days of the earnings release. In other words, the Edwards Report's assessment of the direction of the information arriving on a given day is insufficient to ascertain the expected direction of the stock price movement. It follows that such assessment is equally insufficient to determine whether the direction of the market reaction was consistent with the nature of the information that was released.[133]

140. Duarte-Silva's criticisms of the results of my event studies of December 14, 2016, and March 1, 2018, are fundamentally flawed for at least two reasons.

141. First, it is axiomatic in financial economics that, when performing an event study analysis, a researcher must take special care to avoid infecting the analysis with arbitrary and subjective determinations and assumptions that would render the analysis unreliable and incapable of being replicated.

142. As discussed in the Edwards Report, the two event studies I performed were based on the objective criteria set forth and relied upon in an extensive body of published empirical studies spanning multiple decades. By employing the same objective criteria, I am able to directly compare the results of my analyses to those from these extensive bodies of empirical research performed on other U.S. exchange-traded stocks. If the results of my event studies for Farmland's common stock are consistent with those from these extensive bodies of empirical research, this provides evidence that Farmland's common stock responded to these

---

[132] *See* Duarte-Silva Report, ¶44 (footnotes omitted).

[133] *See* Duarte-Silva Report, ¶35 (footnotes omitted).

information events as one would expect in an efficient market.[134]  If, however, one were to require additional subjective determinations of the value content of other unrelated pieces of information disclosed on each event date, the results become not only incomparable to the literature, but also less informative.  Indeed, it is likely that, when provided a complex earnings disclosure which includes numerous pieces of potentially value-relevant information, ten highly capable economists could come to ten different conclusions regarding the totality of the news.  It is for this reason that researchers take great care to avoid making subjective determinations of value when performing event study analyses.[135]

---

[134] In response to my comparison of the results of my event studies to those from the extensive body of empirical research, Duarte-Silva makes a criticism similar to his criticism of my benchmarking analysis stating: "Even if Edwards' results for Farmland matched the results of those academic papers, that would not imply market efficiency because Edwards has not shown that the stocks in those papers' samples were trading in an efficient market. In other words, it is meaningless to establish efficiency by comparison to a sample of shares that have not been shown to be efficient."  Duarte-Silva Report, ¶ 39.  As with my benchmarking analysis, my comparison of event study results to those from the extensive body of empirical research is based on two principles and precedents that are well accepted by the courts: i) stocks that trade on major U.S. exchanges, such as exchanges on which the empirical studies were performed, are generally considered to be efficient; and ii) event studies such as those performed in the Edwards Reports are appropriate for demonstrating a cause-and-effect relationship under *Cammer* 5.

[135] This concept has also been recognized by the courts.  *See, for example, In Re Countrywide Financial Corp. Securities Litigation*, 273 F.R.D. 586, 618 (C.D. CA. 2009) (emphasis added) stating: "Dr. Jarrell defined the events for study as every quarterly earnings release dated during the class period where earnings differed from analysts' consensus estimates. This is a fairly objective criterion. None of the three defense experts has any objection to the methodology used in Dr. Jarrell's event study on the common, at least "in principle." *It should be obvious, even to those without a background in statistics or econometrics, that the events for study should be selected using criteria that are as objective as possible*. Further, those criteria should be determined before looking at the result to be studied (here, stock returns). Relatedly, unless the expert uses articulable objective criteria, it is difficult to evaluate the probative value of expert evidence without evaluating also the expert's own credibility."  *See, also, David M. Loritz, et al., v. Exide Technologies, et al*., U.S. Dist. LEXIS 100471 (C.D. CA. 2015) (emphasis added) at 41 stating "The Court finds Torchio's analysis persuasive. *Torchio selected the events to be included in his event study using objective criteria* determined before looking at the results [press releases and earnings surprises]. *See In re Countrywide*, 273 F.R.D. at 618. *It was also proper for him to avoid engaging in subjective ex ante evaluations of the studied events. See id. Moreover, other courts have considered and rejected James's argument that a proper event study should examine whether stock prices move in the direction expected based on an ex ante*

143.    As an illustrative example, consider Duarte-Silva's criticism of my event study of March 1, 2018.  According to my event study analysis, Farmland reported adjusted funds from operations that was greater than expected.  Consistent with expectations given a positive earnings surprise, Farmland's stock price increased by a statistically significant amount following the news (*see* Table 3 to the Edwards Report).  But, according to contemporaneous news articles, Farmland also reported: i) better-than-expected revenue;[136] ii) new full-year 2018 AFFO guidance of $0.40 to $0.44, and iii) the acquisition of 5,114 acres of permanent crop farmland for $110 million.[137]  Although Duarte-Silva claims that the objective criteria that I relied on for my event study of earnings surprises is "insufficient to ascertain the expected direction of the stock price movement"[138] on this day, Duarte-Silva provides no suggestion as to how one might go about fixing this purported flaw in my analysis, nor does he cite to any published research or court precedent that might provide some guidance.

144.    Second, Duarte-Silva's claim that the purportedly confounding news on December 14, 2016, "can reasonably be assessed as positively interpreted by the market" is contrary to the extensive body of research on the subject.  Specifically, Duarte-Silva claims that, although Farmland's stock experienced a statistically significance decline on December 14, 2016, which is consistent with the downgrade in investment recommendation by Wunderlich on this day, these results are "inconclusive" because analysts at Janney also issued a report in which they reiterated their "Buy" recommendation for Farmland.[139]  But, there is no basis to conclude

---

*evaluation of the news event at issue.*"
[136] *See* "16:20 EDT Farmland Partners reports Q4 AFFO 16c, consensus 14cReports Q4 revenue..." *Theflyonthewall*, March 1, 2018.
[137] *See* "Farmland Partners Inc. Reports Fourth Quarter and Full Year 2017 Results," *PR Newswire*, March 1, 2018, 4:05 pm.
[138] *See* Duarte-Silva Report, ¶35.
[139] *See* Duarte-Silva Report, ¶44.

that Janney's ratings action on the day can reasonably be considered of equal or greater value

relevance than the ratings downgrade by Wunderlich because Janney simply <u>reiterated</u> the same

investment rating that had been contained in at least its prior ten research reports for

Farmland.[140,141]  Duarte-Silva cites to no empirical research, nor am I aware of any, which

supports his assertion that the presence of both: i) a downgrade in investment recommendation;

and ii) a reiteration of a previously disclosed "Buy" rating, could "reasonably be assessed as

positively interpreted by the market."  In fact, empirical research suggests the opposite.  Indeed,

according to Francis and Soffer (1997):

> Further analysis indicates that the informativeness of stock
> recommendations derives from the *revision in the recommendation*
> rather than the level; that is, the recommendation level does not
> appear to matter, after controlling for the change in the
> recommendation. The results also show that, holding the
> recommendation level constant, *the reaction to reiterated*
> *recommendations is generally weaker than the reaction to new*
> *recommendations*.[142]

145.    Moreover, an examination of the Janney report shows that, although the analysts

maintained their long standing "Buy" rating for Farmland, the analysts actually <u>decreased</u> their

2017 earnings forecasts for Farmland, an objective measure that has been shown by a wide body

of empirical research to <u>negatively</u> impact stock prices, which is also consistent with Farmland's

---

[140] Source: Bloomberg.

