# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-02104-DME-NYW

DON BROKOP, as Trustee for the Brokop Living Trust,
and on behalf of all others similarly situated,

       Plaintiff,

v.

FARMLAND PARTNERS INC.,
PAUL A. PITTMAN, and
LUCA FABBRI,

       Defendants.

---

## DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF GREGG M. EDWARDS

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.    The RF Post, Farmland's Response, and Rota Fortunae's Retraction .................. 3

    B.    Mr. Edwards' Loss Causation and Damages Report ............................................ 6

LEGAL STANDARD ........................................................................................................... 8

ARGUMENT ........................................................................................................................ 9

I.     TO SHOW LOSS CAUSATION AND DAMAGES, EDWARDS MUST
      DISENTANGLE THE EFFECT OF THE ALLEGED FRAUD FROM OTHER
      FACTORS AFFECTING THE STOCK PRICE ......................................................... 9

II.    EDWARDS FAILS TO LINK THE ALLEGED LOSSES TO THE SUPPOSED
      FRAUD ...................................................................................................................... 10

    A.    Edwards' Method for Disaggregating Confounding Allegations Is
         Unreliable .............................................................................................................. 10

         1.    Edwards' Event Studies Fail to Disaggregate the Impact of the
             Confounding Allegations. ......................................................................... 10

         2.    Edwards' Method Is Unreliable Because It Depends on An
             Unsupported Assumption ......................................................................... 13

    B.    Edwards Fails to Disaggregate All Confounding Factors .................................... 15

         1.    Edwards Fails to Disaggregate the "Round-Tripping" Allegations ......... 16

         2.    Edwards Fails to Disaggregate the Effect of Manipulative Trading ........ 17

CONCLUSION ..................................................................................................................... 18

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Ayers v. Robinson*,
  887 F. Supp. 1049 (N.D. Ill. 1995) ........................................................................12

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
  853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014)....................... *passim*

*Brokop v. Farmland Partners, Inc.*,
  2021 WL 4916240 (D. Colo. Jul. 23, 2021) ............................................................6

*Stokes v. John Deere Seeding Group*,
  2014 WL 675820 (C.D. Ill. Feb. 21, 2014)............................................................12

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..............................................................................8, 9, 12

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..................................................................................9, 13

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
  252 F. Supp. 2d 1005 (C.D. Cal. 2003), *aff'd sub nom Mortensen v. Snavely*,
  145 F. App'x 218 (9th Cir. 2005) ........................................................................9

*Kingsbury v. U.S. Greenfiber, LLC*,
  No. 08-CV-00151-DSF, 2013 WL 7018657 (C.D. Cal. Nov. 5, 2013)..................................12

*Mitchell v. Gencorp Inc.*,
  165 F.3d 778 (10th Cir. 1999) ..........................................................................8

*In re Omnicom Group, Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010)..................... *passim*

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)..................................................................10

*In re Williams Sec. Litig.*,
  558 F.3d 1130 (10th Cir. 2009) ...........................................................8, 9, 10, 17, 18

## INTRODUCTION

Plaintiff no longer contests that the RF Post was part of a coordinated attack on Farmland Partners and its shareholders, intended to drive down the stock price for the benefit of short-sellers.[1] This now undisputed fact is but one of several reasons why Farmland's pending summary judgment motion should be granted. Rather than accept that there is—and has been—no basis to sue Farmland for securities fraud, however, Plaintiff offers a speculative and unreliable loss causation and damages opinion from Gregg Edwards.

While the RF Post made numerous false allegations about Farmland, Plaintiff's Complaint focuses on just one of them—the RF Post's allegation that Farmland failed to disclose that it had loaned money to related parties. Mr. Edwards concedes—as he must—that (i) the RF Post contained numerous false allegations not alleged in this case, (ii) those false allegations contributed to the stock drop following publication of the RF Post, and (iii) manipulative trading conducted as part of the short-and-distort attack "could have contributed to the stock price decline," as well. (Ex. 1 (Edwards Dep. Tr.) at 19:20-25.) Nonetheless, without any reliable basis for doing so, Mr. Edwards still opines that the fraud alleged in this case—the alleged failure to disclose related-party loans—caused the bulk of the decline in Farmland's stock price on July 11, 2018.

