**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-02104-DME-NYW

DON BROKOP,
as trustee of the Brokop Living Trust,
and on behalf of all others similarly situated,

Plaintiff,

v.

FARMLAND PARTNERS INC.,
PAUL A PITTMAN, and
LUCA FABBRI,

Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(Doc. 221)**

---

This is a securities fraud class action brought against Farmland Partners, Inc. ("Farmland"), along with its Chief Executive Officer Paul Pittman and Chief Financial Officer Luca Fabbri (collectively, "Defendants"). Don Brokop ("Plaintiff") represents the Certified Class and alleges that Defendants violated securities laws and regulations by making materially false and misleading statements regarding Farmland's related party transactions, causing financial losses for Farmland investors. Discovery has concluded in this long-running case, and now before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. 220) and Defendants' Motion for Summary Judgment (Doc.

221). For the reasons explained herein, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Partial Summary Judgment is DENIED as moot.

## BACKGROUND

### I. Factual Background

#### A. Farmland's Formation

Farmland is a Denver-based real estate investment trust that makes money primarily by acquiring farmland and leasing it to tenant-farmers. Farmland began as an outgrowth of Pittman Hough Farms, a 2011 combination of Mr. Pittman's farming operations at Astoria Farms and Jesse Hough's farming operations at Hough Farms. Mr. Hough is a central figure in this case, as he and another individual, Ryan Niebur, are the alleged related parties to whom Farmland lent money without proper disclosures.

In April 2014, Farmland launched an initial public offering ("IPO") through which it acquired most of the land-holdings of Astoria Farms and Hough Farms and then leased the properties back to the two businesses. Farmland merely owned and leased the land; the actual operations of the farms were separate and left to the tenants. In other words, Farmland owned the land on which Astoria Farms and Hough Farms operated, but the two farms still ran as independent businesses that were merely tenants of Farmland. After the IPO, Farmland was managed by Mr. Pittman and Mr. Fabbri. Mr. Hough managed the independent farming operations of Astoria Farms and Hough Farms.

Mr. Pittman retained 75% ownership of Pittman Hough Farms, however, which in turn owned the businesses of Astoria Farms and Hough Farms.[1] That remained the case until December 31, 2015, when a Reorganization Agreement reached by Mr. Hough and Mr. Pittman took effect. The Reorganization Agreement transferred 100% ownership of Pittman Hough Farms' businesses (Astoria Farms, Hough Farms, and a third farm called American Agriculture) to Mr. Hough and the Hough family. The result was that, while Mr. Pittman still owned 75% of Pittman Hough Farms as an entity, neither he nor Pittman Hough Farms legally owned any interest in the separate entities of Astoria Farms or Hough Farms by 2016.

**B. Jesse Hough's Role**

At the time of the 2014 IPO, Astoria Farms and Hough Farms—the properties overseen by Mr. Hough—accounted for 84% of Farmland's business. Farmland's IPO Prospectus noted Farmland's "dependence" on Mr. Hough and stated that losing him "could have a material adverse effect on our ability to implement our business strategy and to achieve our investment objectives." (Doc. 220 at 4.) Within approximately three months of the IPO, however, Farmland had acquired more land so that Astoria Farms and Hough Farms made up only 26% of its leased acres. That number continued to decrease over time, dropping to 7.8% by the end of 2015 and 4% by the end of 2017.

After the April 2014 IPO, Mr. Hough was also employed by Farmland through a Consulting Agreement, which stated that he would "consult with and advise the

[1] Mr. Hough and his family owned the remaining 25% of Pittman Hough Farms.

Company on matters and/or perform services relating to business strategies and related matters, including asset underwriting, asset acquisitions, and accounting matters, as well as other matters reasonably requested of Consultant by the Company during the Consulting Term." (Id.) These contract terms did not change until April 2018, when Farmland terminated Mr. Hough's Consulting Agreement. After the IPO, Mr. Hough's consultant work typically involved "answer[ing] questions to the accounting department," namely sharing his "agriculture knowledge" with the accountants to help with their purchase price allocations for new farmland. (Doc. 221-19 at 11.) He also occasionally participated in discussions about business strategies and asset acquisition opportunities, though Mr. Pittman had the final say on such matters. As Farmland added more employees, Mr. Hough's work as a consultant decreased. Specifically, his role diminished after Wade Harrison, Eric Sarff, and Ryan Niebur joined Farmland as farm managers, who were all hired by the end of 2015.