[141] Also note that, although the downgrade by Wunderlich was widely disseminated by the financial press, I find no mention of Janney's reiteration of a "Buy" recommendation in any news articles.  *See, for example,* "Farmland Partners Cut to Hold at Wunderlich," *Bloomberg First Word*, December 14, 2016, 6:53 am; and "Wunderlich Securities Inc. downgrades Farmland Partners Inc. to 'hold'," *SNL Real Estate Securities Daily: North America Edition*, December 15, 2015.

[142] *See* J. Francis and L. Soffer, "The Relative Informativeness of Analysts' Stock Recommendations and Earnings Forecast Revisions," *Journal of Accounting Research*, 35(2) Autumn 1997, pp. 193-211, at 208 (emphasis added).

statistically significant stock-price decline on the day.[143]  Duarte-Silva ignored these important

findings when opining that Janney's reiteration of its "Buy" rating "was positively interpreted by

the market."

146.    For the reasons above, in my opinion, it would be improper and unscientific to

reject the objective criteria set forth in the Edwards Report in favor of subjective determinations

of the overall value relevance of information disclosed on each of my event dates.  The objective

criteria used in the Edwards Report is based on extensive bodies of published research spanning

several decades, and the results of my analyses are consistent with the findings of this research.

### *d)*  *Duarte-Silva Makes Misleading Claims Regarding the Proportion of Statistically Significant Days With and Without News*

147.    Duarte-Silva also makes misleading claims regarding the proportion of

statistically significant days during the Class Period that contain news.  Specifically, Duarte-

Silva examines the news stories and market model statistics shown in Appendix B to the

Edwards Report and concludes the following:

> Third, as shown in the table below, Edwards shows that there were
> no company-specific news at all in 42% of the days with
> statistically significant returns and that, before February 2017,
> there were no company-specific news at all in 50% of the days
> with statistically significant returns. While it is possible that
> statistically significant returns can occasionally occur without
> news, in this situation Farmland's share price exhibited statistically

---

[143] *See, for example, ,* P. Asquith, M. Mikhail, and A. Au, "Information content of equity analyst reports," *Journal of Financial Economics*, 75, 2005, 245-282, at 248 sting: "Over the past two decades, security analyst reports have been the subject of extensive empirical and experimental work. Early investigations are primarily related to the market's reaction to revisions in either analysts' earnings forecasts or recommendations. Most of this work shows positive (negative) abnormal returns for upward (downward) earnings forecast revisions or new buy (sell) recommendations. For example, Abdel-khalik and Ajinkya (1982) find significant abnormal returns during the publication week of forecast revisions by Merrill Lynch analysts. Similarly, Lys and Sohn (1990) present evidence consistent with forecast revisions having information content (*see also* Stickel, 1991)."

significant company-specific price movements on a substantial number of days without company-specific news.[144]

148.     Duarte-Silva's claims are misleading and erroneous for several reasons.

149.     First, as stated in the Edwards Report, Appendix B to the Edwards Report was not intended to represent a comprehensive list of all available news articles for Farmland.[145]  In fact, because of file-format incompatibilities with our chronology software, we are unable to import news articles from Lexis Nexis or non-text articles from Bloomberg.  During the Class Period, these articles totaled approximately 4,500 (over 3,700 news articles from Lexis Nexis and over 800 non-text articles from Bloomberg).  By ignoring these articles, Duarte-Silva overstates the number of statistically significant dates during the Class Period without news.

150.     Second, although Duarte-Silva claims that finding 42% of statistically significant days during the Class Period with no readily identifiable news is "a substantial number of days," he again provides no empirical basis for his claim.  Researchers have examined the relationship between information events and statistically significant stock-price reactions, and their findings contradict Duarte-Silva's claims.

151.     For example Fair (2002) studies the relationship between information events and significant stock returns for the general stock market and found that no identifiable news events were found on approximately 69% of the dates.[146]  Therefore, Duarte-Silva's claim that 42% of

---

[144] *See* Duarte-Silva Report, ¶37.

[145] *See* Edwards Report, fn 28 stating "For news stories, I searched Bloomberg and Factiva.  For Bloomberg, I searched current news ("CN") for the ticker symbol "FPI US" using all sources and removing; i) Topics -  Internet Linked Headlines; and ii) Sources - "EDG" – Edgar SEC-Online, "CFL" – Company Filings, "BSV" – Bloomberg Social Velocity Alerts, and "BT" – Bloomberg Transcripts with "medium" relevance.  For Factiva, I searched the company code Farmland Partners, Inc. using "all sources".  I note that Appendix B does not contain all news stories, analyst reports, or other public information regarding Farmland, but is rather a large sample of information currently available."

[146] *See* R. Fair, "Events That Shook the Market." *Journal of Business*, 75, 4, 2002 pp.

Farmland's statistically significant dates without identifiable news is "a substantial number of days," would imply that the companies within the S&P 500 are not informationally efficient.

152.    When presented with a nearly identical finding of approximately 40% of significant days without readily identifiable news as alleged by Duarte-Silva in this matter, the court in *DVI* referenced this article and found that:

> Because approximately 60% of the changes in DVI's stock price can be linked to identifiable news events, the Court finds that this level of correlation strongly suggests a relatively efficient market. Accordingly, this factor weighs in favor of efficiency.[147]

153.    Ryan and Taffler (2004) examine the relationship between information events and significant stock-price reactions at the individual firm level and find that approximately 35% of significant stock-price reactions cannot be explained by "readily available public domain information,"[148] an only slightly lower percentage than alleged by Duarte-Silva before incorporating approximately 4,500 additional potentially relevant articles.

154.    Moreover, to the extent that Duarte-Silva wanted to perform a standard "news vs. no-news" analysis as is common in fraud on the market matters, the first step in such an analysis would have been to identify a pre-set objective definition of news such as earnings disclosures or changes in investment recommendations (which empirical research has determined to be the two most influential information channels), not any day with a news article that simply mentions Farmland. I perform such analyses above, and the results of which provide strong evidence of a cause-and-effect relationship under *Cammer* 5.

---

713-731.

[147] *See* In Re: *DVI Inc. Securities Litigation*, 249 F.R.D. 196, 212 (E.D. PA 2008).

[148] *See* P. Ryan and R. Taffler, "Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-specific News Releases?" *Journal of Business Finance & Accounting*, 31(1), 2004, 49-82, at 51.

155.    The Duarte-Silva Report also provides multiple pointed criticisms of the results of my event study analyses over the pre-acquisition period of November 22, 2015, to February 2, 2017.  As with Duarte-Silva's claims regarding Farmland's indirect indicia, these criticisms are seemingly aimed at showing that Farmland's common stock was less efficient during this earlier period than during the remainder of the Class Period.  As I will show below, these criticisms are misleading and baseless.