The Court should reject Mr. Edwards' opinion because it is based on unfounded assumptions and because Mr. Edwards fails to reliably separate losses supposedly caused by the

---

[1] Pursuant to D.C.COLO.LCiv 7.1(a), counsel for Defendants conferred with Plaintiff's counsel before filing this Motion. Plaintiff objects to the relief requested. In this Motion, we refer to Farmland Partners, Inc. as "Farmland" or "FPI" or the "Company"; to the class period of February 23, 2017 through July 10, 2018 as the "Class Period"; to the Second Amended Complaint (ECF No. 139) as the "Complaint"; and to the July 11, 2018 Seeking Alpha article by Rota Fortunae (Ex. 2) as the "RF Post".

alleged fraud from losses that were caused by confounding (i.e. non-fraud-related) factors, including the RF Post's other allegations and the short-sellers' manipulative trading.

First, Mr. Edwards' opinion rests on unfounded assumptions. His method for disaggregating confounding allegations simply <u>assumes</u> that a substantial portion of the July 11, 2018 stock drop resulted from the RF Post's allegations about Farmland's loans to Mr. Hough and Mr. Niebur. But Mr. Edwards admitted during his deposition that his event study analysis does not distinguish between price movement caused by the alleged fraud and movement caused by confounding factors. Mr. Edwards attempts to disaggregate by assuming that the effects of confounding allegations dissipated entirely in response to the Company's rebuttals to the RF Post and, thus, that the portion of the stock drop remaining after the Company's rebuttals is entirely fraud-related. But this "method" is unreliable, too. In fact, Mr. Edwards' unsupported assumption that the market fully believed all rebuttals of confounding information is directly contrary to Plaintiff's own allegations in this case. As a result, his opinion is unreliable and does not fit the facts of the case.

Second, Mr. Edwards' methodology is unreliable because he fails to account for <u>all</u> confounding allegations. Mr. Edwards, even by his own terms, only purports to isolate the stock drop caused by the RF Post's allegation that Farmland was "using its mortgage lending program <u>to artificially increase revenues</u> by making loans to related-party tenants <u>who round-trip the cash back to</u>" the Company. This is insufficient because Plaintiff does <u>not</u> allege that Farmland engaged in round-tripping or artificially inflated its revenue. Thus, Mr. Edwards' analysis is unreliable because "disaggregating only some of [the confounding factors] cannot suffice to establish" loss causation. *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554

(S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010).

Finally, Mr. Edwards ignores a critical factor in this case. He acknowledges that short-sellers engaged in manipulative trading in Farmland securities around the publication of the RF Post. But his loss causation analysis does not even attempt to account for the effect of this manipulative trading.

## BACKGROUND

### A.    The RF Post, Farmland's Response, and Rota Fortunae's Retraction

On July 11, 2018, an anonymous author writing under the pseudonym "Rota Fortunae" posted the RF Post on internet investor forum Seeking Alpha. The RF Post alleged, among other things, that:

- Farmland "face[d] a significant risk of insolvency" and its shares were "uninvestible;"

- Farmland was "using its mortgage lending program to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to FPI . . .;"

- The Hough and Niebur Loans "lack[ed] economic substance" and were "used to artificially increase revenues;"

- As a result of alleged "roundtrip[ping]" through Farmland's Loan Program, "310% of 2017 earnings could be made up;"

- Farmland had "significantly overpaid for properties;"

- Farmland "ignore[d] very real expenses when it promote[d] adjusted funds from operations;"

- Farmland was engaging in "Financial Shenanigans;" and

- "[F]our board members and [Farmland's] president ha[d] resigned since [Farmland] began lending to Hough, and in March, [Farmland] dismissed its auditor" because the departing executives and PwC were "concerned" about the Company's conduct.

3

(Ex. 2 (RF Post) at 1, 2, 3, 4, 8, 27.)

Following the RF Post's publication, Farmland's stock price fell almost 40%, from $8.49 to $5.18 per share.  (Ex. 3 (Duarte-Silva Report) ¶ 16.)  (Farmland's stock price has since more than fully recovered.  On Tuesday, November 16, 2021, Farmland's stock opened at $12.80 per share, approximately 50% higher than the closing price on July 10, 2018.  *See* https://finance.yahoo.com/quote/FPI/history?p=FPI.)

In response to the RF Post, Farmland issued an initial press release on the afternoon of July 11 (the "July 11 Press Release").  The July 11 Press Release stated, among other things, that:

- The total notes and interest receivable under the Company's loan program was $11.6 million, or 1.0% of the Company's total assets, as of March 31, 2018.