### C. Ryan Niebur's Role

In June 2014, Mr. Niebur became a tenant of Farmland when the company purchased land Mr. Niebur had been leasing from the prior owner. In September 2015, Mr. Pittman hired him as the director of acquisitions and farm management for the Western Plains & Mountain States. Mr. Niebur's duties involved managing and serving as a point-of-contact for Farmland's tenants in the region, handling day-to-day matters such as leases and repairs. He would also find and investigate properties for sale in the region, and then present them to Mr. Pittman for a decision on whether to pursue a purchase of those properties. Mr. Niebur reported to Mr. Harrison, who was the vice

president of acquisitions and farm management at that time. Mr. Niebur's role did not change until his resignation from Farmland in December 2017.

### D. The Loan Program

In August 2015, Farmland announced its Loan Program, through which it would make short-term loans to "third-party farmers," applying the same due diligence to loan candidates as it did to potential farm acquisitions and potential farm tenants.[2] (Doc. 220 at 5.) Through the end of 2018, Farmland made eight loans to farmers through the Loan Program, lending approximately $19.1 million in total. Of those eight loans, three went to Mr. Hough and two went to Mr. Niebur. These five loans are the transactions at issue in this case.

- On October 13, 2015,[3] Farmland loaned Mr. Niebur $980,000 at a 7% interest rate. The loan-to-value ratio ("LTV") of this loan was 82.3% after adjustments.[4]
- In March 2017, Farmland restructured its 2015 loan to Mr. Niebur by purchasing two of his properties and then leasing those properties back to Mr. Niebur. Because Mr. Niebur retained an option to buy back the properties at a higher price, this transaction was disclosed as a $2.194 million financing. Mr. Niebur had about $240,000 left to pay back from his original loan (at an 8% interest rate) as of this restructuring.

---

[2] It is unclear what "third-party" meant or was intended to mean in this context. Mr. Pittman testified that the term includes everybody but Farmland itself, but Farmland's former in-house accountant testified that the term includes everybody but Farmland and Farmland's related parties. Farmland's financial filings indicated that it loaned money to both tenants and non-tenants, which is accurate. Regardless, whether certain tenant loan recipients were related parties (rather than third parties) is the central question in this case.

[3] This loan occurred before the start date of the Class Period, but it is relevant to the March 2017 transaction with Mr. Niebur that falls within the Class Period.

[4] LTV is a key metric for measuring loan risk, with a high LTV meaning higher risk. According to Defendants' expert, an LTV is considered high if it is 70% or above. The first loan made through Farmland's Loan Program had an LTV of 50%.

- In July 2017, Farmland loaned Mr. Hough and a company called PHS Holdings $100,000 at a 7% interest rate.
- In August 2017, Farmland loaned Mr. Hough and Hough Farms $669,000.
- In January 2018, Farmland loaned Mr. Hough, Pine Ridge Holdings, and Siffring Farms, Inc., $5.25 million at a 7% interest rate plus "bonus interest" between 1-3%.

None of these loans were disclosed as "related party transactions,"[5] and Farmland's quarterly filings continued to state that the Loan Program involved only "third-party farmers." (Doc. 220 at 12.)

On July 11, 2018, an individual using the pseudonym Rota Fortunae published a report ("the RF Report" or "the Report") on the investing website Seeking Alpha titled "Farmland Partners: Loans to Related-Party Tenants Introduce Significant Risk of Insolvency – Shares Uninventable." (Doc. 220 at 13.) The RF Report stated that Farmland was using the Loan Program "to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to" the company, "310% of 2017 earnings could be made up," and Farmland had lost board members and dismissed PwC as its auditor as a result of concerns about the related-party lending. (Doc. 221 at 17.) Immediately after the Report was published, Farmland stock dropped from a July 10, 2018, closing price of $8.49 to a closing price of $5.18 on July 11, 2018—a decline of almost 40%. The author of the RF Report has since admitted that several of the Report's allegations were inaccurate. The author also stated that he and his clients—particularly a

[5] Generally Accepted Accounting Principles ("GAAP"), specifically Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 850, require companies "to disclose certain significant related party transactions." ASC 850-10-10-1.

hedge fund called Sabrepoint Capital—shorted Farmland stock before the Report was published and profited off the ensuing price drop.[6]

### E. Farmland's Accounting

At all times relevant to this action, Farmland employed qualified accountants to prepare its financial statements in accordance with GAAP. From 2013 to mid-2016, Michelle Chmielewski was the company's lead accountant, and she prepared Farmland's 2014 and 2015 financial statements. Simon Dexter took over as Farmland's vice president of finance and lead accountant in mid-2015, and he prepared Farmland's 2016 and 2017 financial statements.