156.    For example, Duarte-Silva references Table 3 to his report which aggregates the results of my event study analyses and states that:

> The results in the table above show that, before February 2017, the Edwards Report does not identify a single event that supports a cause-and-effect relationship. Thus, Edwards does not show a cause-and-effect relationship on any day in the first 321 trading days of the Class Period. Even if one were to accept Edwards' conclusion that there was a cause-and-effect relationship on December 14, 2016, his analysis still would not show a cause-and-effect relationship during the first 274 trading days of the Class Period, a period of more than a year. I am unaware of any rationale to infer the existence of a cause-and-effect relationship throughout a Class Period when there is no evidence of a cause-and-effect relationship during a considerable part of it.[149]

157.    Duarte-Silva's above criticisms are flawed for at least two reasons.  First, Duarte-Silva's criticism of my analysis of Farmland's statistically significant stock-price reaction on December 14, 2016, is erroneous for the reasons discussed above.  On this date, Farmland's stock price moved both in the expected direction based on my well-accepted objective criteria, but also by a statistically significant amount.

158.    Second, as can be seen in Table 3 to the Duarte-Silva Report, my event study analyses contained seven event dates during Duarte-Silva's pre-acquisition period of November

---

[149] *See* Duarte-Silva Report, ¶45 (emphasis added).

22, 2015, to February 2, 2017. Of these seven dates, Farmland's stock price moved in the

expected direction based on my pre-determined objective criteria on six dates (86%). This

compared favorably to the published empirical findings that, for other U.S. exchange traded-

stocks, stock-prices move in the expected direction on between 55% and 70% of earnings dates

and 75% of dates with a change in investment recommendation. Moreover, the probability of

Farmland's stock price moving in the expected direction on six or more of seven dates if no

cause-and-effect relationship existed as Duarte-Silva suggests, is just 6.25%, which is only

slightly greater than the standard 5% threshold for statistical significance.[150,151]

159. Moreover, one can always divide a class period into smaller sub periods to show a

lack of a statistically significant relationship at any given threshold. For example, consider an

event study that contains eight event dates, all of which with stock-price reactions that move in

the expected direction based on the pre-determined objective criteria (*i.e.,* a perfect event study

finding). The probability of this 8-for-8 finding is just 0.4% if no cause-and-effect relationship

exists.[152] But, if one were to divide the class period into two equally sized sub-periods (four

events each), the probability of a 4-for-4 finding in either of these three sub-periods is 6.25%, the

same marginal significance found in Duarte-Silva's pre-acquisition sub period discussed above.

As this example shows, the reduction of statistical significance is due not to a weakened cause-

---

[150] $6.25\% = \frac{1}{2^7}\left(\frac{7!}{6!1!} + \frac{7!}{7!0!}\right)$.

[151] That just one of seven event dates exhibited a statistically significant stock-price
reaction is also not surprising. Indeed, as discussed in the Edwards Report (¶75), the literature
shows that, for a large sample of U.S. exchange-traded stocks, just 12% of event dates were
found to be statistically significant at the individual firm level. This suggests that, in an efficient
market, just 0.8 of these seven event dates (*i.e.,* less than one) would be expected to exhibit a
statistically significant response (7 x 12%). Farmland's 1-of-7 finding is consistent with the
findings of this literature.

[152] $0.4\% = 1/2^{\wedge}8$.

and-effect relationship in these subperiods, but simply to a reduction in the number of observations (*i.e.,* a less powerful test).

160.     As can also be seen in Table 3 to the Duarte-Silva Report, prior to the November 3, 2016 event date, Farmland's stock price moved in the expected direction on <u>five of five</u> event dates (100%). The probability of this occurrence in the absence of a cause-and-effect relationship is just 3.1%, which meets the 5% standard threshold for statistical significance.[153]

161.     In my opinion, the above findings provide strong evidence that a cause-and-effect relationship existed for Farmland in Duarte-Silva's pre-acquisition period. This, in addition to the: i) lack of any statistically significant evidence of autocorrelation in Farmland's common stock returns; ii) Farmland's stick adherence to put-call parity during the final approximately seven months; and iii) lack of any discernable differences in Farmland's remaining indirect indicia of efficiency, provides strong evidence that Farmland's stock was informationally efficient during Duarte-Silva's pre-acquisition period.

### III.  DUARTE-SILVA'S OPINIONS ON PRICE IMPACT ARE FLAWED AND UNRELIABLE

162.     In the Edwards Report, I opined that damages incurred by investors who purchased shares of Farmland's common stock during the Class Period could be calculated using an event study analysis of the alleged corrective disclosure on July 11, 2018, and subsequent information provided by Company management and research analysts.[154] Duarte-Silva did not criticize my opinion that damages could be calculated on a class-wide basis.

---

[153] 3.1% = ½$^5$.

[154] *See* Edwards Report, Section VI.

163.     Instead, Duarte-Silva opines that there is no evidence that the alleged misrepresentations affected Farmland's stock price during the Class Period.[155]  The primary bases for Duarte-Silva's opinion are as follows:

a)  There is no evidence of front-end price impact;

b)  The information regarding the recipients of the at-issue loans was purportedly "in the public domain" before the July 11, 2018 alleged corrective disclosure;

c)  The risk allegedly created by the Loan Program itself was purportedly not value-relevant;

d)  It is "more reasonable to conclude" that the stock-price reaction on July 11, 2018, was due to confounding information contained in the Seeking Alpha article.

164.      In my opinion, Duarte-Silva's conclusion of no price impact is flawed and unsupported by both economic theory, an extensive body of empirical research, and the economic evidence in this case.  I discuss the bases for my opinion in the sections that follow.

## A.  Duarte-Silva's Opinion of No Front-End Price Impact

165.     When forming his opinion of no price impact, Duarte-Silva performs an event study analysis of the date on which Farmland announced the Loan Program, as well as each date during the Class Period on which Plaintiffs alleged misstatements were made regarding the Loan Program.[156]  Duarte-Silva then concludes that, because: i) Farmland's stock price did not increase by a statistically significant amount on any dates on which new information regarding the Loan Program was disclosed; and ii) there was minimal and brief discussions of the Loan Program by research analysts during the Class Period, "[t]his confirms that alleged misstatements about the Loan Program would not have had price impact when they were

---

[155] *See* Duarte-Silva Report, ¶9.
[156] *See* Duarte-Silva Report, ¶82.

made."[157]  As I will show below, Duarte-Silva's analysis of front-end price impact is fundamentally flawed and inappropriate.