- The program generated $0.5 million in net revenues, or 1.1% of total revenue, in the year ended December 31, 2017.

- The program is directed at farmers, including, as previously disclosed, tenants. It was publicly announced in August 2015, and included in the Company's public disclosures since then. None of the borrowers under the program as of March 31, 2018 were related parties, or have other business relationships with the Company, other than as borrowers and, in some cases, tenants.

(Ex. 4 (July 11 Press Release).)  Farmland then issued a press release on July 17, titled, "Farmland Partners Provides Rebuttal to Inaccurate, Misleading and Anonymous Internet Posting on Seeking Alpha" (the "July 17 Rebuttal").

The July 17 Rebuttal addressed the "Main Points" of the RF Post, explaining that:

"1. The Company's Presentation of AFFO Does Not Exclude Preferred Dividends;"[2] "2. The

---

[2] "AFFO" refers to adjusted funds from operations, a measure of a REIT's financial performance.  In other words, the RF Post alleged that Farmland was overstating its cash flow.

Company Did Not Make Loans to Related Parties;" "3. The Company Did Not Fail to Properly
Disclose the Financial Impact of the Loan Program;" "4. FPI Charges Appropriate Rents For Our
Properties;" "5. FPI Has Not Intentionally Overpaid For Acquisitions;" "6. No Director or
Officer Has Left the Company, Nor Has Any Auditor Been Dismissed, Due to a Dispute With
the Company;" "7. Our Same-Property Rent Disclosures Are Appropriately Calculated and
Materially Accurate;" and "8. Paul Pittman Has Never Pledged Any Shares." (Ex. 5 (July 17
Rebuttal).)

On June 21, 2021, the RF Post's author, Quinton Mathews, retracted the RF Post and
admitted he had published it as part of a coordinated effort to drive down Farmland's stock price,
funded by a short-selling hedge fund, Sabrepoint Capital. (Ex. 9 at 1.) Mathews explained that,
for several years, Sabrepoint paid him to publish negative articles on Seeking Alpha about
companies it was shorting. (*Id.*) Sabrepoint paid Mathews more than $100,000 in 2018 alone.
(*Id.*) In May 2018, Sabrepoint contacted Mr. Mathews, told him that it was shorting Farmland
stock, and directed him to "research" Farmland. (*Id.*) Sabrepoint said it would not short
Farmland more without a "catalyst" to move the stock. (Ex. 6 (SABREPOINT000132).) After
Sabrepoint contacted him, Mathews shorted the stock himself by purchasing put options and
advised others to do so, as well. (Ex. 9 at 1.) Mathews then drafted the RF Post with
Sabrepoint's input. (*Id.*) Mathews now admits that the RF Post "contained inaccuracies and
false allegations" and that "many of the key statements in [the RF Post] were incorrect." (*Id.*)
Mathews also admits that he "profited from [his] short position in FPI when [the RF Post] led to

the Company's stock [price] fall[ing]."[3]  (*Id.*)  After Mathews retracted his false allegations, *Seeking Alpha* "blocked" him from the website and deleted the RF Post "due to the intentional inclusion of material factual inaccuracies in submitted content."  (Ex. 11.)

### B.     Mr. Edwards' Loss Causation and Damages Report

Attempting to meet his burden to prove loss causation, Plaintiff offers the opinion of Gregg Edwards.[4]  Mr. Edwards' loss causation analysis begins with an "event study" of the movement in Farmland's stock price following the RF Post's publication on July 11, 2018.

As Magistrate Judge Wang succinctly explained:

> "An event study (i.e., regression analysis) evaluates a company's stock price movement following the release of new information. To isolate the meaningful price movements, an expert conducts a regression analysis whereby the company's price movement is compared to the price movement in the overall market and an index of other companies in the relevant industry. This analysis then predicts the 'expected return' and compares it with the 'actual return' (i.e., the actual price movement of the company's stock).  The difference between the expected and actual returns yields the 'abnormal return,' which is considered company-specific movement."

*Brokop v. Farmland Partners, Inc.*, 2021 WL 4916240, *15 (D. Colo. Jul. 23, 2021).