Ms. Chmielewski addressed the question of whether Mr. Hough was a related party under GAAP in 2015, in connection with Mr. Hough's Consulting Agreement with Farmland. Noting that Mr. Hough's role had diminished in the months after the 2014 IPO, she concluded in a memorandum that Mr. Hough was not a related party as of January 2015. Mr. Pittman and Mr. Fabbri, who had the final say on the issue, discussed it with Ms. Chmielewski and agreed that Mr. Hough was not a related party as of 2015. The accounting firm PwC also agreed with this assessment when it audited Farmland's 2015 financial statements.

Ms. Chmielewski also considered whether Mr. Niebur was a related party in 2015, in connection with the loan made to him in October 2015 under the Loan Program. She

[6] Plaintiff notes, however, that Defendants' separate lawsuit against Sabrepoint Capital arising from these facts has been dismissed twice. Also, the fact that Farmland made loans to Mr. Hough and Mr. Niebur is undisputed, so is not one of the admitted inaccuracies in the RF report.

concluded that Mr. Niebur was not a related party for purposes of GAAP disclosures. Again Mr. Pittman, Mr. Fabbri, and PwC all agreed with her assessment.

Mr. Dexter, in preparing Farmland's 2017 financial statements, also concluded that Mr. Hough and Mr. Niebur were not related parties at that time, so their 2017 loans did not need to be disclosed as related party transactions under GAAP. PwC agreed with this conclusion in its 2017 audit as well.

In 2018, the year that the last loan to Mr. Hough was made, the accounting firm Plante Moran replaced PwC as Farmland's independent auditor. In reviewing the loans and PwC's prior audits, Plante Moran also agreed that neither Mr. Hough and Mr. Niebur were related parties. It stuck to this determination even after the RF Report was published in 2018. Indeed, both Plante Moran and PwC continue to stand by their conclusions that Mr. Hough and Mr. Niebur were not and are not related parties to Farmland.

## II. Procedural History

On August 17, 2018, the original plaintiffs in this case filed a class action complaint against Defendants asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act ("the Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities Rule 10b-5, 17 C.F.R. § 240.10b-5.[7] This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

---

[7] Section 10(b) of the Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission

Since the first complaint was filed, several lead plaintiffs have withdrawn and been replaced. New lead plaintiffs filed a Second Amended Complaint on December 8, 2020, again alleging violations of the Act and Rule 10b-5 on the basis of "Defendants' knowing failure to disclose to [Farmland] investors that the Company was loaning money to related parties in violation of Generally Accepted Accounting Principles (GAAP) and Financial Accounting Standards Board (FASB) Accounting Standards." (Doc. 139 at 2.) Current Plaintiff Mr. Brokop was eventually substituted as the sole named plaintiff by order of this Court on June 7, 2021.

Defendants have repeatedly sought dismissal of this action and the Court has repeatedly denied those motions. On September 30, 2021, the Court certified the class for a Class Period beginning February 23, 2017. Discovery has now been completed, leading the parties to file the motions at issue here: a Motion for Partial Summary Judgment by Plaintiff (Doc. 220), and a Motion for Summary Judgment by Defendants (Doc. 221).[8]

---

may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 then prohibits, among other things, "any untrue statement of a material fact" or omission of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b). Section 20(a) imposes liability on persons with "control" over others who violate the Act. 15 U.S.C. § 78t(a).

[8] Two additional motions remain pending before this Court: Plaintiff's Unopposed Motion for Approval of Notice of Pendency of Class Action (Doc. 224), and Defendants' Motion to Exclude the Expert Testimony of Gregg M. Edwards (Doc. 217). The magistrate judge has made a recommendation on the former motion (Doc. 258) but not yet issued a recommendation on the latter. This Order moots both motions, however, and so the Court will not address them.