166.    An event study analysis can, under certain circumstances, be used to quantify the stock-price effect of an affirmative misrepresentation on the date on which it is made (such as a statement that a company had secured a lucrative contract when it had not done so).  But, such an analysis is not applicable for a misrepresentation of omitted information.[158]  Indeed, because an omitted fact is one that is <u>not</u> disclosed to the market, it is illogical to expect to observe a stock-price reaction on the date on which a company should have, but failed to, disclose a piece of value-relevant information.  Moreover, because stock-prices adjust to the disclosure of new information, if one were to observe a stock-price reaction on a date on which a company omitted value-relevant information, the stock-price reaction would not represent a quantification of the import of the omitted information, but that of whatever new information was in fact disclosed on the date.[159]  Consequently, it is incorrect and improper to use an event study to quantify the effect of information that was alleged to have been omitted from the event of interest.  At his deposition, Duarte-Silva testified that he agreed that one would not expect to observe a statistically significant stock-price reaction on a date if the material information is omitted from a disclosure.[160]

---

[157] *See* Duarte-Silva Report, ¶¶82-84.

[158] *See, for example,* Frank Torchio, "Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law* 35(1), Fall 2009, 159-68.

[159] *See* David Tabak and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in <u>Litigation Services Handbook: The Role of the Financial Expert</u>, Third Edition, ed. by Roman L. Weil, Michael Wagner and Peter Frank, Wiley, 2001 stating that an event study is designed to quantify the effect of disclosed information, not <u>undisclosed</u> information. (emphasis added).

[160] *See* Duarte-Silva Dep., pp. 152:21-153:15.

167.    Because the allegations in this case involve the Company's alleged failure to disclose that a significant proportion of the loans in the Loan Portfolio were issued to related parties, it is illogical for Duarte-Silva to attempt to quantify the effect of these omissions on Farmland's stock price using an event study of the days on which this information was <u>not</u> revealed to the market.  Instead, a proper price impact analysis would require a comprehensive event study analysis of the date on which the previously omitted information was ultimately disclosed to the market (*i.e.*, the alleged corrective disclosure).  As I discuss later in this report, Duarte-Silva admittedly failed to perform this analysis and, as such, his opinion of no price impact is unreliable.

## B.  Duarte-Silva's Opinion that the Information Regarding the Recipients of the At-Issue Loans Was Already in the Public Domain

168.    Duarte-Silva argues that, because Mr. Neibur's personal bankruptcy filings from February 2018 disclosed a $240,000 loan from Farmland, "[t]he fact that Farmland had lent money to alleged related parties had been in the public domain well before the [Seeking Alpha Report] in July 2018."[161] As such, according to Duarte-Silva:

> …if the market for Farmland shares was efficient, the supposed disclosure in the RF Post regarding the risk of the Loan Program due to loans to claimed third parties would not have caused any price reaction on July 11, 2018.
>
> If, on the other hand, Plaintiffs' allegations are correct that there was a price reaction on July 11, 2018 to the alleged disclosure of the risk of the Loan Program, then Farmland's share price reacted to information that was previously publicly available and therefore Farmland's shares did not trade in an efficient market.[162]

169.    Duarte-Silva also provided the following testimony regarding his opinion:

---

[161] *See* Duarte-Silva Report, ¶86.

[162] *See* Duarte-Silva Report, ¶¶87-88.

Q       Now.  *Is it your opinion that investor regularly monitor personal bankruptcy filings for info that might be value relevant to their investments*?

A       *Yes.  This information is made public, even in search engines, so any analysts could put this information -- could obtain this information by having alerts for these individuals' names.*

So it is certainly findable, and I would expect analysts to look into it.

Q       But why would they have even had these individuals' names on alerts if they didn't know there was an issue?

A    The problem with this is that it's hard for me to have it both ways.  *So if the loan program was value relevant, then analysts should and would be checking and monitoring the names of these individuals, and monitoring the loan program closely.  And so this information that was public would have been immediately an alert to these analysts*.

If on the other hand the loan program was not value relevant, then there would be no reason to do that.[163]

170.    Duarte-Silva's opinions regarding the identities of the recipients of the at-issue loans having already been incorporated into Farmland's stock price are flawed for numerous reasons.

171.    First, as with many of his prior opinions, Duarte-Silva's above opinion rests on his binary definition of market efficiency, which has been rejected by the U.S Supreme Court (*see* ¶99).

172.    Second, Duarte-Silva's claim that if investors thought the Loan Program was value relevant, investors would have set up alerts and monitored personal bankruptcy filings for Messrs. Hough and Niebur is illogical.  Indeed, because the Company did not identify Messrs. Hough and Niebur as recipients of the at-issue loans, market participants would have had no way of knowing whose bankruptcy filings to monitor nor whose names to use for these alerts.

---

[163] *See* Duarte-Silva Dep., pp. 127:14-128:21 (emphasis added, objections omitted).

173.    Third, Duarte-Silva's opinion that, if information is "in the public domain," this necessarily means that it has been disseminated to, and digested by, enough investors such that the information is fully impounded in the market price[164] is flatly contradicted by decades of empirical research on the topic.  Indeed, there is a wide body of empirical research that shows that, while widely disseminated and easily accessible information is quickly impounded in stock prices, the same may not be said for more obscure or complex information.  The explanation for this is quite simple – information is costly to acquire, digest, and verify, and resources are limited.

174.    As Stout (2003) explains:

> The idea of informational efficiency, while less revolutionary than the idea of fundamental value efficiency, accordingly has had a significant effect on modern corporate policy and thinking . In light of this, it seems worthwhile to explore the extent to which securities markets are, in fact, informationally efficient.

> Gilson and Kraakman's article provides an excellent starting point for this exploration. They note that one of the underlying puzzles of market efficiency is that *information, like other resources, is costly*.  Moreover, the cost of acquiring, analyzing, and verifying different information varies substantially from investor to investor. Even when a particular piece of data is technically in the public domain, in many cases it is likely to be obtained and analyzed only by a small subset of all investors. *Thus the fact that information may be "public" does not necessarily imply that all investors are actually aware of it*. How, then, can market prices behave as if all investors know the information?[165]

175.    Stout (2003) then goes on to explain:

---

[164] *See, also,* Duarte-Silva Dep., p. 130:5-16 testifying that: "Because [the loan information] is freely available.  You could access it from a computer in your home, so it was widely disseminated, as I understand what 'widely [disseminated]' means.  If it's on the web, it's available for anyone and anyone in the world can see it.  It's widely – anyone in the world can see it"

[165] *See* L. Stout, "The Mechanisms of Market Inefficiency: An Introduction to the New Finance," *Journal of Corporate Law*, 28(4), Summer 2003, pp. 635-669, at 652 (emphasis added footnote omitted).

But consider for a moment the *kind* of information researchers initially used to test the efficient market hypothesis. *Merger announcements and public reports of stock splits are both widely disseminated and relatively easy to understand*. *What happens when new information becomes available, but investors must invest substantial time, trouble, or money to get it*? What happens when the information is technical and difficult to understand ? *Do prices still change within hours or minutes*?