Mr. Edwards' event study found an "abnormal" or company-specific price decline of $3.35 on July 11, 2018 and he concluded that the market's reaction to the RF Post was the "predominate" cause of that decline.  (Ex. 7 (Edwards Report) ¶¶ 80, 83.)  But Edwards concedes that his event study on July 11 cannot disaggregate the portion of that decline, if any, attributable to the purported revelation of the alleged fraud from the portion attributable to the RF Post's other, non-fraud-related (i.e., confounding) allegations:

---

[3] Mathews agreed to pay Farmland multiples of the profits he made from his trading.  (Ex. 12 (June 21, 2021 Farmland Press Release).
[4] Mr. Edwards has not previously provided an expert report on damages and loss causation in a securities class action case in the United States.  (Ex. 1 (Edwards Dep. Tr.) at 83:22-84:1.)

Q:    So in your view the Seeking Alpha report contains both allegations that economically correspond with the alleged misrepresentations and omissions and confounding allegations that were unrelated to the alleged misrepresentations and omissions, correct?

A:    That's correct, yes.

Q:    And the entire stock drop on July 11th can be attributed to the effect of all of those disclosures, correct, some portion in your view of the stock drop on July 11th can be attributed to the related-party allegations and some portion of it could be attributed to confounding allegations that were unrelated to the alleged misrepresentations and omissions, correct?

A:    That is -- that is true.  Some would be the confounding allegations, some would be the information, that's true.

Q:    So just by looking at the July 11th Seeking Alpha report and the stock drop on July 11 you can't determine how -- what portion of that stock drop was attributable to which allegations in the Seeking Alpha report?

     [Objection]

A:    That is -- that is true.  Looking at that stock price decline and only that stock price decline you cannot, that's true.

(Ex. 1 (Edwards Dep. Tr.) at 14:13-15:25.)

To attempt to disaggregate the effect of the alleged fraud-related disclosures and the effect of the confounding allegations—as required to prove loss causation—Mr. Edwards conducted additional event studies of the movement in Farmland's stock price on selected dates when Farmland and others rebutted the RF Post.  Mr. Edwards found company-specific stock price increases following rebuttals on July 12, July 17, and July 18, 2018.  (Ex. 7 (Edwards Report) at ¶¶ 87, 102, 113.)  He then assumed that the stock price increased on those days in response to the rebuttals because the market concluded that the confounding allegations were false.  (*Id.* at ¶¶ 87-120.)  Thus, Mr. Edwards reasons, the amount of the stock price increases on July 12, July 17, and July 18, 2018 represents the reversal of the stock drop caused by the

confounding allegations.  After subtracting that amount from the July 11, 2018 stock drop, Mr.

Edwards concludes that the remaining losses on July 11 were caused by the revelation of the

alleged fraud.  This method for disaggregating fraud and non-fraud factors is speculative,

unreliable, unsupported by the facts and, as a result, inadmissible.

## LEGAL STANDARD

Rule 702 imposes on the district court a gatekeeper function to "ensure that any and all

scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell*

*Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  "In performing this gatekeeper role, the judge

must assess the reasoning and methodology underlying the expert's opinion, then determine

whether it is scientifically valid and applicable to a particular set of facts."  *In re Williams Sec.*

*Litig.*, 558 F.3d 1130, 1137 (10th Cir. 2009) (citations omitted).  If the Court determines that

proffered expert evidence is inadmissible, then summary judgment must be determined without

considering that evidence.  *See Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999)

("[W]e believe the district court did not abuse its discretion by determining that Plaintiffs'

proffered expert testimony was inadmissible.  We further conclude that without the benefit of

their experts, Plaintiffs cannot prove causation.  Accordingly, the district court correctly granted

Defendant's motion for summary judgment.").

The Court's gatekeeper function "looms large in securities fraud cases, where complex

event studies are often the only evidence used to establish reliance and loss causation."

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d

181, 187 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014) ("*CSFB*").

## ARGUMENT

I.    **TO SHOW LOSS CAUSATION AND DAMAGES, EDWARDS MUST DISENTANGLE THE EFFECT OF THE ALLEGED FRAUD FROM OTHER FACTORS AFFECTING THE STOCK PRICE**

"The securities laws are not meant to 'provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'"  *In re Williams*, 558 F. 3d at 1137 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).  Under *Dura*, securities fraud plaintiffs "bear the burden of showing that their losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price."  *In re Williams*, 558 F. 3d at 1137.

To be admissible under *Daubert* and Rule 702, an expert's loss causation analysis must "reliably link the class's losses to the revelation of the alleged misrepresentations, as *Dura* requires."  *Id*.  To do so, the analysis must account for "market events for which Defendants cannot be held responsible" and "eliminate that portion of the price decline . . . [that] is unrelated to the alleged wrong."  *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1016 (C.D. Cal. 2003), *aff'd sub nom Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005).