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Thom v. Bristol-Myers Squibb Co., 353 F.3d 848, 851 (10th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." Id.

The movant must make a prima facie showing of the absence of a genuine issue of material fact, and Defendants may do so "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Id. If that burden is met, the "nonmovant that would bear the burden of persuasion at trial"—here, Plaintiff—must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Id. (internal quotations omitted). Facts are to be viewed in the light most favorable to the nonmovant at the summary judgment stage. Id.

## DISCUSSION

To prevail on his § 10(b) and Rule 10b-5 claims,[9] Plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

---

[9] Plaintiff's § 20(a) claims cannot proceed without proof of an underlying violation of the Act. See City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1271 (10th Cir. 2001).

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157 (2008). Plaintiff alleged two different "material misrepresentation[s] or omission[s]" here: first Farmland's false statement that it "conduct[ed] due diligence on loan collateral the same way [it] conduct[ed] due diligence on potential farm acquisitions," and second Defendants' failure to disclose that Farmland issued loans to related parties Mr. Hough and Mr. Niebur during the Class Period. (Doc. 139 at ¶¶ 2–3, 149.)

**A. Due Diligence Statements**

Defendants have moved for summary judgment as to the claim that Defendants falsely stated that they "conduct[ed] due diligence on loan collateral the same way [they] conduct[ed] due diligence on potential farm acquisitions, and [they] screen[ed] potential borrowers the same way [they] screen[ed] potential tenants." (Doc. 139 at ¶ 89.) The Court holds that Plaintiff has failed to produce evidence from which a reasonable jury could infer this statement was a misrepresentation, justifying summary judgment for Defendants as to this claim.

Richard Keck, Farmland's Chief Operating Officer who ran the Loan Program, testified that Farmland did conduct the same due diligence on loan collateral as it did for potential farm acquisitions; both processes involved visiting farms, evaluating access to water and irrigation assets, and assessing farm values in the region, among other steps. Plaintiff argues in rebuttal that Defendants' due diligence process for Mr. Niebur's loan must have been different because his LTV was higher, and the loan therefore riskier, than

other Loan Program loans. But this extra risk reflects nothing about the due diligence process, as Farmland was undisputedly aware of it and chose to proceed anyway. Defendants did gather and evaluate the information they said they would gather about loan collateral; Plaintiff's quarrel with what Defendants did with that information is distinct from his quarrel with Defendants' statement about due diligence.

Plaintiff targets the second half of the due diligence statement separately, arguing that there is no evidence to prove that Defendants "screen[ed] potential borrowers the same way [they] screen[ed] potential tenants" (Doc. 139 at ¶ 89), thus precluding summary judgment.[10] As contravening evidence, Plaintiff points to Mr. Keck's testimony that Farmland's "experience and knowledge of a borrower would impact [the Loan Program] screening process," because a "history of dealing with them outside of a lending relationship" was probative of a potential borrower's "character, collateral, and capacity." (Doc. 253-7 at 9.) This, Plaintiff asserts, shows that borrowers were screened differently than tenants. Not so; it is merely evidence that screening under the Loan Program accounted for prior relationships. Plaintiff provides no reason to think that screening in the context of tenancy would not do the same, whereas Mr. Keck affirmatively testified that "due diligence" was the same for both.[11]

---

[10] A dearth of evidence favorable to Defendants is not enough for Plaintiff to survive summary judgment on this issue; he still must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Thom, 353 F.3d at 851 (internal quotation marks omitted).

[11] Plaintiff does not clarify what distinction can or should be drawn between screening and due diligence.

And in any event, Mr. Hough and Mr. Niebur were both Farmland tenants before they were Loan Program borrowers. Consequently, even if there was some difference in screening across the two contexts—a difference of which Plaintiff has failed to present any evidence—it would not have had any effect on the loans to Mr. Hough and Mr. Niebur, who had already been screened as tenants as well. Perhaps for this reason, Plaintiff's expert made no effort to draw any causal link between an alleged misrepresentation in the due diligence statements and the losses suffered by the Class. Plaintiff has thus failed to create a genuine dispute of fact as to the misrepresentation element and the loss causation element of his § 10(b) claim related to the due diligence statements, and Defendants' Motion for Summary Judgment is GRANTED as to this claim.