*Recent studies suggest that the answer to this last question may be "no." Many types of information highly relevant to assessing the economic health of firms appear to be incorporated into stock prices far more slowly and incompletely than the conventional view of market efficiency would suggest*. Sometimes, it seems, the market's machinery can be rather creaky and cranky.[166]

176.    Stout (2003) then discusses the results of Chang and Suk (1998) which studied stock-price reactions to the disclosure of the purchase or sale of a company's securities by insiders who are thought to have access to valuable non-public information.[167]  The study found that, although insider transactions are reported to the SEC and made available online on the same day, significant stock-price reactions were also observed when the transactions were later reported in *The Wall Street Journal*.  Chang and Suk (1998) then concluded that:

Since insider-trading information is initially disclosed to the public at the SEC filing, the information contained in the *WSJ* is a secondary dissemination.  Although we find significant abnormal stock performance at the *WSJ* publication, *this does not necessarily imply market inefficiency*. *Rather, it is more likely that individual investors consider the expected costs of obtaining new information from the SEC filing to exceed the expected benefits*.[168,169]

---

[166] *See* L. Stout, "The Mechanisms of Market Inefficiency: An Introduction to the New Finance," *Journal of Corporate Law*, 28(4), Summer 2003, pp. 635-669, at 653 (emphasis added footnote omitted).

[167] *See* L. Stout, "The Mechanisms of Market Inefficiency: An Introduction to the New Finance," *Journal of Corporate Law*, 28(4), Summer 2003, pp. 635-669, at 653-654.

[168] *See* S. Chang and D.Y. Suk, "Stock Prices and the Secondary Dissemination of Information: The Wall Street Journal's 'Insider Trading Spotlight' Column" *The Financial Review*, 33, 1998, 115-128, at 125 (emphasis added).

[169] *See, for example,*  J. Rogers, D. Skinner, and S. Zechman, "The role of the media in disseminating insider-trading news," *Review of Accounting Studies,* 21, 2016, 711-739, at 715-

177.    Dawkins and Bamber (1998) add to the literature by studying the stock-price reactions to a <u>particularly relevant</u> type of company disclosure - a bankruptcy petition filing.[170] The authors state:

> DOES IT MATTER WHETHER INFORMATION is broadly disseminated by media such as the Broadtape, if that information is otherwise publicly available? <u>*In other words, is information impounded into prices when that information becomes publicly available, or when the information is disclosed via widely disseminated media?*</u> Prior research has provided little evidence on these questions because announcement through a broadly disseminated medium is a necessary condition for inclusion in most event studies.
>
> Bankruptcy petition filing information is publicly available on the filing date. However, broad-based announcement of the news of these bankruptcy filings can appear later, or not at all, in more widely disseminated media. <u>*Thus, bankruptcy filings provide an excellent opportunity to examine the relations among (1) public availability of the information on the bankruptcy petition filing date, (2) announcement of bankruptcy filing news through more widely disseminated media such as the Broadtape, and (3) the pattern of the market's response to the bankruptcy information*</u>.[171]

---

716 stating: "Our work more closely relates to a stream of the investor inattention literature, which argues that the market takes longer to assimilate information that is released at times when investors pay less attention. Dellavigna and Pollet (2009) and Niessner (2015) argue that investors are distracted on Fridays so that the market takes longer to respond to news released on these days. <u>*In our setting, it seems plausible that insider filings released via EDGAR attract less investor attention because it is relatively costly for investors to track EDGAR postings in real time*</u>. If so, dissemination of insider trading news by a prominent media outlet such as Dow Jones increases its visibility to investors, which in turn triggers a market response. <u>*It is likely to be less costly for market participants to track insider trading news using a prominent source such as Dow Jones than to constantly monitor ("scrape") the EDGAR website or to access the related PDS feed, as described in more detail below*</u>." (emphasis added footnote omitted)

[170] *See* M. Dawkins and L. Bamber, "Does the Medium Matter? The Relations among Bankruptcy Petition Filings, Broadtape Disclosure, and the Timing of Price Reactions," *The Journal of Finance*, 53(3), 1998, 1149-1163.

[171] *See* M. Dawkins and L. Bamber, "Does the Medium Matter? The Relations among Bankruptcy Petition Filings, Broadtape Disclosure, and the Timing of Price Reactions," *The Journal of Finance*, 53(3), 1998, 1149-1163, at 1149-1150 (emphasis added).

178.    The authors go on to theorize that, although bankruptcy filings are a matter of

public record, "*investors who do not find it cost effective to monitor various jurisdictions for*

*news of bankruptcy filings may remain unaware of a filing unless it is announced through a*

*widely disseminated medium such as the Broadtape*."[172]  Consistent with this theory, the authors

find that <u>most</u> of the stock-price reaction occurs not on the Bankruptcy filing date, but instead

when this information is <u>widely disseminated</u> through the Broadtape.  Moreover, when the

Broadtape disclosure occurred two days after the Bankruptcy filing, the stock-price reaction on

both the day of and day after the Bankruptcy filing date was *not significantly different than*

*zero*."[173]  Dawkins and Bamber (1998) then concluded that:

> This study's results suggest that even for economically significant
> bankruptcy petition filing information that is publicly available on
> the filing date, the existence and timing of disclosure via broadly
> disseminated media is associated with the pattern of the market's
> reaction to information.  Most of the market reaction to our
> comprehensive sample of 330 bankruptcy filings occurs on the
> Broadtape disclosure date rather than the bankruptcy petition filing
> date when the information became publicly available. This
> difference persists after controlling for firm size, exchange listing,
> and predisclosure information.  *Despite the economic significance*
> *of bankruptcy filings, disclosure of this information through media*
> *that are publicly available, but not necessarily widely disseminated*
> *(i.e., court records) is not necessarily sufficient to ensure that the*
> *information is quickly impounded into prices*.[174]

179.    As can be seen above, there is an extensive body of empirical research spanning

several decades that has shown that, in an informationally efficient market, because information

---

[172] *See* M. Dawkins and L. Bamber, "Does the Medium Matter? The Relations among
Bankruptcy Petition Filings, Broadtape Disclosure, and the Timing of Price Reactions," *The
Journal of Finance*, 53(3), 1998, 1149-1163, at 1153 (emphasis added).

[173] *See* M. Dawkins and L. Bamber, "Does the Medium Matter? The Relations among
Bankruptcy Petition Filings, Broadtape Disclosure, and the Timing of Price Reactions," *The
Journal of Finance*, 53(3), 1998, 1149-1163, at 1158-1159.

[174] *See* M. Dawkins and L. Bamber, "Does the Medium Matter? The Relations among
Bankruptcy Petition Filings, Broadtape Disclosure, and the Timing of Price Reactions," *The
Journal of Finance*, 53(3), 1998, 1149-1163, at 1162 (emphasis added).

is costly to acquire, digest, and verify, not all types of "publicly available" information is immediately impounded in publicly traded stock prices. This research includes information contained in corporate bankruptcy filings, which directly contradicts Duarte-Silva's opinions in this matter.