"An event study that fails to disaggregate the effects of confounding factors . . . misleadingly suggests to the jury that a sophisticated statistical analysis proves the impact of defendants' alleged fraud on a stock's price when, in fact, the movement could very well have been caused by other information . . . ."  *CSFB*, 853 F. Supp. 2d at 190.  For this reason, courts in the Tenth Circuit and elsewhere have repeatedly excluded loss causation opinions that fail to

disaggregate the effects of confounding factors.  *See In re Williams*, 558 F.3d at 1137-43.[5]

## II.    EDWARDS FAILS TO LINK THE ALLEGED LOSSES TO THE SUPPOSED FRAUD

### A.    Edwards' Method for Disaggregating Confounding Allegations Is Unreliable

Mr. Edwards claims to "disaggregate" the confounding information by simply assuming that the total amount of the company-specific stock price increases on July 12, 17, and 18 represents the total amount of the earlier stock drop attributable to the confounding information. Defendants are unaware of any court approving such an approach.  And for good reason.  Mr. Edwards' novel "method" is illogical, unreliable, and unsupported.

#### 1.    Edwards' Event Studies Fail to Disaggregate the Impact of the Confounding Allegations

Here, "confounding factors pervade [Mr. Edwards'] event study."  *CSFB*, 853 F. Supp. 2d at 191.  As discussed above, Mr. Edwards admits that by looking solely at the RF Post and the July 11 stock drop, he cannot determine what portion of the stock drop is attributable to which allegations in the RF Post.  *Supra* at 6-7 (citing Ex. 1 (Edwards Dep. Tr.) at 14:13-15:25.)

Edwards' event studies of Farmland's stock price movement in response to rebuttals in the days following the RF Post cannot solve this problem because those rebuttals responded to <u>all</u> of the RF Post's allegations, including <u>both</u> the confounding allegations <u>and</u> the supposedly fraud-related allegation.  Just as Mr. Edwards admits that his July 11 event study does not

---

[5] *See also CSFB*, 853 F. Supp. 2d at 181 (loss causation expert's "failure to isolate the effect of defendants' alleged fraud from other . . . company-specific news reported on event days confounds his event study and renders it unreliable"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010) (excluding damages opinion where expert "fails to separate the loss caused by the disclosure of corrective information …from loss caused by the disclosure of other company-specific information"); *In re Omnicom*, 541 F. Supp. 2d at 553–54 (excluding loss causation opinion because expert could not "demonstrate that the market reacted negatively to the disclosures, rather than to other information simultaneously released to the market").

differentiate between the effects of different information released on that day, he admits that his event study analysis of Farmland's stock price on July 12, 17, and 18 does not distinguish price movement relating to rebuttals of confounding allegations and price movement related to the alleged fraud:

> Q:    [O]n each of those days the company did in fact issue rebuttals that included rebuttals of some portions at least of the related-party loan allegations?
>
> A:    Sure.  It described why it believes it wasn't or those two individuals were not related parties.
>
> Q:    ***And your analysis, you know, it cannot tell one way or another whether the price increase or any portion of it was associated with the rebuttals of the related party allegations versus the rebuttals of the confounding allegations, correct?***
>
> A:    ***That's correct. . . .***
>
> Q:    So in fact, this finding does not in any way separate or disaggregate the effect of the related-party allegations versus the confounding allegations?
>
> [Objection]
>
> A:    Does not in any way. I mean I think I have answered this plenty of times but yes, there's a possibility that the stock price increases on the 12th, the 17th and I believe the 18th could include rebuttals by the company that Niebur and Hough were, in fact, related parties. So yes, I mean I have given you that quite a few times already.

(Ex. 1 (Edwards Dep. Tr.) at 272:2-273:11 (emphasis added).)

This admission—that Mr. Edwards does not disaggregate the effect of the related-party allegations versus the confounding allegations in either the original July 11 event study or the subsequent event studies—renders his analysis unreliable and inadmissible. *CSFB*, 853 F. Supp. 2d at 190 ("An event study that fails to disaggregate the effects of confounding factors must be excluded . . . .") (citing *In re Williams*, 558 F.3d at 1142).