**B. Related Party Transactions**

The second basis for Plaintiff's § 10(b) claim, to which the parties devote much more discussion, is Defendants' alleged failure to disclose that Farmland issued loans to Mr. Hough and Mr. Niebur during the Class Period. Specific disclosure of the transactions would only be required under GAAP—and thus would only give rise to a § 10(b) violation—if Mr. Hough and Mr. Niebur were related parties to Farmland at the time of the loans. See ASC 850-50-1 (requiring companies to disclose details about certain "material related party transactions."). Under GAAP, related parties include those that "control or can significantly influence the management or operating policies of" a

company "to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests." ASC 850-10-05.[12]

Plaintiff has moved for summary judgment on the sole issue of whether Mr. Hough and Mr. Niebur were related parties. Defendants, meanwhile, have moved for summary judgment based on any of four distinct elements of this § 10(b) claim, arguing that (1) Farmland did not make a misrepresentation or omission because Mr. Hough and Mr. Niebur were not related parties at the time of the loans, (2) the loans to Mr. Hough and Mr. Niebur were not material in any event, (3) Defendants did not possess the required scienter as to whether Mr. Hough and Mr. Niebur were related parties, and (4) the alleged misrepresentation did not cause Plaintiff's losses. All of these elements are essential, so summary judgment in favor of Defendants on any one of them would end the case, regardless of whether summary judgment in favor of Plaintiff is appropriate on the related-party issue. As such, the Court reaches only Defendants' most clear-cut grounds for summary judgment: scienter.[13]

---

[12] "Examples of related party transactions include those between . . . [a]n entity and its principal owners, management, or members of their immediate families." ASC 850-10-05-3. "Management" includes "[p]ersons who are responsible for achieving the objectives of the entity and who have authority to establish policies and make decisions by which those objectives are to be pursued," such as board members and CEOs. ASC 850-10-20.

[13] The Court notes, however, that it has doubts about the sufficiency of Plaintiff's evidence as to the related-party and materiality issues as well. The loss causation element, meanwhile, hinges on Defendants' separate pending motion to exclude the testimony of Plaintiff's expert Gregg Edwards and so would not be an appropriate ground for summary judgment at this point.

To prove scienter, Plaintiff must present evidence showing Mr. Pittman and Mr. Fabbri knew they were misrepresenting the loans or "acted with a reckless disregard of a substantial likelihood of misleading investors." In re Zagg Inc. Sec. Litig., 797 F.3d 1194, 1206 (10th Cir. 2015) (quoting Nakkhumpun v. Taylor, 782 F.3d 1142, 1150 (10th Cir. 2015)).[14] In other words, here, Plaintiff can survive summary judgment only by presenting facts indicating that Defendants (1) knew or recklessly disregarded the fact that Mr. Hough and Mr. Niebur were related parties, and (2) knew or recklessly disregarded the likelihood that failure to disclose the related-party nature of their loans would mislead Farmland investors. "Recklessness in the context of securities fraud is a high bar," requiring "conduct that is an extreme departure from the standards of ordinary care." Id. at 1201. For the purposes of analyzing this element, the Court will assume, without deciding, that Mr. Hough and Mr. Niebur were related parties in order to assess whether Defendants were reckless in concluding the opposite at the time the loans were issued (Mr. Niebur's in 2015 and 2017, Mr. Hough's in 2017 and 2018).

Defendants assert that Mr. Pittman and Mr. Fabbri's decision not to categorize Mr. Hough and Mr. Niebur as related parties as of the dates of their loans could not have been reckless—and certainly could not have been knowing—because Mr. Pittman and Mr. Fabbri were reasonably relying on the multiple accountants and auditors who told them that Mr. Hough was not a related party as of the end of 2015 (which predated the first

---

[14] Plaintiff's scienter allegations focus on Mr. Pittman and Mr. Fabbri. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter.")

loan to Mr. Hough) and Mr. Niebur was never a related party.[15] The Court agrees. "[W]here a chief executive . . . relies in good faith on the professional judgment of the company's internal and external accounting and auditing personnel, and the plaintiffs have not put forth any evidence that he was notified or should have known that [the company's] accounting policies violated GAAP, summary judgment is warranted." In re Fed. Nat. Mortg. Ass'n Sec., Derivative, ERISA Litig., 892 F. Supp. 2d 59, 72 (D.D.C. 2012).