180.    Courts have also routinely acknowledged that information, including misinformation, must be <u>widely disseminated</u> to be fully reflected in a company's stock price. For example, the court in *In re HealthSouth Corp. Sec. Litig* found that:

> Applying the preponderance of the evidence standard, the court finds that the true financial status of HealthSouth was a material fact the omission of which made the UBS analysts' "Strong Buy" recommendations misleading at best. *These UBS analyst reports were made public and widely disseminated, and thus became part of the mix of information that informed the market*. Contrary to UBS's contention, Plaintiffs submitted more than enough evidence at this stage to show that these reports did impact the market by becoming part of the total mix of information.[175]

181.    The court in *In re Initial Pub. Offering Sec. Litig*. similarly found that, in order to rebut plaintiffs' presumed reliance, a defendant must show wide dissemination of the alleged scheme stating:

> However, the question of whether publicly available information "would have made any reader aware of the allegations here" presents an important class-wide common issue. *If any of defendants' proffered publications is determined to have been so relevant, clear and widely disseminated that knowledge of the alleged scheme must be imputed to the universe of investors in the stock market, then reliance cannot be proven individually or collectively*. Furthermore, differences among class members in terms of access to publicly available information (e.g., whether certain investors *actually* saw all publicized materials, or whether they had access to sophisticated investment advice in interpreting

---

[175] *See In re HealthSouth Corp. Securities Litigation*, 257 F.R.D. 260, 280 (N.D. Ala. 2009) (emphasis added).

the releases) are insufficient to defeat certification or rebut plaintiffs' presumed reliance.[176]

182.    Duarte-Silva has also recognized the importance of wide dissemination for the incorporation of news into stock prices in his published work.  For example, after quoting Justice Thomas' dissent in *Halliburton* stating "not all public information will be impounded in a security's price with … the same quickness," Duarte-Silva acknowledges that:

> *It is well known that the speed of incorporation of information into prices varies across securities and occasions*. For example, a security's price may react faster to news of a stock split that is *well publicized* and quicker to understand than to complex financial disclosures. Efficiency, however, is a matter of degree, as *Basic* acknowledges.[177]

183.    Duarte-Silva's opinion that, if Farmland's stock traded in an informationally efficient market, information contained in Mr. Niebur's personal bankruptcy filings which were not widely disseminated to investors, must have been fully reflected in Farmland's stock price is directly contradicted by the research, court precedent, and Duarte-Silva's published work. Duarte-Silva has provided no explanation for why Farmland investors would devote valuable time and resources scouring personal bankruptcy court filings of the unknown recipients of the at-issue loans for information that might be value-relevant to Farmland.  Indeed, as discussed in the Seeking Alpha Report, it was not until the author reviewed hundreds of deed records in dozens of counties across the country that he was able to identify the recipients of the loans in the Loan Program – a necessary prerequisite for analysts to be capable of setting up alerts for these individuals as Duarte-Silva asserts.[178]  The information contained in these deed records is

---

[176] *See In re Initial Public Offering Securities Litigation*, 227 F.R.D. 65, 110-111, (S.D. N.Y. 2004) (emphasis added footnotes omitted).

[177] *See* N. Morgan, C. McElroy, DLA Piper, and T. Duarte-Silva, "*Halliburton* Fallout: Fate of the 'Efficient Market' Hypothesis and Event Studies in Securities Litigation," *Westlaw Journal of Securities Litigation & Regulation*, 20(5), 2014, at 3 (emphasis added).

[178] *See* Seeking Alpha Report, pp. 2 and 7.

not the type that gets immediately impounded in the price of stocks trading in informationally efficient markets.

## C. Duarte-Silva's Opinion that the Risks Created by the Loan Program Was Not Value Relevant Is Contradicted by the Research

184. In dismissing the economic materiality of the alleged misrepresentations, Duarte-Silva attempts to argue that, because the Loan Program was "a very small portion of Farmland's market capitalization… It follows that the risk created by the Loan Program was not material."[179] As such, Duarte-Silva implicitly argues that, because the risk created by the Loan Program was immaterial in his view, any alleged misrepresentations relating to the Loan Program must, by definition, be immaterial as well. Duarte-Silva's opinion is flawed for numerous reasons.

185. First, Duarte-Silva conceded at his deposition that, although the Loan Program itself was immaterial in his view, it is possible that a disclosure of the <u>identity</u> of the recipients of the loans <u>could</u>, in fact, be economically material, testifying:

> Q      Okay. Going on another hypothetical, what if it was disclosed during the class period, not that these loans went to the co-founder and the ex-director of acquisitions, I believe Mr. Niebur, what if, instead, they were issued to the CEO? Would that have been significant?
>
> Q      Significant as to value relevance.
>
> A      *It's possible. I haven't thought too much about that*.
>
> Q      Okay. Imagine what -- or what if the loans went to the friend of an executive who had criminal ties, could that be value-relevant?
>
> A      *It could. I haven't thought enough through that*.[180]

186. Second, as I discuss below, empirical research has shown that companies that issue loans to individuals with various senior leadership-level positions,[181] <u>including those of</u>

---

[179] *See* Duarte-Silva Report, ¶89.
[180] *See* Duarte-Silva Dep., pp. 136:17-137:12 (emphasis added, objection omitted).

equivalent size to the at-issue loans, are associated with a greater likelihood of financial misstatements, lower market valuations, less reliance on reported income, and lower future stock-price performance – all which could reasonably be expected to impact a company's stock price.

187.    For example, Cullinan et al. (2006) study the relationship between financial misstatements and the granting of loans to executives (pre-Sarbanes-Oxley) and found that "firms that grant loans to executives are significantly more likely to misstate revenue than those firms that do not grant loans to executives."[182]  The authors also examine the aggregate dollar amount of the executive loans outstanding for misstatement firms ($924,031) and non-misstatement firms ($223,143) and conclude that these results "provide some evidence that the size of loans outstanding is associated with the probability of misstatement."[183,184]  The authors then conclude that:

> The results presented in this paper suggest that firms that provide loans to executives are more likely to misstate their financial statement than firms that do not provide such loans. Despite recent calls for modification of the loan prohibition of the [Sarbanes-

---

[181] *See, for example,* Complaint citing: a 2014 letter to the SEC stating that Farmland had "formulated its business strategy" in part, "based on the extensive experience" of Mr. Hough (¶41); Farmland's IPO prospectus indicating that Farmland had deemed Hough Farms a related party because Hough was a co-founder and key consultant of Farmland (¶45); Farmland's IPO prospectus characterizing Hough of equal importance as the CEO ad CFO (¶48); a 2015 presentation identifying Niebur as part of Farmland's management team (¶59); and a 2016 report identifying Niebur as "Director of Acquisitions & Management – High Plains" at Farmland (¶60).

[182] *See* C. Cullinan, H. Du, and G. Wright, "A test of the loan prohibition of the Sarbanes-Oxley Act: Are firms that grant loans to executives more likely to misstate their financial results?" *Journal of Accounting and Public Policy,* 25, 2006, 485-497, at 492.