11

Mr. Edwards' only response is to claim that his analysis, while imprecise, is "conservative."  Mr. Edwards says that he did not "parse out any portion of the stock price increase attributable to the rebuttal of confounding allegations" because he made "a conscious decision to make a conservative assumption."  (Ex. 1 (Edwards Dep. Tr.) at 273:25-274:7.)  But Mr. Edwards' claim that his "opinion is conservative does not make it scientific" or reliable under *Daubert*.  *Stokes v. John Deere Seeding Group*, 2014 WL 675820, at *4 (C.D. Ill. Feb. 21, 2014).[6]  Regardless whether he considers this analysis "conservative," Mr. Edwards admits that he does not distinguish between the effects of the allegedly fraud-related allegations and the effects of the confounding allegations:

> **Q:**    So you are making a conservative assumption but you, in fact, do you - - do you believe that it's likely that some portion of that price movement was related to the rebuttal of the transactions?
>
> **A:**    Quite possibly. Quite possibly.
>
> **Q:**    *And your methodology does not, there is no way for your methodology to separate that out?*
>
> **A:**    *I struggle when you say no way. I'm sure if I sat down and thought about it I might be able to --*
>
> **Q:**    Let me withdraw that question. That's fine. *You have not done that, you have not sat down and separated those affects?*
>
> **A:**    *I have not.*

(Ex. 1 (Edwards Dep. Tr.) at 274:8-275:3 (emphasis added).)

---

[6] *See also  Kingsbury v. U.S. Greenfiber, LLC*, No. 08-CV-00151-DSF, 2013 WL 7018657, at *2 (C.D. Cal. Nov. 5, 2013) (excluding "conservative" calculations without basis on a "reliable foundation"); *Ayers v. Robinson*, 887 F. Supp. 1049 (N.D. Ill. 1995) ("Someone who states on the basis of a dull pain in his right knee that he thinks it is going to rain less than .1 inch expresses a conservative, but surely an unscientific, opinion.").

Mr. Edwards' decision to attribute all of the stock price movement on July 12, 17, and 18 to the rebuttal of confounding allegations without any reliable basis for doing so can hardly be called "conservative." The Court should see Mr. Edwards' claimed conservatism for what it is: a concession that he cannot reliably tie the alleged losses to the claimed fraud, as *Dura* requires. *See e.g.*, *CSFB*, 853 F. Supp. 2d at 191 (finding event study unreliable where "many event days are hopelessly confounded" and expert "made unreasonable judgments about which factors likely caused stock price movement on event days.").

In short, Mr. Edwards does not "disaggregate" the various factors involved in Farmland's stock price decline at all. He simply observes that Farmland's stock price fell $3.35 in response to the RF Post, partially recovered by $1.44 in response to Farmland's rebuttals, and then speculates that the remaining $1.91 of the July 11 price decline should be attributable to the alleged fraud. This is not a reliable expert loss causation and damages analysis.

## 2. Edwards' Method Is Unreliable Because It Depends on An Unsupported Assumption

Mr. Edwards assumes that the effects of the confounding allegations had completely dissipated by July 18 and, thus, that the portion of the July 11 stock drop remaining after July 18 is entirely attributable to the supposedly fraud-related allegations. In effect, Mr. Edwards' analysis assumes that the market fully believed the rebuttals of the confounding allegations— and, thus, fully disbelieved the confounding allegations—such that the stock price after July 18 no longer reflected any negative effects from the confounding allegations. But Mr. Edwards does not employ any reliable or well-accepted method to support this assumption. And it is nonsensical to assume that 100% of the market would fully credit the rebuttals of a company just accused of all sorts of "financial shenanigans" and making up its earnings (among other things).

Mr. Edwards' assumption that the market fully believed the rebuttals is not only unsupported and unreasonable, it squarely contradicts Plaintiff's own allegations.

Among the confounding allegations Mr. Edwards identifies is the RF Post's allegation that Farmland's decision to change auditors and the departure of a handful of Company directors and an officer were suspicious and indicative of wrongdoing. (Ex. 7 (Edwards Report) ¶ 69(g).) Mr. Edwards asserts that, by July 18, 2018, this confounding allegation was fully rebutted, the market no longer believed it, and any negative effect the allegation may have had on the stock price had dissipated entirely. According to Mr. Edwards, "by July 18th . . . the market knew that these departures, that the change in auditors . . . were not ominous or suspicious or suggestive of any wrongdoing and so any negative impact of these allegations was gone by July 18" and "by July 18th . . . there was not a significant number of people who believed that there was anything suspicious or nefarious about these resignations or about the change in auditor." (Ex. 1 (Edwards Dep. Tr.) at 256:8-257:21; 259:6-16.)