While Plaintiff has presented sufficient evidence that Mr. Pittman and Mr. Fabbri had the final say as to who counted as a related party under GAAP and were familiar with Mr. Hough's and Mr. Niebur's roles at Farmland, Plaintiff has not presented any evidence disputing the fact that Defendants relied on the professional judgment of qualified accountants and auditors who uniformly and consistently concluded that the loans were not related-party transactions. Instead, Plaintiff argues that this reliance was not "in good faith" because Defendants intentionally misled PwC by giving the firm

[15] Plaintiff asserts that Farmland accountants did consider Mr. Hough and Mr. Niebur related parties as late as June 2016 because Ms. Chmielewski forwarded a spreadsheet to Mr. Dexter on June 16, 2016, that listed them as related parties. This assertion mischaracterizes the meaning of the document in two ways. First, metadata shows that this document was not edited after September 2015, and Ms. Chmielewski testified that the document was from Farmland's 2015 audit—she sent it only to give newly hired Mr. Dexter an introduction to the company's accounting processes. As a result, it cannot be viewed as evidence that the internal accountants continued to categorize Mr. Hough as a related party beyond 2015. Second, Ms. Chmielewski testified that the document was a list of "individuals to be looked at and to be evaluated for a related-party nature," rather than an affirmative statement that the listed individuals were related parties. (Doc. 257-6 at 49, ¶¶ 19–20.) Thus, the spreadsheet is not itself evidence that the internal accountants considered Mr. Hough and Mr. Niebur related parties at any point.

incomplete and incorrect information about whether Mr. Hough was a related party.[16] (Doc. 253 at 32.) See Provenz v. Miller, 102 F.3d 1478, 1491 (9th Cir. 1996) ("If it is true that defendants withheld material information from their accountants, defendants will not be able to rely on their accountant's advice as proof of good faith.").

Specifically, Plaintiff shows that Defendants provided only two pages of the Reorganization Agreement between Mr. Pittman and Mr. Hough to PwC, telling PwC that it did not need the rest of the Reorganization Agreement. The pages PwC saw stated that Mr. Pittman would "not have any direct or indirect ownership interest in, or management control of, Hough Farms, Astoria Farms, Pine Ridge or American Ag" as of December 31, 2015. (Doc. 220-9 at 1.) The pages that PwC did not see divided certain other assets owned by Pittman Hough Farms between Mr. Pittman and Mr. Hough and set terms by which Mr. Pittman would continue to support Mr. Hough financially, among other things. It is uncontested that PwC did not account for this latter information in its 2015 audit of Farmland.

But PwC's related-parties assessment in connection with the 2015 audit specifically stated that its "engagement team did not need to obtain the agreement in its entirety" because the Reorganization Agreement "was between Paul Pittman and Jesse Hough as individuals, not on behalf of Farmland." (Doc. 220-50 at 3.) The additional

[16] Plaintiff offers no evidence that the accountants' assessment of Mr. Niebur's non-related-party status was based on inadequate information provided by Defendants, as the Reorganization Agreement concerns only Mr. Hough. Plaintiff also does not offer evidence suggesting that Ms. Chmielewski or Mr. Dexter, who conducted related-party inquiries separate from PwC's audit, were "misled" by Defendants when evaluating Mr. Hough's related-party status.

pages of the Reorganization Agreement do indeed reflect only arrangements between Mr. Pittman and Mr. Hough, not Farmland and Mr. Hough. And Plaintiff does not present any evidence contradicting PwC's statement that the other pages were unnecessary to evaluate Mr. Hough's related-party status with Farmland. Plaintiff merely points to testimony from Wendy McCray-Benoit, a PwC partner, declining to opine on how the missing pages may have hypothetically affected PwC's 2015 conclusions about Mr. Hough's related-party status. This understandable and defensible refusal to speculate is not enough to suggest that Defendants could not rely on PwC's opinion in good faith due to the withholding of some of the pages of the Reorganization Agreement.