[183] *See* C. Cullinan, H. Du, and G. Wright, "A test of the loan prohibition of the Sarbanes-Oxley Act: Are firms that grant loans to executives more likely to misstate their financial results?" *Journal of Accounting and Public Policy,* 25, 2006, 485-497, at 492-493.

[184] Exhibit 3 to the Duarte-Silva Report shows that the total dollar amounts outstanding for loans to Messrs. Niebur and Hough ranged from $980,000 to $7.5 million during the Class Period, exceeding the average outstanding balance of $924,031 found in this study.

Oxley] Act, our results support the effectiveness of the loan prohibition provision, and suggest it will help to meet the Act's objective.[185]

188. Gordon et al. (2004) study whether loans and other related party transactions involving executive and non-executive board members (pre-Sarbanes-Oxley) are detrimental to firm value, and whether there exists a correlation between the issuance of these loans and weak corporate governance mechanisms.[186] For the sample of 200 transactions involving loans (median loan transaction amount of $2.2 million), the authors find "a strong negative relationship between industry-adjusted returns and loans when we examine both the number and dollar amount of related part transactions."[187] The authors also find a negative correlation between measures of corporate governance strength and the existence of related party transactions "that generally imply conflict of interest," and conclude that:

> Taken together, the results from the corporate governance mechanisms tests and the industry-adjusted returns tests, indicate that _shareholders do not benefit from, and in fact are harmed by related party transactions_, showing strong support for the conflict of interest hypothesis. _This effect is especially strong for loans to executives and non-executives_ (now prohibited under SOX) and the number of other transactions with non-executive directors, namely purchases of goods and services and direct services.[188]

189. Kohlbeck and Mayhew (2010) similarly study the effects of related party transactions and loans to directors, officers and shareholders (pre-Sarbanes-Oxley) on market

---

[185] _See_ C. Cullinan, H. Du, and G. Wright, "A test of the loan prohibition of the Sarbanes-Oxley Act: Are firms that grant loans to executives more likely to misstate their financial results?" _Journal of Accounting and Public Policy,_ 25, 2006, 485-497, at 495-496.

[186] _See_ E. Gordon, E. Henry, and D. Palia, "Related Party Transactions: Associations with Corporate Governance and Firm Value," Working Paper, August 2004.

[187] _See_ E. Gordon, E. Henry, and D. Palia, "Related Party Transactions: Associations with Corporate Governance and Firm Value," Working Paper, August 2004, at 4, 6, 50 (Table 7).

[188] _See_ E. Gordon, E. Henry, and D. Palia, "Related Party Transactions: Associations with Corporate Governance and Firm Value," Working Paper, August 2004, at 6-7 (emphasis added).

valuations of publicly traded companies within the S&P 1500 Index.[189]  The authors find the
following:

> a) The market assigns both statistically and economically significantly lower
> valuations to companies that engage in relatively simple related party
> transactions, including loans to directors, officers and shareholders;[190]
>
> b) The market places less reliance on reported income and/or discounts the return
> to shareholders from future income for firms that engage in related party
> transactions, including loans to directors, officers and shareholders;[191] and
>
> c) Firms that engage in related party transactions, including loans to directors,
> officers and shareholders, experience marginally lower subsequent returns,
> indicating that they are not being compensated due to increased perceived risk
> and lower valuations.[192,193]

190.    As can be seen above, empirical research has shown that related party
transactions, including loans to individuals in various senior leadership positions, are associated
with greater likelihood of financial misstatements, lower market valuations, less reliance on
reported income, and lower future stock-price performance.  Duarte-Silva makes no reference to
this research which, in my opinion, directly contradicts his opinion that the alleged
misrepresentations relating to the Company's failure to disclose the identities of the recipients of

---

[189] *See* M. Kohlbeck and B. Mayhew, "Valuation of firms that disclose related party
transactions," *Journal of Accounting and Public Policy,* 29, 2010, 115-137.

[190] *See* M. Kohlbeck and B. Mayhew, "Valuation of firms that disclose related party
transactions," *Journal of Accounting and Public Policy,* 29, 2010, 115-137, at 115-117, 125, and
134.

[191] *See* M. Kohlbeck and B. Mayhew, "Valuation of firms that disclose related party
transactions," *Journal of Accounting and Public Policy,* 29, 2010, 115-137, at 115-116, and 127-
128.

[192] *See* M. Kohlbeck and B. Mayhew, "Valuation of firms that disclose related party
transactions," *Journal of Accounting and Public Policy,* 29, 2010, 115-137, at 115-116, 129, and
134.

[193] Unlike the prior to studies, Kohlbeck and Mayhew (2010) did not analyze whether the
size of the at-issue loans had an effect on their findings, in part, because "…Sarbanes-Oxley
banned all RP loans, not just loans over a specified dollar amount.  *This approach suggests that
Congress views all RP loans as problematic, not just their monetary impact.*"  *See* M. Kohlbeck
and B. Mayhew, "Valuation of firms that disclose related party transactions," *Journal of
Accounting and Public Policy,* 29, 2010, 115-137, at 120-121.

the at-issue loans did not impact Farmland's stock price during the Class Period. In fact, Duarte-Silva testified at his deposition that he is <u>unaware</u> of the existence of this research:

> Q      Okay. Are you aware of any research that discusses the effect of related party transactions on firm value?
>
> A      *I am not*.
>
> Q      Okay are you aware of any research that discusses the effect of related party loans on firm value?
>
> A      *I am not*. But even if there was such research, I doubt it that research would be about Farmland. I hesitate to draw inferences from studies of hundreds of thousands of stocks into Farmland.
>
> Q      Okay. So you might be aware Mr. Edwards was deposed about a month ago. Did you read Mr. Edwards transcript?
>
> A      I skimmed through it and I did some keyword searches. I didn't read the whole thing.
>
> Q      Okay. Well, you might [be] aware then, he discussed during his deposition some research that showed that companies that provide loans to executives have significant discounts to valuation and they have lower future stock price performance.
>
>        Are you aware of his research?
>
> A      <u>I am not</u>.
>
> Q      Okay. Do you have any thoughts on it?
>
> A      *Because I haven't seen it and examined what that research is.* I haven't seen it cited here, that I recall at least, I didn't review it. I have to look.[194]

## D. Duarte-Silva's Opinion that the July 11, 2018 Stock-Price Reaction was Due to Confounding Information

191.    When opining that there is no evidence that the alleged misrepresentations affected Farmland's stock price, Duarte-Silva argues that the Seeking Alpha Report contained the following unrelated claims: i) Farmland overstated its revenue and AFFO; ii) Farmland had

---

[194] *See* Duarte-Silva Dep., pp. 137:18-139:4 (emphasis added)

significantly overpaid for its properties; iii) Pittman's valuation calculation for Farmland was inappropriate; and iv) Farmland faced a significant risk of insolvency.[195]

192.　　Duarte-Silva then stated:

> I understand from reading analyst reports that investors were _more concerned_ with various claims in the RF Post than with the allegations in the SAC, and that investors did not associate much of a value impact, if any at all, with the allegations concerning the risk of the Loan Program in the RF Post.[196]

193.　　I first note that, while Duarte-Silva opined that investors were "more concerned" with the unrelated claims than the allegations in the Complaint, Duarte-Silva did not opine that investors were <u>unconcerned</u> with these allegations.  It would then follow that, according to Duarte-Silva, at least some of the approximately 40% stock-price decline on the day was attributable to the correction of misrepresentations alleged in the Complaint.  After two short paragraphs referencing passages from three analyst reports issued in the days following the alleged corrective disclosures, however,  Duarte-Silva then concludes that it is reasonable to assume that it was these confounding allegations that were responsible for Farmland's highly statistically significant stock-price decline on July 11, 2018,[197] effectively contradicting his prior opinion.