But after July 18, 2018, Plaintiff (and his predecessor plaintiffs) alleged in each of the complaints filed in this action that the change in auditors and the executive resignations were "suspicious." For example, in the operative Second Amended Complaint filed in December 2020, Plaintiff alleged that:

> "[A]round the same time that FPI made a $5.25 million loan to Hough . . . four of FPI's directors and its President resigned. In March 2018, FPI also inexplicably switched auditors. This spate of resignations and change in auditors – beginning so close to FPI's January 2018 $5.25 million loan to Hough – suggests that FPI directors and its auditor were uncomfortable with FPI's undisclosed related party dealings."

(SAC ¶ 15.) Indeed, the Court relied on these very allegations in denying Defendants' motion to dismiss. (ECF No. 58 at 13-14.) Having alleged that the director departures and change in

14

auditor were "suspicious" and supported an inference of scienter (and having relied on that allegation to survive a motion to dismiss), Plaintiff cannot reasonably offer an expert analysis that assumes the "market knew that these departures, that the change in auditors . . . were not ominous or suspicious or suggestive of any wrongdoing."[7]

Mr. Edwards' flawed assumption that by July 18, 2018 the market fully believed all rebuttals of confounding allegations requires exclusion of his damages opinion as unreliable. Suppose, for example, that $1.00 of the $3.35 price drop was attributable to the Board Member Departures/PWC Dismissal Allegations. And suppose, as Plaintiff's own complaint evidences, that the Company's rebuttal of the Board Member Departures/PWC Dismissal Allegations was not fully believed and only resulted in a stock price increase of $.25 in the days that followed. In this scenario, Mr. Edwards' methodology would incorrectly assume that a loss of $.75 that is actually attributable to the Board Member Departures/PWC Dismissal Allegations was caused by the related party allegations alone.

**B.    Edwards Fails to Disaggregate All Confounding Factors**

The Court should exclude Mr. Edwards' opinion for a second, independent reason. Mr. Edwards' flawed "method" for disaggregating confounding factors does not even attempt to disaggregate the effects of two key confounding factors—the round-tripping allegations and the impact of the manipulative trading scheme. This failure renders his opinion unreliable. *See In re Omnicom*, 541 F. Supp. 2d at 554 ("Because the law requires the disaggregation of confounding

---

[7] Plaintiff cannot have it both ways. Either reasonable market participants still believed the RF Post's "Board Member Departures/PWC Dismissal Allegations" after July 18, 2018 (in which case Mr. Edwards' analysis must be rejected as flawed and unreliable) or Mr. Edwards is correct that the "market knew that these departures, that the change in auditors . . . were not ominous or suspicious or suggestive of any wrongdoing" (in which case Plaintiff's counsel repeatedly signed pleadings without a good faith basis, in violation of Rule 11).

factors, disaggregating only *some* of them cannot suffice to establish that the alleged

misrepresentations actually caused Plaintiffs' loss.").

### 1.    Edwards Fails to Disaggregate the "Round-Tripping" Allegations

Mr. Edwards admits he did not even attempt to disaggregate the effect of the confounding

round-tripping allegations.  Specifically, the RF Post alleged that because Farmland was round-

tripping cash paid by tenants, up to 310% of Farmland's 2017 earnings could be "made up."

(Ex. 2 (RF Post) at 1.)  Plaintiff does not allege in the Complaint that Farmland was round-

tripping rent or that its revenue was overstated, as Mr. Edwards conceded.  (Ex. 1 (Edwards Dep.

Tr.) at 238:7-13 ("Q. So the plaintiffs are not alleging that there was round-tripping going on,

correct? A. That's correct. Q. They are not alleging that the revenue was overstated, correct? A.

That's correct.").)  Indeed, Plaintiff's counsel has said that the round-tripping allegations

"[o]bviously . . . have nothing to do with our case." (Ex. 8 (Duarte-Silva Dep. Tr.) at 97:17-22)

And Quinton Matthews (Rota Fortunae) has now himself admitted "the evidence [he has] seen

does not support" his allegation of round-tripping.  (Ex. 9 at 3.)