Plaintiff additionally asserts that the Reorganization Agreement given to PwC included "misinformation" about Mr. Pittman's stake in Pine Ridge Holdings, which also would prevent Mr. Pittman and Mr. Fabbri from claiming "good faith" reliance on the PwC opinion. The alleged misinformation was the Agreement's statement that Mr. Pittman no longer held an ownership interest in Pine Ridge Holdings as of December 31, 2015. Plaintiff claims that this could not have been true because Mr. Pittman was listed as an officer and director of Pine Ridge in a 2018 application to transact business filed in Nebraska. But Mr. Hough explained in his deposition that this detail in the Nebraska application was an error, made because the application was filed at the "11th hour, 59th minute, 59th second." (Doc. 220-4 at 274.) He reiterated that Mr. Pittman had no ownership nor management interest in Pine Ridge in 2018. Further, Mr. Pittman said he was not involved in or aware of the Nebraska filing or other similar state filings, nor does Plaintiff claim that he knew of it. A single erroneous filing, explained as such by Mr.

Hough in sworn and unrefuted testimony and unknown to Mr. Pittman, does not create a genuine dispute about the Reorganization Agreement's express representation that Mr. Pittman ceased to own or manage Pine Ridge as of December 31, 2015. Thus, Plaintiff has failed to present evidence supporting the claim that Defendants provided "misinformation" to PwC that would preclude their claim of good-faith reliance on PwC's opinion.

In addition, Plaintiff presents no particularized evidence to rebut Defendants' good-faith reliance on the separate accounting opinions of Ms. Chmielewski and Mr. Dexter as to Mr. Hough's related-party status. There is no testimony suggesting that Ms. Chmielewski and Mr. Dexter were deprived of relevant information at any point nor suggesting that their opinions were outside the realm of reason. Plaintiff also has not produced evidence undercutting the good-faith reliance on any accountant's opinion as to the non-related-party status of Mr. Niebur, whose relationship with Farmland was thoroughly documented and evidently understood by all accountants and auditors.

Furthermore, discovery has eliminated several of the Second Amended Complaint's alleged "suspicious" facts from which the Court held that scienter could be plausibly inferred in the order denying Defendants' earlier motion to dismiss. (Doc. 58 at 14.) These suspicious facts included the resignations of five Farmland directors between August 2017 and April 2018—roughly the same timeframe that the three loans to Mr. Hough were made—and Farmland's replacement of PwC with Plante Moran as its independent auditor in March 2018. Plaintiff now concedes that no "direct evidence" of those allegations was uncovered during discovery and characterizes those allegations as

"largely extraneous," though the Court viewed them as important at the motion-to-dismiss stage. (Doc. 253 at 33.) What was uncovered in discovery was evidence that the allegations were false: the directors who quit (except for one, who died after resigning) submitted sworn declarations that their departures were unrelated to the Loan Program, and PwC and Mr. Fabbri both confirmed on the record that Plante Moran replaced PwC as auditor because PwC's fees were higher, not because of any disagreements about related party transactions or other matters.

In sum, Plaintiff has failed to present evidence genuinely disputing Defendants' good-faith reliance on the professional judgment of Ms. Chmielewski, Mr. Dexter, PwC auditors, and Plante Moran auditors, all of whom concluded that the loans to Mr. Hough and Mr. Niebur were not related party transactions that needed to be disclosed under GAAP. Consequently, construing the facts in the light most favorable to Plaintiff, no jury could reasonably find that Defendants "extreme[ly] depart[ed] from the standards of ordinary care" by believing that Mr. Hough and Mr. Niebur were not related parties. Zagg, 797 F.3d at 1201 (quoting City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1245, 1265 (10th Cir. 2001)). Because scienter of at least recklessness is an essential element of Plaintiff's § 10(b) claim as to the related party transactions, summary judgment in favor of Defendants is warranted on this claim as well.

**CONCLUSION**

Based on the foregoing, the Court GRANTS Defendants' Motion for Summary Judgment, DENIES Plaintiff's Motion for Partial Summary Judgment as MOOT, and DISMISSES the case with prejudice.[17]

DONE AND SIGNED this 5th day of April, 2022.

BY THE COURT:

*s/ David M. Ebel*

U. S. Circuit Court Judge

[17] The § 20(a) claims cannot proceed without an underlying violation of the Securities and Exchange Act. See supra note 9. Thus, because the Court has granted summary judgment to Defendants on both of Plaintiff's asserted § 10(b) violations, the § 20(a) claims are also DISMISSED with prejudice.