194.　　Although it is my understanding that analyses of the extent to which confounding information may have contributed to the stock-price decline following an alleged corrective disclosure is typically not required at the class certification stage, I point out that the passages on which Duarte-Silva relies contradict his second opinion.  Specifically, Duarte-Silva references an

[195] _See_ Duarte-Silva Report, ¶93.

[196] _See_ Duarte-Silva Report, ¶94 (emphasis added).

[197] _See_ Duarte-Silva Report, ¶¶95-96.

article by *Theflyonthewall.com* which include quotes from two research analysts.[198] The article states in relevant part:

> ANALYST DEFENSE: Two analysts this morning jumped to the defense of Farmland Partners, with B. Riley FBR upgrading shares to Buy and Baird calling the stock a "Fresh Pick." In a research note, B. Riley FBR analyst Craig Kucera cited valuation, telling investors that the Seeking Alpha article had *"questionable" valuation assumptions and "nonexistent, in our view" concerns about solvency*. Meanwhile, Baird analyst David Rodgers said the reaction in shares yesterday, aside from new-found shorts, reflects "the ongoing frustration of longer-term investors at a company that has been unable to deliver on a promise of delivering farmland returns to public investors." *However, Rodgers said he believes the negative Seeking Alpha article raised questions about Farmland's loan program and valuation, "but may reach too far."* PRICE ACTION: In early trading, shares of Farmland Partners are up 17% to $6.18.[199]

195.    As can be seen above, the passages above do not support Duarte-Silva's opinion, but instead contradict it.  Indeed, the B. Riley FBR analyst's opinion that the Seeking Alpha Report had "questionable" valuation assumptions and that concerns of insolvency were "nonexistent" (confounding allegation iii and iv) speaks to the credibility of these specific allegations in the minds of the analysts.  Likewise, because Farmland did not refute the identity of the recipients of the loans in the Loan Program, the Baird analyst's opinion that the Seeking Alpha Report raised questions regarding the Loan Program and valuation, "but may reach too far," speaks to the credibility of the allegations beyond the identities of the recipients – *i.e.*, the overstatement of AFFO, valuation, and insolvency (confounding allegations i, iii, and iv).  And, that neither analyst was quoted discussing the allegation of overpayment for properties (confounding allegation ii), speaks to the credibility of this allegation.  Indeed, it is illogical to

---

[198] *See* Duarte-Silva Report, ¶95.

[199] *See* "09:49 EDT Farmland Partners bounces after analysts, company push back on short..." *Theflyonthewall.com*, July 12, 2018, 9:49 am (emphasis added).

argue that these confounding allegations were responsible for the entirety of the highly statistically significant stock-price decline on July 11, 2018, while simultaneously quoting research analysts dismissing the credibility of these same allegations.[200]

196.    A proper analysis of the extent to which the alleged misrepresentations (and confounding allegations) impacted Farmland's stock-price would require a comprehensive event study analysis of the alleged corrective disclosure.  This analysis would include a thorough examination of the information content of:

> a) Farmland CEO's interviews and public statements following the Seeking Alpha Report in which he responded that there was "utterly no risk of insolvency" for Farmland, that Farmland had not overpaid for properties, and that rents were "in fact going up."[201]
>
> b) Farmland's July 11, 2018 after-hours press release "draw[ing] attention to certain facts about the Company's loan program that the article omitted and/or misrepresented;"[202]
>
> c) Farmland's July 17, 2018 press release providing detailed rebuttals of each of the "main points" alleged in the Seeking Alpha Report;[203] and
>
> d) Seeking Alpha's July 19, 2018 report retracting certain allegations contained in the July 11, 2018 Seeking Alpha Report.[204]

197.    The analysis would then require a thorough examination of media and analyst reports published in response to these events, as well as Farmland's subsequent stock price

---

[200] Duarte-Silva testified at his deposition that he agreed that the analysts he cited did not seem to believe that the allegations regarding valuation and solvency.  *See* Duarte-Silva Dep., pp. 142:17-143:4.

[201] *See* "UPDATE 1-Farmland Partners shares skid on short seller report; CEO disputes findings," *Reuters News*, July 11, 2018, 4:28 pm.

[202] *See* "Farmland Partners Inc. Responds to Unfounded Allegations," *PR Newswire,* July 11, 2018, 5:54 pm.

[203] *See* "Farmland Partners Provides Rebuttal to Inaccurate, Misleading and Anonymous Internet Posting on Seeking Alpha," *PR Newswire,* July 17, 2018, 9:05 am.

[204] *See* "Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible," *SeekingAlpha.com,* July 19, 2018.

reactions, to determine how this new information was perceived by the market.[205]  Duarte-Silva

does not attempt to perform a comprehensive event study analysis of these events.[206]  Instead, by

asserting that "it is more reasonable to conclude that Farmland's share price declined on July 11,

2018 due to reasons other than those alleged in the SAC," Duarte-Silva instead concludes,

without proper analysis, that <u>none</u> of the highly statistically significant stock-price decline

following the alleged corrective disclosure can be attributed to the revelation of the alleged

misrepresentations.[207]

---

[205] For example, if the market viewed as both credible and economically material the allegations that: i) Farmland incorrectly calculated AFFO by excluding preferred dividends; and ii) Farmland inappropriately recognized loan interest revenue, and the credibility of these allegations were not eroded by the Company's prior rebuttals and/or media and analyst commentary, then one would expect to see a statistically significant stock-price increase following the July 19, 2018 Seeking Alpha report that retracted these allegations.

[206] *See, also,* Duarte-Silva Dep., pp. 146:24-148:6 testifying that he did not perform an event study of any of the information disclosed after the July 11, 2018 alleged corrective disclosure.

[207] *See* Duarte-Silva Report, ¶97.

I certify that, to the best of my knowledge and belief:

– the statements of fact contained in this report are true and correct;

– the reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions;

– I have no present or prospective interest in the parties to this case, and I have no personal interest or bias with respect to the parties involved;

– my compensation is not contingent on an action or event resulting from the analyses, opinions or conclusions in, or the use of, this reply report.

<u>March 10, 2021</u>
Date

Gregg M. Edwards

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
BERENS LAW LLC
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
(303) 861-1764 (Telephone)
jeff@jberenslaw.com