But Mr. Edwards' report does not account for the round-tripping allegation as a

confounding allegation and, as a result, Edwards does not even attempt to disaggregate the

decline in the stock price attributable to the false round-tripping allegation.  (Ex. 7 (Edwards

Report) ¶ 68 (noting round-trip allegations) and ¶ 69 (defining confounding allegations but not

including the round-trip allegations in that definition).)

Mr. Edwards confirmed during his deposition that his $1.91 per share calculation of

inflation included harm caused by the RF Post's allegation that Farmland was round-tripping

through its Loan Program and overstating revenue. (Ex. 1 (Edwards Dep. Tr.) at 118:8-119:4; 237:11-238:6.)

There is every reason to think that the confounding allegations of round-tripping and artificial earnings inflation mattered to investors. Defense expert Dr. Duarte-Silva explained that "[i]t is well documented and reasonable that allegations of financial misstatements (such as the conduct alleged in the round-tripping allegations . . .) have large negative effects on stock prices." (Ex. 3 (Duarte-Silva Report) ¶ 70 (citing Z. Palmrose, V. Richardson, S. Scholz, Determinants of market reactions to restatement announcements, Journal of Accounting and Economics, 2004).) Thus, a reliable loss causation analysis must disentangle the effect of the "round-tripping" allegations. And Mr. Edwards does not even purport to do so.

Accordingly, Mr. Edwards' failure to disaggregate the round-tripping allegations alone compels exclusion of his opinion. *See In re Williams*, 558 F.3d at 1142-43; *In re Omnicom*, 541 F. Supp. 2d at 554 ("disaggregating only some of [the confounding factors] cannot suffice to establish" loss causation).

### 2.    Edwards Fails to Disaggregate the Effect of Manipulative Trading

Mr. Edwards' method is separately unreliable because he admits he did not attempt to disaggregate the impact of the manipulative trading conducted as part of the short-and-distort attack, which contributed to the stock price decline on July 11, 2018. Defendants' expert, Prof. Jonathan Brogaard, performed a detailed analysis of the trading by Mathews and Sabrepoint (and some of Mathews' other clients) as part of their short-and-distort attack. (Ex. 10 (Brogaard Report) ¶¶ 4, 12, 42-45, 109-119, 154-60.) Specifically, the Brogaard Report explains how, as part of the short-and-distort attack, Sabrepoint acquired short-dated put options, knowing that

17

this would cause market mechanics like "delta hedging" to create a "feedback effect, creating a 'powder keg' scenario in which an initial price swing gets amplified." (*Id.* at ¶¶ 12, 42-45, 154-160.) Brogaard opined that this "powder keg" effect likely caused the price to fall even further than it would have otherwise from the RF Post. (*Id.* ¶¶ 154-160.)

Notably, Mr. Edwards agrees with Professor Brogaard that manipulative trading activity likely caused some of the July 11 stock price decline. Mr. Edwards testified, "So we had the short positions, we had the option positions – like your expert Professor Brogaard explained, that could have contributed to the stock price decline on the 11th." (Ex. 1 (Edwards Dep. Tr.) at 19:20-25.) Despite acknowledging the likely effect of the manipulative trading activity, however, Mr. Edwards' Report never addresses this confounding factor in his analysis nor does he attempt to disaggregate the portion of the stock price decline attributable to the manipulative trading's "powder keg" effect. Mr. Edwards' failure to disaggregate this confounding factor likewise mandates exclusion of his opinion as unreliable. *See In re Williams*, 558 F.3d at 1142-43; *In re Omnicom*, 541 F. Supp. 2d at 554.

## CONCLUSION

The Court should exclude Gregg Edwards' unreliable loss causation and damages opinion.

Dated:  November 16, 2021

Respectfully submitted,

MORRISON & FOERSTER LLP

/s/ James J. Beha II
James J. Beha II
Jocelyn E. Greer
250 West 55th Street
New York, NY 10019-9601
Telephone:  212.468.8000
Facsimile:  212.468.7900
Email: JBeha@mofo.com
        JGreer@mofo.com

Nicole K. Serfoss
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
Telephone:  303.592.1500
Facsimile:  303.592.1510
Email: NSerfoss@mofo.com

*Attorneys for Defendants*

19

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November 2021, I caused the foregoing to be
electronically filed with the Clerk of the Court using the CM/ECF system, which will send
electronic notification of such filing to the following email addresses:

jeff@jberenslaw.com
lhasson@bernlieb.com
rusty@shumanlawfirm.com
jake@blockesq.com
seidman@bernlieb.com

_/s/ James J. Beha II_